UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  Request from the United Kingdom
Pursuant to the Treaty Between the Government of
the United States of America and the Government
of the United Kingdom on Mutual Assistance in
Criminal Matters in the Matter of Dolours Price

M.B.D. No. 11-MC-91078

**MOTION OF TRUSTEES OF BOSTON COLLEGE TO QUASH SUBPOENAS**

Trustees of Boston College and two of its representatives have been subpoenaed to

produce highly confidential interview materials gathered as part of an oral history project that

documents the history of conflict in Northern Ireland in the last decades of the 20th Century.

Trustees of Boston College move to quash, or, in the alternative, modify the subpoenas, and set

out in this motion the grounds for their request.

**Introductory Statement.**

Trustees of Boston College, on their own behalf and on behalf of Professor Thomas E.

Hachey and Dr. Robert K. O'Neill (collectively, "Boston College"), submit this motion in order

to obtain a determination by the Court of the proper balance to strike between two important

interests.  One interest is what appears to be a foreign criminal investigation into violence that

occurred in Northern Ireland decades ago (the only information Boston College has in that regard

is from the heading and text of the subpoena, because the order of the Court authorizing the

subpoena, and whatever papers were submitted requesting that order, are sealed).  The other

interest is the protection and promotion of academic research into the causes of violence in

Northern Ireland, which relies on gathering the stories of participants who spoke about their

experiences only on the condition of confidentiality.

F.R. Crim. P. 17(c)(2) provides that "the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Through this motion, Boston College seeks the Court's direction on important issues of public policy. Boston College presents the facts and applicable law in this motion not as a typical advocate seeking to protect its own parochial concerns, but as an institution of higher education seeking appropriate resolution of conflicting interests of fundamental importance to academia and to society as a whole.

### Procedural background.

On May 5, 2011, Commissioner's Subpoenas dated May 2, 2011, directed to the John J. Burns Library at Boston College, Robert K. O'Neill, the Burns Librarian, and Boston College University Professor Thomas E. Hachey, were served on the named recipients. The subpoenas were issued pursuant to a treaty between the United Kingdom and the United States, 18 U.S.C. § 3512, and an Order of this court dated March 31, 2011. According to the subpoenas, they were issued for the purpose of assisting the United Kingdom

"regarding an alleged violation of the laws of the United Kingdom, namely, murder, contrary to Common Law; conspiracy to murder, contrary to Common Law; incitement to murder, contrary to Common Law; aggravated burglary, contrary to Section 10(1) of the Theft Act (Northern Ireland) of 1969; false imprisonment, contrary to Common Law; kidnapping, contrary to Common Law; and causing grievous bodily harm with intent to do grievous bodily harm, contrary to Section 18 of the Offenses Against the Person Act of 1861."

The subpoenas commanded production on May 26, 2011, of the following documents:

"1. The original tape recordings of any and all interviews of Brendan Hughes and Dolours Price.

"2. Any and all written documents, including but not limited to any and all transcripts, relating to any and all tape recordings of any and all interviews of Brendan Hughes and Dolours Price.

"3. Any and all written notes created in connection with any and all interviews of Brendan Hughes and Dolours Price.

"4. Any and all computer records created in connection with any and all interviews of Brendan Hughes and Dolours Price."

On May 26, 2011, Boston College produced the audio recordings, transcripts, and word processing files of the interviews of the late Brendan Hughes, because the conditions pertaining to the confidentiality of his interviews had terminated with his death. By agreement with the United States Attorney's Office, the date for Boston College to produce the other documents and materials sought in the subpoenas or otherwise respond to them was extended to June 2, 2011.

