Neutral Citation No [2009] NICty 4

| Ref: | County 117 |

*Judgment: approved by the Court for handing down*
*(subject to editorial corrections)\**

| Delivered: | 18/06/09 |

# IN THE MATTER OF AN APPLICATION BY D/INSPECTOR JUSTYN GALLOWAY, PSNI, UNDER PARAGRAPH 5, SCHEDULE 5 OF THE TERRORISM ACT 2000

**RESPONDENT: SUZANNE BREEN**

**HIS HONOUR JUDGE BURGESS, RECORDER OF BELFAST**

**DELIVERED: 18 JUNE 2009**

## INTRODUCTION:

[1] The respondent is the highly respected northern editor of the Sunday Tribune newspaper. In her evidence to the court she described herself as an investigative journalist with a particular speciality in relation to the activities of republican paramilitary organisations in Northern Ireland.

[2] On the evening of Saturday 7 March 2009 an attack was carried out it is believed by the Real IRA, on security personnel at Massereene Barracks, Randalstown Road, Antrim. This attack resulted in the murder of Sappers Patrick Azimkar and Mark Quinsey. A number of other military personnel were wounded, as were a number of civilians who had been delivering pizzas to the Barracks.

[3] After the shootings the respondent received a mobile telephone call from a person claiming to represent the RIRA. The person gave a code word which was one established between that organisation and Ms Breen in earlier contacts in relation to her covering the activities of this organisation. She and her editor considered the information that was received, and were satisfied that it came from a reliable source. The caller stated that the Southern Antrim Brigade of the Real IRA were claiming responsibility for the gun attack on the Army Base and according to her evidence the caller continued in the following terms:

> "We make no apology for killing British soldiers while they continue to occupy Ireland. Nor do we apologise for shooting the pizza delivery men who were collaborating with the British Military Personnel by servicing them. A further statement from the Real IRA will follow".

[4] In her evidence to the court Ms Breen stated that she did not have any means of recording what was said but rather had gone straight home and written down as accurately as she could remember what the caller's words had been.

[5] A police investigation was commenced, and as part of that investigation on 23 April 2009 Ms Breen received a letter by hand from D/C/Superintendent D J Williamson

who is head of serious crime in the PSNI. The letter read as follows:

> **Sunday Tribune Articles of 15 March 2009 and 12 April 2009.**
>
> As you are aware the PSNI is conducting an investigation into the murders of Sappers Azimkar and Quinsey at Massereene Barracks, on the evening of Saturday 7 March 2009. This is a "terrorist investigation" within the meaning of Section 32 of the Terrorism Act 2000. In addition, PSNI is conducting investigations into the murder in County Donegal of Mr Dennis Donaldson on 4/4/06 in conjunction with An Garda Siochana.
>
> The Police Service of Northern Ireland seeks your co-operation with these investigations by way of provision to investigating officers of all notes, records, photographs and other material either electronic or otherwise (including computers, discs or other such media) relating to claims of responsibility and contact with paramilitary groups in connection with these investigations and the articles referred to above. Specifically, with regard to a claim of responsibility made to you on 8 March 2009 and reported by you in the Sunday Tribune on 15 March 2009 referring to the murders of soldiers at Massereene Barracks. Secondly, in relation to further claims allegedly made to you by a so called member of the "Real IRA Army Council" and reported by you in the Sunday Tribune on 12 April 2009.
>
> It will be my intention, should you fail or refuse to co-operate, to seek a Court Order under Schedule 5, Paragraph 5(1) of the Terrorism Act 2000 for the production of this material.
>
> I understand that you will have concerns regarding the contents of this letter and I will be very happy to discuss these issues with you as required.
>
> I trust you will understand that the Police Service of Northern Ireland has a clear duty to investigate these most shocking of crimes. I also very much hope that a court order will be unnecessary.
>
> If within seven days from the date of this letter you have not responded I will assume that you decline to provide any relevant material or information. I look forward to your assistance in this important matter.
>
> Yours faithfully
>
> D J Williamson".

[6] Ms Breen made it clear to the PSNI that she had no intention of handing over any material as sought by the police, and as a result this application was made by the PSNI to this court. I record, as was confirmed by Dr McGleenan, appearing on behalf of the PSNI, that the application does not relate to any investigation into the murder in County Donegal of Mr Dennis Donaldson, as was referred to in the first paragraph of the letter of 23 April 2009, but rather the draft order annexed to the application reads in the following terms:

> "Whereas it appears from the application on oath of Justyn Galloway a D/Inspector of the Police Service of Northern Ireland that records and other materials in respect of a claim of responsibility for the murders of Patrick Azimaker and Mark Quinsey, namely mobile phones, computers, related media and journalistic notes including internal memorandum, reports whether those records are in written form or kept on microfilm, magnetic or other form of mechanical or electronic data retrieval mechanism from 8 March 2009 to the date of the Order".