**Factual background.**

The interview materials sought by the subpoenas are part of an oral history archive collected and preserved by Boston College and constitute a unique resource for academic research: the stories told by participants in the "Troubles" in Northern Ireland from 1969 through the early 2000's. Affidavit of Robert K. O'Neill (O'Neill Affidavit), ¶ 3. Those stories were gathered as part of the Boston College sponsored "Belfast Project" by interviewers who, starting in 2001 and extending through approximately 2006, interviewed members of the Provisional Irish Republican Army, the Provisional Sinn Fein, the Ulster Volunteer Force, and other paramilitary and political organizations regarding their involvement in the "Troubles." *Id.*; Affidavit of Ed Moloney (Moloney Affidavit), ¶ 26.

1.      The purposes of the Belfast Project.

The purposes of the Belfast Project were to gather and preserve for posterity recollections that would help historians and other academicians illuminate the intricacies of the Northern Ireland conflict in studies and books, and that would advance knowledge of the nature of societal violence in general, through a better understanding of the mindset of those who played a significant part in the events in Northern Ireland. Affidavit of Thomas E. Hachey (Hachey Affidavit), ¶ 5; Moloney Affidavit, ¶¶ 3, 21-23. In addition, if and when a truth and

reconciliation process for Northern Ireland is launched by the British and Irish governments, following the model in South Africa following the end of apartheid, the trove of first-hand reports gathered and preserved by the Belfast Project may serve as a critical resource. Moloney Affidavit, ¶¶ 19-20, 24.

        2.    <u>The initiation of the Belfast Project</u>.

The Belfast Project was conceived following the 1998 Good Friday Agreement (GFA). The GFA was negotiated by the British and Irish governments, together with the major political parties of Northern Ireland including Sinn Fein, the political wing of the Irish Republican Army (IRA). The IRA was the principal group fighting to achieve the withdrawal of Britain from Northern Ireland and seeking Irish reunification and independence. Moloney Affidavit, ¶ 4.[*]

Lord Paul Bew, then a faculty member at Queens University Belfast, and a visiting scholar at Boston College, first suggested the value of preserving in an oral history the recollections of those directly involved in the Troubles. Hachey Affidavit, ¶ 2; O'Neill Affidavit, ¶ 4. Professor Bew believed that, with the dramatic changes in Northern Ireland following the GFA, it was essential to begin collecting and preserving the memories of those who had been combatants for over 20 years. Moloney Affidavit, ¶¶ 10-12. Professor Bew believed that building such a resource would have great value for future historians. Hachey Affidavit, ¶ 3.

---

[*] A more extended view of the history of the conflict in Northern Ireland is offered in the Affidavit of Ed Moloney at ¶¶ 14-18, in the event that the Court would find such background useful in addressing the issues Boston College's motion presents.

3.      The sponsorship of the Belfast Project by Boston College.

The Irish Collection at the Burns Library of Boston College has been recognized as one of the most comprehensive collections of Irish historical, political, and other materials outside of Ireland.  O'Neill Affidavit, ¶ 2.  Paul Bew had been a Burns Scholar at Boston College in the late 1990s, and was therefore familiar with the institution and its importance as a principal repository of Irish history materials in the United States.  Hachey Affidavit, ¶ 2.

These factors made Boston College the ideal sponsor for the Belfast Project and the natural host for its archive.  In fact, this year the British and Irish governments donated to Boston College highly sensitive papers regarding the GFA and its implementation, thereby confirming that both governments view Boston College as a neutral, unbiased, and secure repository for important materials relating to this history.  O'Neill Affidavit, ¶ 15; Moloney Affidavit, ¶ 24.

4.      The importance of confidentiality to the success of the Belfast Project.

It was recognized from the very start that the success of the Belfast Project would depend entirely upon the willingness of a large number of the participants to agree to talk, and to talk candidly, to interviewers for the Project.  It was equally obvious that the interviewees' willingness to participate depended on giving them assurances that their identities, and what they disclosed in the interviews, would be held in strict confidence.  O'Neill Affidavit, ¶ 11; Hachey Affidavit, ¶¶ 6-7; Affidavit of Anthony McIntyre (McIntyre Affidavit, ¶ 8).  If the participants not been promised confidentiality, their memories would not have been preserved and would have been lost upon their deaths.  O'Neill Affidavit, ¶ 12.