[7] The Production Order sought is therefore of specified journalistic material under Schedule 5 to the Terrorism Act 2000. Following a hearing which was partly in the presence of the respondent and her legal advisors (the open hearing) and partly in their absence (the closed hearing) the court was minded to grant the Order that had been sought in substantially the terms of the draft Order to which I have referred. The court also stated:

(a) That the information given to the court both in the form of information (subsequently adopted in his evidence by D/C/Superintendent Williamson as his evidence) and further oral evidence given by him, should not be disclosed to the respondent or made public on the basis that to do so would substantially and significantly compromise and impede the investigation of the PSNI into the murders.

(b) That the Order sought was for the purposes of a 'terrorist investigation' as defined in the 2000 Act; and

(c) That there were reasonable grounds for believing that the material sought is likely to be of substantial value, whether by itself or together with other material, to a terrorist investigation.

The court indicated that it would hear further argument from the respondent in respect of the application and timetabled a hearing which took place last Thursday, 11 June 2009.

Skeleton arguments were filed by the legal representatives of both parties. The court acknowledges the considerable help that these skeleton arguments and indeed the subsequent submissions made on behalf of both parties have been to the court.

**THE RELEVANT LEGISLATION**

[8] Section 37 of the 2000 Act provides that Schedule 5 shall have effect. By paragraph 5 of Schedule 5, a constable may apply to a Circuit Judge for an Order under the paragraph for the purposes of a terrorist investigation (sub-paragraph (1)). An application for an Order shall relate to particular material or material of a particular description, which consists of or includes "excluded material or special procedure material" (sub-paragraph (2)). "Excluded material" includes "journalistic material which a person holds in confidence". An Order may require a specified person to produce to a constable within a specified period for seizure or retention any material which he or she has in his or her possession, custody or power and to which

the application relates (paragraph 5(3)(a)).

[9]  Paragraph 6 provides:

> "(1) A Circuit Judge may grant an application under paragraph 5 if satisfied:
>
> (a) That the material to which the application relates consists of or includes excluded material or special procedural material;
> (b) That it does not include items subject to legal privilege, and
> (c) That the conditions in sub-paragraphs (2) and (3) are satisfied in respect of that material.
>
> (2) The first condition is that:
>
> (a) The Order is sought for the purposes of a terrorist investigation, and
> (b) There are reasonable grounds for believing that the material is likely to be of substantial value, whether by itself or together with other material, to a terrorist investigation.
>
> (3) The second condition is that there are reasonable grounds for believing that it is in the public interest that the material should be produced or that access to it should be given having regard:
>
> (a) To the benefit likely to accrue to a terrorist investigation if the material is obtained, and
> (b) To the circumstances under which the person concerned has any of the material in his possession, custody or power".

[10]  I shall refer to sub-paragraphs (2) and (3) as "the access conditions".

[11]  Paragraph 8 of Schedule 5 provides:

> "(a)  An Order under paragraph 5(a) shall not confer any right to production of, or access to, items subject to legal privilege, and
> (b)   Shall have effect notwithstanding any restriction on the disclosure of information imposed by statute or otherwise".

[12]  By Section 32, a "terrorist investigation" is defined as an investigation of:

> "(a)  The commission, preparation or instigation of acts of terrorism,
> (b)   An act which appears to have been done for the purposes of terrorism;
> (c)   The resources of a prescribed organisation;
> (d)   The possibility of making an Order under Section 3(3), or
> (e)   The commission, preparation or instigation of an offence under this Act".

[13]  For completeness I record that under paragraph 18 of Schedule 5 sub-paragraph (g) references to "a Circuit Judge" in the legislation shall, in Northern Ireland, be taken as references to a county court judge.

## THE HEARING:

[14]    Whilst the court had not made a final Order, reserving as it had the rights of the Respondent to make further representations, nevertheless the hearing progressed on the basis that the Respondent was seeking a discharge or revocation of any Order that would be contemplated by the court.  As I have stated I had determined, based on the evidence I had received in the closed hearing that the material sought by the PSNI, or so much of it as would be referred to in any final Order of the court, constituted reasonable grounds for believing that the material sought is likely to be of substantial value, whether by itself or together with other material, to a terrorist investigation.