The reason those interviewed for the Belfast Project insisted on confidentiality was not simply their interest in not incriminating themselves or their colleagues.  In the case of former IRA members such as Dolours Price, of equal or greater importance was the danger of retaliation

from other IRA members.  The IRA imposes a code of silence akin to the concept of "omerta" in

the Mafia.  Moloney Affidavit, ¶ 28; McIntyre Affidavit, ¶ 8.  Because those who were perceived

as having violated that code were subject, under IRA rules, to punishment by death, interviewers

and interviewees who had been associated with the IRA were naturally unwilling to participate in

the Belfast Project without assurance that the interviews would be kept locked away until the

interviewees' deaths.  *Id*.

Potential interviewees for the Belfast Project were therefore assured that their identities

and the contents of their interviews would be kept confidential and not disclosed until the earlier

of their agreement to permit disclosure or their death.  McIntyre Affidavit, ¶¶ 6-7.  The person

who interviewed Dolours Price believed that there were no circumstances under which disclosure

would be required, and would not have participated in the Belfast Project if he had thought

otherwise.  *Id*., ¶ 8.  Dolours Price was expressly informed of this condition and relied upon it in

giving her interviews.  *Id*., ¶ 6.

Another interviewee, Brendan Hughes, who received the same commitment, died in

2010.  Moloney Affidavit, ¶ 26.  The interview materials of Brendan Hughes, which were also

sought by the subpoenas to Boston College, have already been produced by Boston College in

accordance with the subpoenas because the embargo on access to them ended with his death.

The assurances of confidentiality at the start and during the interview process were

subsequently documented when the interviews were concluded.  Each interviewee was given a

form to donate his or her interview materials to the Burns Library at Boston College on the

express condition that the materials would not be disclosed, absent the interviewee's permission,

until after his or her death.  O'Neill Affidavit, ¶ 6; McIntyre Affidavit, ¶ 9; Moloney Affidavit,

¶ 29.  A copy of that form signed by the late Brendan Hughes is Attachment 2 to the Affidavit of Robert K. O'Neill.  See O'Neill Affidavit, ¶ 7.

Dolours Price signed a donation agreement in the standard form used by the Belfast Project.  McIntyre Affidavit, ¶¶ 11, 15.  Her interviewer sent that form to Boston College (and, for reasons of security, did not keep a copy), but the Burns Library has been unable to locate a copy of the Price donation form.  McIntyre Affidavit, ¶ 12; O'Neill Affidavit, ¶ 8; Moloney Affidavit, ¶ 30.  Dolours Price was re-interviewed in 2010 by the former Project Director of the Belfast Project, again with the same promise of confidentiality as applied to her earlier interviews as part of the Belfast Project.  Moloney Affidavit, ¶ 35.  The materials from those interviews were sent to the Burns Library at Boston College to be part of the historical record relating to Dolours Price.  *Id*.; O'Neill Affidavit, ¶ 14.

5.     Protection of the interview materials.

Boston College has scrupulously observed the expectations of confidentiality given to those interviewed for the Belfast Project.  Interview materials are stored at the Burns Library of Boston College, in a secure area, monitored by cameras, with access controlled by a combination of keyed lock and entry of a security code.  Access is limited to select Burns staff, and the key must be signed out by staff.  O'Neill Affidavit, ¶ 9.  Only the few interviewers and academicians directly involved in the Project have been permitted to see the materials of those interviewees who have not died.  O'Neill Affidavit, ¶ 10; Hachey Affidavit, ¶ 8-9.

**Argument.**

More than a decade ago, the First Circuit held that "when a subpoena seeks divulgement of confidential information compiled by a[n] . . . academic researcher in anticipation of publication, **courts must apply a balancing test** . . . ."  *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1998) (emphasis added).