No point was taken by Mr Harvey QC on behalf of the Respondent that this is a terrorist investigation.  Nevertheless he wished to reserve his position in relation to the conclusions reached by the court in respect to the first condition contained in paragraph 6(2)(b).

In addition to points raised in the skeleton argument in relation to this particular aspect of the application, he referred to the decision of the House of Lords handed down the previous day in the case of AF.  I record this simply to confirm that the court acknowledges the reservation of the Respondent's position in respect of this aspect of the application.

[15]    The court therefore moves to consider the evidence and representations given and made on behalf of the Respondent in relation to the second access condition contained in paragraph 6(3).  In this respect the main thrust of the evidence and representations made related to the question of confidentiality for the protection of sources by a journalist, and the rights of the Respondent under Article 2 of the European Convention on Human Rights – that is the right to life.

[16]    Before considering the issues raised by this application, I remind myself that it is the view of the PSNI that the information sought by them is likely to be of substantial value in the investigation of these murders and the attempted murders of the pizza delivery men.  Outwith the court's view on the determination of that question, it is the view of the police themselves that it has that significance.  This carries with it potential consequences which I have to bear in mind when addressing the legal submissions on the part of the Respondent.  First, these were hideous acts in which two young men lost their lives and two other men were very fortunate that they did not lose their lives.  It was a cold blooded and ruthless attack carried out with the use of considerable fire power.  It therefore is axiomatic to say that there is a strong public interest in bringing to justice those who have carried out such attacks or have been in any way involved in their planning and carrying out.  Secondly however I have to take into account the fact that the police have stated that the information in Ms Breen's possession would be of substantial value in the apprehension of such people.  The fact that this view of the nature of the information is in the public domain must be taken into account by the court in considering the existence of risk to her life, and the consequences if she were to disclose that information.

[17]    Therefore the court is faced with fundamental but competing interests, the

investigation of the most serious of crime on the one part, and the most coveted right of any individual, the right to life, on the other part.

[18]   Having considered all of the evidence I first consider the argument of Ms Breen that journalists such as her have a general duty of confidentiality to protect the sources from which information is received by her. Reference was made to a code of conduct from the Nation Union of Journalists, setting out the main principles of British and Irish journalism under which (at Rule 7) it states:

> "A journalist protects the identity of sources who supplies information in confidence and material gathered in the course of her/his work".

In fact the evidence of Ms Breen and other witnesses called on her behalf argue that such a code is universal. I believe it was accepted, and in any case would be determined by me, that information received from a source purely for the purposes of dissemination of information that the source wishes the public to know, would clearly not be covered by any such obligation. Therefore a telephone call to warn that a bomb had been placed in particular premises would clearly have as its purpose that the warning was to be made public - and a journalist would not be in breach of any code in disseminating that information. Similarly if information is received by a journalist claiming responsibility for a particular outrage, the dissemination of that claim, simplicitor, would be free of any duty of confidentiality where it is cloaked with the wish of the source for that claim to be made public.

The evidence given by Ms Breen and by other distinguished journalists to the court was that a public interest is served by investigative journalists in putting into the public arena information in relation to the motives and agenda of various organisations, many of whom I believe the journalists themselves find repugnant. Evidence was given of the role that journalists played in positive outcomes and consequences of such dissemination. From that position it is argued that any breach of an undertaking of confidentiality would have an effect not just on the work and future prospects of employment of the journalist him or herself, but that it would potentially have an adverse affect on journalism generally. This was expressed in perhaps slightly differing terms by some of the witnesses with metaphors such as dams bursting or slippery slopes being embarked upon. Whichever way one chooses to express it I believe the thrust of this evidence was that no exception could be made in respect of this duty of confidentiality.

Mr Harvey reinforced the fundamental nature of this duty of confidentiality by reference to the specific provisions made in relation to journalistic material both in the 2000 Act and in PACE. He also referred to the provisions of Article 10 of the European Convention on Human Rights and Section 12 of the Human Rights Act 1998 in respect of journalistic freedom of expression.