*Cusumano* established a three-part test for determining whether, and to what extent, to enforce a subpoena for the compelled disclosure of academic research materials: "[i]nitially, the . . . [party seeking the information] must make a prima facie showing that . . . [its] claim of need and relevance is not frivolous"; after that burden is met, "the burden shifts to the objector to demonstrate the basis for withholding the information"; the Court then balances the "need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan."  162 F.3d at 716 (citations omitted).

## I.     THE GOVERNMENT'S PRIMA FACIE SHOWING.

Boston College acknowledges and respects the legitimate public purpose in pursuing criminal investigations, and willingly cooperates with authorities.  In this case, Boston College has no way to know the basis for the request by authorities in the United Kingdom to obtain the Belfast Project interview materials of Dolours Price, because the papers that would shed light on the request have been sealed.  Nevertheless, Boston College stipulates, for the first part of the *Cusumano* test, that the need for such materials is not "frivolous."

At the same time, Boston College believes that the government of the United Kingdom has indicated by its actions a policy not to pursue events that occurred before the GFA peace accords, in order to put the past behind and achieve and maintain reconciliation in Northern Ireland.  The implementation of the GFA led to the disarming of the IRA and other militant groups and the granting of effective amnesty to all prisoners from paramilitary organizations. Moloney Affidavit, ¶ 7.  This effective amnesty, though controversial, was widely understood to mean that the British government was going to close this chapter of history, and not seek to pursue criminal investigations into events that occurred during the course of the Troubles.  *Id.*

The belief that prosecutorial action had ended was a significant factor in the willingness of those interviewed as part of the Belfast Project to talk candidly about the conflict. *Id.*, ¶ 8. That same belief gave assurance to those in charge of the Belfast Project that the interviewees' materials would be safe even from compulsory process in the judicial system. O'Neill Affidavit, ¶ 13.

Boston College also believes that forced disclosure of Belfast Project materials may challenge the delicate political stability that has been achieved in Northern Ireland, and threaten to enflame the sectarian grievances that have been mostly quieted since the GFA. Hachey Affidavit, ¶ 13; O'Neill Affidavit, ¶ 17.

For these reasons, Boston College requests that the Court, which has access to the reasons presented by the United Kingdom for the issuance of the subpoenas to Boston College, consider how compelling the need for the archive materials is, particularly in light of what appears, from the public information available to Boston College, to be governmental decisions made since the GFA to avoid seeking or enforcing criminal sanctions against members of paramilitary organizations that occurred in the past.

## II.   THE INTERESTS OF BOSTON COLLEGE IN WITHHOLDING THE INFORMATION REQUESTED.

The Court in *Cusumano* stated that "[a]cademicians engaged in pre-publication research should be accorded protection commensurate to that which the law provides for journalists." 162 F.3d at 714. The First Circuit described the reasons why academic research materials deserve protection as follows (162 F.3d at 714 [emphasis added]):

> "scholars . . . are information gatherers and disseminators. If their research materials were freely subject to subpoena, **their sources likely would refuse to confide in them**. As with reporters, a drying-up of sources would sharply curtail the information available to academic researchers and thus would restrict their output. Just as a journalist, stripped of sources, would write fewer, less incisive

articles, an academician, stripped of sources, would be able to provide fewer, less cogent analyses."

Given the importance of protecting and fostering academic research, "courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information." *Cusumano*, 162 F.3d at 716, quoting *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 595-96 (1st Cir. 1980).  This balance must be struck in criminal as well as civil proceedings.  *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181 (1st Cir. 1988).  See *Cusumano*, 162 F.3d at 716.

The District of Columbia Circuit has noted that there is a wide-spread recognition that the interests of scholars in defending their research materials from unwarranted discovery are legitimate and deserve weight in balancing the needs of the requesting party and the concerns of the recipient of the subpoena.  *Burka* v. *United States Department of Health and Human Services*, 87 F.3d 508, 519-21 (D.C. Cir. 1996).  In reviewing parallel issues relating to journalists, the First Circuit explained that

> "[w]hether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a "conditional," or "limited" privilege is, we think, largely a question of semantics.  The important point . . . is that courts faced with enforcing requests for the discovery of [such] materials . . . should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights."

*Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 595-96 (1st Cir. 1980) (footnotes omitted).

The issue is not whether courts recognize a formal academic privilege.  The fact is that courts in many jurisdictions acknowledge the importance of protecting the materials academic researchers gather from sources that have a reasonable expectation of confidentially.  "Federal courts interpreting the discovery rules have frequently denied or limited discovery absent claims of formal privilege, based upon reasons of public policy."  *Plough, Inc. v. National Academy of*

*Sciences*, 530 A.2d. 1152, 1157 (D.C. 1987) (citation omitted).  *See also Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1548 (11th Cir. 1985) (protection of confidential research information "does not depend upon a legal privilege").

In *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1274 (7th Cir. 1982), the Seventh Circuit considered the assertion that subpoenas seeking scholarly research materials "touch[] directly upon interests of academic freedom."  Noting the long line of precedents, including many at the level of the United States Supreme Court, that hold academic freedom to be a core First Amend-ment value, the Court concluded that "to prevail over academic freedom **the interests of government must be strong and the extent of the intrusion carefully limited**" (672 F.2d at 1275 [emphasis added]).

These concerns are particularly germane when the materials gathered in the course of academic research were provided by sources with an expectation of confidentiality.  As the Court in *Richards of Rockford, Inc.* v. *Pacific Gas & Electric Co.*, 71 F.R.D. 388, 389 (N.D. Cal. 1976), noted, "society has a profound interest in the research of its scholars, work which has the unique potential to facilitate change through knowledge."  The Court went on to acknowledge that

> "[m]uch of the raw data on which research is based simply is not made available except upon a pledge of confidentiality.  Compelled disclosure of confidential information would without question severely stifle research into questions of public policy, the very subjects in which the public interest is the greatest."

(71 F.R.D. at 389-90).  *See also United States* v. *Doe*, 460 F.2d 328, 333 (1st Cir. 1972), *cert. denied*, 411 U.S. 909 (1973) (acknowledging "an important public interest in the continued flow of information to scholars about public problems which would stop if scholars could be forced to disclose the sources of such information").

The courts' concerns about compelling the production of research materials that have been gathered with an understanding of confidentiality are founded not only on the risk of breaching that understanding with past research subjects, but also on the fact that such a breach will inevitably inhibit future research that requires such confidentiality.  In *Farnsworth* v. *Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985), the Court upheld protection of confidential patient information "obtained from a population willing to submit to in-depth questioning" out of fear that production "could seriously damage this voluntary reporting."  Similarly, in *Snyder* v. *American Motors Corp.*, 115 F.R.D. 211, 215-16 (D. Ariz. 1987), the Court quashed a subpoena to avoid what it saw as "[t]he potential for a chilling effect on research [that] appears great . . . ."  The Court in *Snyder* expressed particular concern about the impact of compelled disclosure on "members of the public who volunteer, under a promise of confidentiality, to provide information for use in such studies [citation omitted].  *See also Harris* v. *Upjohn Co.*, 115 F.R.D. 191, 192 (S.D. Ill. 1987) (protective order crafted for identities of reporting physicians in order to prevent "a deterrent on efforts to conduct research in the medical and science community").

## A.     Disclosure violates the interviewee's expectation of confidentiality.

As explained above (pp. 5-7), all of the interviews taken in the course of the Belfast Project, and specifically the interviews with Dolours Price, were premised on an express agreement of the interviewer, the interviewee, and those in charge of the Belfast Project at Boston College that the identity of the interviewees and the substance of the interviews would be kept confidential at the Burns Library at Boston College, and not disclosed until the interviewees' deaths unless the interviewees gave permission for earlier disclosure.  The promise of confidentiality was essential to win cooperation from the interviewees, because they had engaged in activities during the Troubles that put them at risk of punishment by both former

combatants and by civil authorities (see p. 5).  In addition, simply by disclosing information

about their IRA activities, former IRA members like Dolours Price knew they were violating the

code of silence that the IRA historically enforced by death (see pp. 5-6).