[19]   Dr McGleenan in his skeleton argument, and in his presentation of the argument on this aspect of the case, argued that there was no legal basis for any such sense of undertaking on the part of the journalist, albeit there may be a moral obligation on their part. That seems to the court to be approaching the matter of confidentiality in the context for example of commercial agreements. However that in my opinion

overlooks the very definition of journalistic material incorporated into the 2000 Act by reference to the definition of "excluded material" in PACE. At Article 13(1)(c) it states as follows:

> "Subject to the following provisions of this Article, in this Order "excluded material" means:
>
> (c) Journalistic material which a person holds in confidence and which consists –
> (i) Of documents; or
> (ii) Of records other than documents.
>
> (2) The person holds material other than journalistic material in confidence for the purpose of this Article if he holds it subject –
> (a) To an express or implied undertaking to hold it in confidence:
> (3) The person holds journalistic material in confidence for the purposes of this Article if –
> (a) He holds it subject to such an undertaking, restriction or obligation; and
> (b) It has been continuously held (by one or more persons) subject to such an undertaking, restriction or obligation since it was first acquired or created for the purposes of journalism".

[20] A similar reference to the concept of receiving information "in confidence" is referred to in Article 10 of the Convention where under Article 10.2 it states:

> "The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in the democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, …., [and] for preventing the disclosure of information received in confidence, …."

[21] The legislature clearly addressed the question of journalistic material in relation to Article 10 in various ways, but for the purposes of this application I have addressed it by the inclusion in the 2000 Act of a special procedure whereby such material can only be produced on an application to the court. However, and this mirrors the position under the Convention, such a right is not an absolute right. It is a qualified right following the wording of Article 10(2) namely that the freedom is "subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society". The paragraph in short introduces the balance between the public interest specifically referred to of the prevention of disorder or crime, with the interest of the freedom of expression including the preventing of the disclosure of information received in confidence.

[22] While the court clearly must both respect, as it does, the personal view of any journalist who appears before it in relation to information in his or her possession, and the obligation imposed on themselves by themselves reflecting any professional obligation such as contained in the Code of Practice, nevertheless the court has its

obligations to carry out the balancing exercise which on occasion may well demand that the duty which the journalist believes he or she is under must give way to a public interest such as the detection and successful prosecution of a member of such a ruthless organisation prepared to carry out this and other attacks.

[23]   As an aside, and with the greatest respect to the witnesses, I was advised of some incidences where journalists have taken a different approach which was acknowledged by the witnesses as something with which they disagreed but which was clearly a decision for those journalists. I do not sense that the dam broke overwhelming other journalists. There was certainly no evidence of such consequences in the telling testimony given by all of those witnesses.

[24]   I can confirm that I have carefully considered all of the points that have been put by them and have weighed them carefully in approaching my conclusions in this particular matter. I am satisfied as to the role of confidentiality in the work of journalists, a role acknowledged by the legislation.

[26]   I also am satisfied that in relation to Ms Breen specifically, and her contacts with members of the Real IRA, such a term of confidentiality was at the core of that relationship. That is evidenced by the fact that she had a code word which allowed her to satisfy herself, and through her the paper's editorial team, that they were dealing with representatives of this organisation. I have no reason whatsoever to doubt the uncomfortable position into which this may well put journalists, and I believe that discomfort and concern is real in the case of Ms Breen.

[27]   I am also satisfied that in making the claim of responsibility through her, there would have been an inference that nothing further would be disclosed which may lead to the identification of the source of that claim of responsibility. The draft Order sought by the police states that it is records and other material "in respect of a claim of responsibility". However the very nature of the material which is sought shows that the investigation has wider objectives. At this point the court records that it is aware of what those objectives are, and in line with the Ruling already given, it is not the court's intention to put those objectives or those lines of enquiry into the public arena. That in my opinion would be totally contrary and alien to the interests of the public in the ongoing investigation being carried out by the police. Nevertheless the court has taken this into account in its determination as to the scope and nature of the investigation. What I can I believe state with impunity is that the overarching objective is to seek to identify those involved in the carrying out of these murders, and that is the context in which I require to consider this application.

[28]   I now turn to the argument on behalf of Ms Breen that to disclose this information, which she regards as subject to that obligation of confidentiality, would have in terms of a risk to her life.

Having considered all of the evidence I have concluded that the investigation of terrorist groups can, perhaps inevitably, give rise to some risk to the investigative journalist in different ways.

(i)   An investigation could be carried out into their activities which does

not directly involve members of that organisation. That investigation could be carried out using other lines of enquiry and sources. Clearly in such circumstances there is a danger to the journalist from members of such an organisation who would not welcome any light being shone on their activities, and as a result of which there is a risk of action being taken against such a journalist. Examples of such attacks and tragic loss of life on the part of journalists are well known.