In *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 715 (1st Cir. 1998), the First Circuit

recognized that "confidentiality comes in varying shapes and sizes."  The Court went on to state

that "determinations of where particular disclosures fall along the continuum of confidentiality,

and related determinations anent the degree of protection that attaches to them, must take into

account the totality of the circumstances."  *Id.*  Boston College has presented in the affidavits

filed in support of this motion clear evidence that confidentiality was both an agreement with the

interviewees and a necessity for the success of the Belfast Project.  Because confidentiality was

the essential condition on which the interview materials were created in the first place, they

deserve a high degree of protection in the Court's balancing of the *Cusumano* scales.

       **B.**      **Disclosure risks serious harm to participants in the Belfast Project.**

There is a real risk of harm to participants in the Belfast Project if materials that were

given in confidence were ordered disclosed.  As explained earlier (see pp. 5-6), the IRA punished

violations of its code of silence severely, and those who still follow its practices may seek to take

vengeance against those whose involvement in the Belfast Project is now revealed and yields

new disclosures.  Moloney Affidavit, ¶ 33.  Of course, some of their involvement is already in

the public domain, either from the publication of information previously released from embargo,

from their own statements, or from the attention already engendered by the subpoenas to Boston

College.  But the disclosure of the interview materials of Dolours Price to government authorities

may only focus the potential anger.  McIntyre Affidavit, ¶ 18.

The interviewers for the Belfast Project have expressed their own apprehensions, and one

experienced what appeared to be retribution aimed at him and his family, and became aware of

death threats against him, when his involvement in the Belfast Project was first disclosed.
Hachey Affidavit, ¶ 12; Moloney Affidavit, ¶ 33; McIntyre Affidavit, ¶ 18.  The director of the
Center for Irish Programs at Boston College, who helped oversee the Belfast Project, was
recently warned by the United States Consul General in Belfast not to come to Belfast for a
previously planned celebration of Boston College's contribution to the peace process because of
reactions to the possible release of materials from the Belfast Project.  Hachey Affidavit, ¶ 12.

Most importantly, there is a direct risk to Dolours Price.  In her interviews she may have
revealed IRA information in violation of the code of silence enforced by the IRA.  Moloney
Affidavit, ¶ 33.  She now suffers from serious depression, and the person who interviewed her
for the Belfast Project asserts that she will be deeply traumatized by the forced disclosure of the
interviews she agreed to give on the promise that they would not be disclosed during her
lifetime.  McIntyre Affidavit, ¶ 17.

A 2009 decision of the High Court of Belfast, *In re: Application by D/Inspector
Galloway*, annexed to this motion as Attachment A, demonstrates the real and persistent danger
to those making disclosures about the IRA.  In that case, the Court declined to require a
journalist to produce information relevant to a horrific crime that the journalist had gathered
regarding the activities of the Real IRA.  The decision was based not only on grounds of
journalistic privilege, but also on the conclusion that there was a demonstrable risk to her life if
she was required to disclose the information.  This decision confirms that the concerns expressed
in the affidavits submitted in support of this motion are well-grounded and not speculative.

C.      **Disclosure deters individuals from cooperating in future oral history
        projects.**

When the stories people tell may expose them to risk of personal harm, criminal
prosecution, or disclosure of secrets they do not want revealed during their lifetimes, gathering

valuable oral history records depends on confidentiality.  If confidentiality can be breached by enforced disclosure through the use of a subpoena, oral history projects dealing with sensitive or controversial subjects will be difficult, if not impossible, to pursue.  O'Neill Affidavit, ¶ 16; Moloney Affidavit, ¶¶ 25, 32; McIntyre Affidavit, ¶ 17.