(ii) There may well be a risk through any connection with such an organisation even if the journalist scrupulously adheres to the expectation of confidentiality. These are people to whom logic is a distant relation. Self preservation is an overriding imperative, and their attack against two men delivering pizzas shows how little value they place on human life in the pursuit of their aims, and in my opinion in the pursuit of their own self preservation. Nevertheless clearly a conscious decision is made by any journalist who makes a judgment first as to in what way and to what extent they deal with such organisations, and secondly as to the reaction of those organisations if the rules of engagement are kept to.

(iii) The third measurement of risk would be that where a journalist engages with sources within such a ruthless organisation on terms and conditions which are then not adhered to. In those circumstances I believe the court would have no difficulty in holding that there would be a heightened risk of danger and to life – indeed a substantially higher risk of such danger and to life.

[29] So what is that risk? In this regard I have considered three areas of evidence. These are:
(i) Objective assessments of the Real IRA outwith any of the parties in this case and outwith the claims of the organisation itself.
(ii) The statements of the Real IRA as to their objectives and their attitude towards those who they regard as legitimate targets; and
(iii) The specific evidence given to me in this case by Ms Breen as to any specific threat made to her if she were not to comply with the undertakings given by her of confidentiality.

(i) By a tragic irony, on 7 May 2009 the Independent Monitoring Commission published its latest report. Within that report it stated:

- That CIRA and RIRA have been especially active, resulting in a more concentrated period of attack than at any time since they had first reported in April 2004.
- The view that the threat was only to the police was no longer valid. It said OMH had "also targeted and gathered intelligence about members of the security forces" (paragraph 2.11).
- In paragraph 2.30 the report states "the efforts made to enhance RIRA's capability is further evidence of RIRA's determination and ruthlessness, as also are its continued covert activities …

RIRA remain ... highly dangerous and active".

The court is also aware of public statements made by the Chief Constable as to the height of both activity and the dangers and ruthless nature of this group particularly at the present time.

(ii) The RIRA itself has made a number of statements as to its objectives and the means of attaining those objectives. In the claim for responsibility to Ms Breen I have already recorded the fact that no apology was offered "for shooting the two pizza delivery men who were collaborating with the British Military Personnel by servicing them".

In a statement on 17 May 2009 the leadership of OMH stated -

"We also reserve the right to execute anyone providing services, in any shape or form, to the enemy. Those who assist the occupiers have placed themselves in harm's way. They need to know what to do to extricate themselves from a situation of their own making. There will be no further warnings".

It is not my intention to regurgitate the statements of OHM, save to say that it is their self proclaimed objective to visit death if necessary on anyone who's assist in the work of the security forces and in that regard the police would be included in that threat.

(iii) As regards Ms Breen herself she has given evidence in which she states that over the course of the period since 8 March 2009 she has had contact with individuals, and understands and is aware that the Real IRA have on several occasions expressed in clear terms that the passing of any information by herself to the PSNI (even by order of the court) would place her life at risk. She also gave evidence that she had contact with an anonymous source who I understand to have links with the Real IRA and was informed by that source in terms that "you know what co-operating with the PSNI means". Ms Breen had no doubt that this was and is a clear threat to her life, and to the life of her partner and 14 month old child, a threat posed by the handing over of any material.

[30] I have set out in brief terms the received evidence from three separate sources in order to allow myself to determine the nature and reality of any risk to Ms Breen if she were to be considered as co-operating in any way with the police, even if that "co-operation" were under Order of the court. Her views are adamant that the risk is so great that, over and above her absolute view on her code of responsibility towards the protection of sources, in no circumstances would she be prepared to hand over the material that is sought.

[31] In determining this risk I asked if the police intended to place evidence in front of the court to counter any of the evidence of Ms Breen in respect of the situation generally or in relation to herself. I was advised that no evidence would be called. The court therefore has no information to suggest whether or not the police have any evidence or intelligence in relation to the position of Ms Breen. In those circumstances I

determine that, having given her evidence under oath and having considered all of the issues, I can accept that there is objective evidence that she would fall within a group of people deemed "legitimate targets" against whom this murderous organisation would all too quickly carry out their threats of violence and murder.

[32]   During the course of discussion Dr McGleenan referred to Ms Breen's subjective fears. They of course exist. But on the evidence placed before the court those subjective concerns find their foundations in the objective assessments of others, the very real and objective evidence of the activities of this group, and their stated views as to who is a target who they believe they can legitimately murder.