Oral historians are aware of, and deeply troubled by, the news that the confidential materials held by Boston College from the Belfast Project may be ordered disclosed to governmental authorities despite the fact the interviews were given with the expectation they would be kept sealed until the interviewee's death.  Hachey Affidavit, ¶¶ 10-11.  The former president of the Oral History Association has submitted an affidavit attesting to the fact that the mandated disclosure of the confidential materials sought under the subpoenas from Boston College will harm the ability of others in the field to obtain essential historical materials. Affidavit of Clifford M. Kuhn, ¶ 5.  By breaching the confidence promised to interviewees in the Belfast Project, potential interviewees in future oral history projects may decline to participate in such projects, and vital historical work will be diminished.  *Id.*, ¶¶ 6-7.

### III.    THE SUBPOENAS ARE OVERBROAD.

The subpoenas served on Boston College are overbroad in two different respects.  First, by seeking generally the tape recordings and transcripts of "any and all interviews of . . . Dolours Price," the subpoenas appear to be a classic fishing expedition, not appropriately tailored to the purposes of whatever investigation is being pursued by governmental authorities in the United Kingdom.  Because the papers that presumably describe the purposes of that investigation are sealed, Boston College is unable to present with more specificity in what ways the subpoenas overreach.  But by seeking all the interviews with Dolours Price, when those interviews covered a myriad of subjects, the subpoenas are by definition not focused on particular matters.

Boston College therefore requests either that the Court permit designated representatives of Boston College to have access to information about the purposes of the investigation so that Boston College can more particularly identify in what ways the subpoenas are overbroad, given the information that Boston College knows are in the interview materials of Dolours Price, or that the Court itself undertake such a review (in which case Boston College would submit the transcripts of the Dolours Price interviews to the Court for an *in camera* inspection).

The second respect in which the subpoenas are overbroad is that they seek from Boston College (in ¶¶ 2 and 4 of each of the subpoenas) "[a]ny and all written documents . . . relating to any and all tape recordings of any and all interviews of . . . Dolours Price" and "[a]ny and all computer records created in connection with any and all interviews of . . . Dolours Price.) While Boston College can if necessary determine and produce without undue burden and expense the recordings and transcripts of the interviews, locating all written documents that relate to them and all computer records that were created in connection with them would require a process both dubious and daunting. Determining what written documents may exist that "relate" to the interviews would require Boston College to spread a wide net to gather large volumes of materials, which would then have to be reviewed by lawyers and paraprofessionals to make subjective judgments about what does or does not constitute a relationship. Similarly, finding and reviewing all computer records "created in connection" with the interviews would impose significant burdens on Boston College, while unlikely to produce any materials of value beyond the interview recordings and transcripts themselves. Paragraphs 2 and 4 of the subpoenas should therefore be narrowed to require no more than the recordings and transcripts of the interviews themselves.

**Conclusion.**

For the reasons stated in this motion, Boston College requests that the Court quash the Commissioner's subpoenas dated May 2, 2011, directed to the Burns Library at Boston College, Professor Hachey, and Dr. O'Neill.  In the alternative, Boston College requests that the Court direct a process to narrow the subpoenas by either permitting designated representatives from Boston College access to the documents that describe the purposes of the investigation to enable them to specify with more particularity in what ways the subpoenas are overbroad, or by the Court conducting such a review *in camera*.  In any event, Boston College requests that the subpoenas be modified by striking so much of ¶¶ 2 and 4 as requires the production of materials other than the recordings and transcripts of interviews.

By its attorneys,

/s/  Jeffrey Swope

Jeffrey Swope (BBO #490760)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, Massachusetts 02199-7613
(617) 239-0100
jswope@eapdlaw.com

Dated: June 2, 2011

CERTIFICATE OF SERVICE

I hereby certify that this document sent electronically to Assistant United States Attorney John T. McNeill on June 2, 2011.

/s/ Jeffrey Swope