[33]   I have therefore at this point reached conclusions as follows:

(a)   That the concept of confidentiality for journalists protecting their sources is recognised in law, and specifically under the 2000 Act and Article 10 of the Convention;

(b)   That given the objectives of this application that the material sought would be such as would be regarded as covered by that obligation of confidentiality which Ms Breen has confirmed under oath exists in respect of her relationship with this organisation and the spokesman of this organisation;

(c)   That while there may well be a risk of involving oneself with such an organisation in any way, that risk would be greatly increased by any breach of that undertaking;

(d)   That there is objective evidence that we are dealing with a ruthless and murderous group of people who would regard any handing over of any information in the possession of Ms Breen over and above the publication of their claim for responsibility, as exposing her to be treated as a legitimate target with the murderous consequences that could and may well follow from that.

## CASE LAW

[34]   In the case of *In re-Officer L* police officers who had been called to give evidence at the enquiry into the death of Robert Hamill sought a Ruling from the enquiry to have their names withheld and to be screened from the view of the public while giving evidence. Lord Carswell referred to the relief sought compendiously as "anonymity". The Tribunal refused the application and the officers brought an application for judicial review of that decision. The Divisional Court quashed the decision, and that decision in turn was upheld by the Court of Appeal in Northern Ireland. During the course of the Enquiry's Investigation into a general risk assessment they received evidence that the police were not aware of any information at that time which would indicate a specific threat to the Enquiry or to the witnesses, but by way of a supplemental letter the police indicated that, although an officer may not have a specific threat against him, the general threat which exists against all officers would have applied and indeed did at that time from dissident groups. That letter would have been written at a time when concerns of the activities of dissident groups would have been well below that now expressed by the police.

[35]   Lord Carswell stated in his judgment at paragraph 19 et seq as follows:

"19 The right to life is simply and briefly expressed in the first sentence of Article 2 of the Convention. "Everyone's right to life shall be protected by law". As the Strasberg jurisprudence is laid down, this covers not only the negative obligation, not to take the life of another person, but imposes on contracting states a positive obligation, to take certain steps towards the prevention of loss of life at the hands of others and the State. The locus classicus of this doctrine is <u>Osmond -v- United Kingdom</u> [2000] 29 EHRR 245, which reads:

"115 The court notes that the first sentence of Article 2(1) enjoins the State not only to refrain from the intentional and unlawful taking of law, but also to take appropriate steps to safeguard the lives of those within its jurisdiction. It is common ground that the State's obligation in this respect extends beyond its primary duty to secure the right to life by putting in place effective criminal law provisions to deter the commission of offences against the person backed up by law enforcement machinery for the prevention, suppression and sanctioning of breaches of such provisions. It is thus accepted by those appearing before the court that Article 2 of the Convention may also imply on certain well defined circumstances a positive obligation on the authorities to take preventative operational measures to protect an individual whose life is at risk from the criminal acts of another individual. The scope of this obligation is a matter of dispute between the parties.

116 For the court, and bearing in mind the difficulties involved in policing modern societies, the unpredictability of human conduct and the operational choices which must be made in terms of priorities and resources, such an obligation must be interpreted in a way which does not impose an impossible or disproportionate burden on the authorities. Accordingly, not every claimed risk to life can entail for the authorities a Convention requirement to take operational measures to prevent that risk from materialising. Another relevant consideration is the need to ensure that the police exercise their powers to control and prevent crime in a manner which fully respects the due process and other guarantees which legitimately place restraint on the scope of their action to investigate crime and bring offenders to justice, including the guarantees contained in Articles 5 and 8 of the Convention. In the opinion of the court where there is an allegation that the authorities have violated their positive obligations to protect the right of life in the context of their above mentioned duty to prevent and suppress offences against the person, it must be established to its satisfaction that the authorities knew or ought to have known at the time of the existence of a real and immediate risk to the life of an identified individual or individuals from criminal acts of a third party and that they failed to take measures within the scope of their powers which, judged reasonably, might have been expected to avoid that risk. The court does not accept the Government's view that the failure to perceive the risk to life in the circumstances known at the time or to take prevention

measures to avoid that risk must be tantamount to gross negligence or wilful disregard of the duty to protect life. Such a rigid standard must be considered to be incompatible with the requirements of Article 1 of the Convention and the obligation of contracting States under that Article to secure the practicable and effective protection of the rights and freedoms laid down therein, including Article 2. For the court, and having regard to the nature of the right protected by Article 2, a right fundamental in the scheme of the Convention, it is sufficient for an appellant to show that the authorities did not do all that could be reasonably expected of them to avoid a real and immediate risk to life of which they have or ought to have knowledge. This is a question which can only be answered in the light of all the circumstances in any particular case".

20  Two matters have become clear in the subsequent development of the case law. First, this positive obligation arises only when the risk is "real and immediate". The wording of this test has been the subject of some critical discussion, but its meaning has been amply summarised in Northern Ireland by Weatherup J in *Re W's Application* [2004] NIQB 67, where he stated that:

"A real risk is one that is objectively verified and an immediate risk is one that is present and continuing".

It is in my opinion clear that the criterion is and should be one that is not readily satisfied: in other words, the threshold is high. ... Moreover the requirement that the fear has to be real means that it must be objectively well founded. .... That is not to say that the existence of a subjective fear is evidentially irrelevant, for it may be a pointer towards the existence of a real and immediate risk, but in the context of Article 2 it is no more than evidence.

21  Secondly there is the reflection of the principle of proportionality, striking a fair balance between the general rights of the community and the personal rights of the individual, to be found in the degree of stringency imposed upon the State Authorities in the level of precautions which they have to take to avoid being in breach of Article 2. As the ECtHR stated in paragraph 116 of *Osmond*, the applicant has to show that the authorities failed to do all that was reasonably to be expected of them to avoid the risk to life. The standard accordingly is based on reasonableness, which brings in considerations of the circumstances of the case, the ease or difficulty of taking precautions and the resources available. In this way the State is not expected to undertake an unduly burdensome obligation; it is not obliged to satisfy an absolute standard requiring the risk to be averted, regardless of all other considerations. ... It has not been definitively settled in the Strasbourg jurisprudence whether the countervailing factors relating to the public interest – such matters as the credibility of the Inquiry and its role in restoring public confidence – as distinct from the practical difficulty of providing elaborate or far reaching precautions, may be taken into account in deciding if there has been a breach of Article 2. It does appear that it may be correct in principle to take such factors into account (cf *Re: Donaghy's Application* [2002] NICA 25(1) and *Re: Meehan's Application*

[2003] NICA 34) but I would prefer to reserve my opinion on the point.

22      The principles which apply to a tribunal's common law duty of fairness towards a person whom it proposes to call to give evidence before it are distinct and in some respects different from those which govern the decision made in respect of an Article 2 risk. They entail consideration of concerns other than the risk to life, although as the Court of Appeal said in paragraph 8 of its judgment in the *Widgery Soldiers'* case, an allegation of unfairness which involves a risk to the lives of witnesses is one that the court must consider with the most anxious scrutiny. Subjective fears, even if not well founded, can be taken into account, as the Court of Appeal said in the earlier case of *R -v- Lord Saville of Newdigate*, ex p A[2000] 1 WLR 1855. It is unfair and wrong that witnesses should be avoidably subjected to fears arising from giving evidence, the more so if that has an adverse impact on their health. It is possible to envisage a range of other matters which could make for unfairness in relation to witnesses. Whether it is necessary to require witnesses to give evidence without anonymity is to be determined, as the Tribunal correctly apprehended, by balancing a number of factors which need to be weighed in order to reach a determination."

[36]    The House of Lords then considered the evidence in the case and the approach taken by the Tribunal. Having disposed of the appeal before the House Lord Carswell then went further and stated that it would be timely and of assistance to further Tribunals to say a word about the relationship between Article 2 consideration of anonymity and that which is decided by reference to the common law principles. He continued in paragraph 28 to consider a formula which would address these two principles. He stated:

"28. I think that it is possible, however, to conduct the exercise basically as a single test, which is obviously desirable in the interests of simplicity. This could be done by approaching it as a single decision under the common law, having regard in the process to the requirements of Article 2.

In pursuit of this end I suggest that the exercise to be carried out by the Tribunal faced with the request for anonymity should be the application of the common law test, with an excursion, if the facts require it, into the territory of Article 2. Such an excursion would only be necessary if the Tribunal found that, viewed objectively, a risk to the witnesses' life would be created or materially increased if they gave evidence without anonymity. If so, it should decide whether that increased risk would amount to a real and immediate risk to life. If it would, then the Tribunal would ordinarily have little difficulty in determining that it would be reasonable in all the circumstances to give the witnesses a degree of anonymity. That would then conclude the exercise, for that anonymity would be required by Article 2 and it would be unnecessary for the Tribunal to give further consideration to the matter. If there would not be a real and immediate threat to the witnesses' life, then Article 2 would drop out of consideration and the Tribunal would continue to decide the matter as one governed by the common law principles. In coming to that decision the existence of subjective fears can be taken into account, on the basis which I

> have earlier discussed (see paragraph 22). For the same reasons as those which I have set out in paragraph 20, however, I would not regard it as essential in every case to commence consideration of the issue by seeking to identify such objective fears".

[37]  One of the elements of the test to be applied is whether a risk is one that is objectively verified, and an immediate risk is one that is present and continuing. As regards the first element I have already concluded for the reasons set out that the risk is objectively verified. Dr McGleenan on behalf of the police argued that the risk was not an immediate one. Ms Breen acknowledged that at present she does not regard herself under any immediate risk. However that view is predicated on the fact that she does not intend to hand over any of the material sought and, in those circumstances, that the risk which she believes would inevitably be carried out if she did hand it over would not be carried out. Dr McGleenan's argument cannot be accepted by the court. In <u>Re: Officer L</u> the officers had not yet given evidence, and therefore any risk that they considered would flow from not having anonymity was not immediate. It would of course become immediate, if objectively verified, once they gave evidence and their identity became known due to the lack of anonymity. It is clear to the court that the exercise of its powers to make the Order must envisage the position in relation to risk in the context of the order being made and the consequences that would flow from it. If the court took the view that the Article 2 considerations did not arise until after an Order was made, then after the Order was made the court would simply have to consider whether, in the light of the consequences of its Order, and the possible tragic consequences of the making of its Order, the State <u>had</u> taken all necessary steps to protect these specific individuals after the Order was made. Such an approach removes from the court's deliberations the right to conclude it should not make an Order because to make such an Order would give rise to an immediate and real risk of the loss of life. That is an indefensible proposition.

[38]  Therefore I believe it is a perfectly legitimate exercise of the court's power to consider what would be the position if it made an Order, and if it believed that the Article 2 Rights of Ms Breen outweighed the public interest in the investigation of crime, then the court should not make the Order. That is the path I intend to pursue.

[39]  In the light of that approach I determine that a positive obligation arises on the part of the State, and indeed on the part of this court as a public authority under the provisions of the Human Rights Act, to take such steps as it believes right and proper for the protection of the life of Ms Breen – and by extrapolation potentially the life of her partner and child.

[40]  In weighing this balance I have decided that for the reasons that I have stated, namely the nature of this organisation, its declared intentions and the callousness with which it will carry out its threats not least in the protection of itself, this organisation has the capacity to carry out such threats; is willing to carry out such actions; and, in my opinion, given the argument of the PSNI that the material in the hands of Ms Breen is likely to be of substantial value to them in their investigation, that I must place very considerable weight on that public interest in the protection of life, and the very specific personal interest of Ms Breen as regards her life and that of

her family.

[41]  In terms of the public interest in the investigation of this terrible crime, the court again, no doubt to the chagrin of Mr Harvey and the Respondent, must express its views carefully and without in any way contradicting itself in terms of the importance of not disclosing any of the lines of enquiry being followed by the police and where, in that scheme of things, the police believe that the material in the possession of Miss Breen would play its part. I believe that I can express it in these general terms – that it is but one part of the investigation; that I believe that I can take a view as to weight to be placed on it in the overall scheme of the investigation (as it has been disclosed to me) and whether its role would, in itself, be self determinative of any matter or, if its weight is found in its juxtaposition and interrelationship to other evidence.

The court is conscious of the somewhat cryptic terms in which for the purposes of this open decision these matters are expressed, but as with its reasoning in relation to the first access condition, it will put these particular considerations into writing should the matter come to be reviewed by any other appellant court.

[42]  At the outset of this Ruling I expressed the enormous difficulty posed by the conflicting interests in this case by reason of the enormity of the crime committed and the enormity of the risk as I have determined it to Ms Breen. No evidence was given as to the steps that might be taken by the police in the event that such an Order was made and which they would regard could provide protection within the test of reasonableness. Dr McGleenan put forward a number of such possibilities in terms of home protection, police patrols and other safeguards. Lord Carswell said he had not determined the question as to whether the court can and should take into account the practical difficulties of providing what may well be elaborate or far reaching precautions, but I believe that the court could exercise its own judgment in considering whether again given the factual situation of this case, and the ruthless attitude of the potential perpetrator of the crime of the murder of Ms Breen, that it would be close to inconceivable as to how she, and potentially her family could be protected for what could well be for many years to come. Because the risk is not just real and immediate. It is continuing. That is evidenced by all of the statements made by the International Monitoring Commission and there is nothing in the public statements of the Police Service of Northern Ireland to contradict the view that the dissident republicans are with us certainly for some time to come.

[43]  I have therefore concluded that in this case taking into account all of the factors to which I have referred and which I have sought to balance fairly and objectively in respect of both public interests that the application for the Production Order should be refused.