UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: Request from the United Kingdom Pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom on Mutual Assistance in Criminal Matters in the Matter of Dolours Price | M.B.D. No. 11-MC-91078 |

**AFFIDAVIT OF THOMAS E. HACHEY**

I, Thomas E. Hachey, being duly sworn, state as follows:

1. I am a chaired University Professor of History at Boston College and Executive Director of Boston College's Center for Irish Programs.

2. It is my understanding that the oral history project that came to be called the Belfast Project was broached as a possible undertaking by Ed Moloney, at the suggestion of Paul Bew, to Burns Librarian Dr. Robert O'Neill in the summer of 2000, some weeks before I came to Boston College in August of that year. Paul Bew is a peer of the realm in the United Kingdom today, but at the time he recommended this project he was a faculty member in the Politics Department at Queens University Belfast. Paul Bew was also at the time a close advisor to David Trimble, the Ulster Unionist Party leader, and had taught a number of former Irish Republican Army and Ulster Volunteer Force activists in his politics courses, including Anthony McIntyre, who became the interviewer of IRA paramilitary veterans for the Belfast Project. Paul Bew was also a former Burns Scholar at Boston College for a year in the late 1990s, and as a result Boston College was a familiar institution to him. Ed Moloney is a prize-winning journalist and a respected author of works on Northern Ireland.

- 2 -

3.  When I joined Boston College as a faculty member I was also appointed Executive Director of all Irish Programs at Boston College. Because of my remit in that role, Robert O'Neill advised me of the proposed Irish project. I distinctly remember Paul Bew telling me that an oral history drawn from interviews with former operational leaders from the IRA and the UVF regarding "The Troubles" in Northern Ireland over the past several decades would constitute a unique and invaluable archive. Indeed, Paul Bew went so far as to characterize the value of such a compendium for historians in the future as being comparable to what might have been yielded by the Jacobins and the Gerondists had senior participants in the French Revolution contributed to a similar oral history archive.

4.  Paul Bew is very arguably one of the most accomplished scholars in this field, and I knew instinctively that his assessment was by no means hyperbolic and that this proposed oral history could indeed prove to be an invaluable resource for any future study respecting "The Troubles."

5.  The goal of the project, as Robert O'Neill and I perceived it, was to garner a number of recollections by IRA and UVF veteran leaders in order to better illuminate the intricacies of the Northern Ireland conflict. Both of us have taught a course on Northern Ireland numerous times over the years and are especially well positioned to see the significance of a repository of this kind. Moreover, we also thought that this resource could prove to be of significant value to specialists attempting to understand the phenomenology of societal violence, especially as it illustrates the mindset of those who played a significant part in the events.

6.  The scope of the enterprise was undetermined from the start as we were uncertain as to how many people would be willing to commit to the oral history interviews, especially since those approached were often leading activists who were not prone to broadcast their

involvement in the conflict. But the opportunity to gather testimony for posterity that would be kept strictly confidential during the interviewee's lifetime, and retained in a collection that would be housed in Boston, rather than Belfast or Dublin, prompted more involvement by paramilitary veterans than we might otherwise have expected.

7. Ed Moloney, the Project Director, required the interviewers to convey to the interviewees the absolute promise that their accounts would be kept confidential until the demise of the individual providing the testimony. That promise helped convince the interviewees to provide candid accounts of their activities and, to the best of my knowledge, that assurance was communicated orally in every instance. I believe that few, if any, of the interviewees would have agreed to participate without such assurance.

8. Apart from the two interviewers, who saw only the transcripts of the individuals whom they themselves interviewed, the only other people who ever saw **any** of the material were Robert O'Neill, Ed Moloney, myself, and two academic specialists who were given some of the transcripts to review, but only with coded numbers (not names) attached to them, for the purpose of confirming for us what we believed to be the value of this unique collection.

9. No one is allowed to see any of the transcripts, or to listen to the recorded version, until the demise of a given contributor, or until such a person himself or herself provides permission for access to the document in writing. That was, and remains, the hard and fast conditions of the embargo that have been placed on access to these materials.

10. If Boston College is ordered to turn over the tapes and transcripts of the interviews of Dolours Price, there will be a substantial negative impact on oral history projects everywhere; a direct threat to the safety and security of our interviewers; stress and anxiety will

inevitably affect those who participated in the interviews; and people will feel betrayed by what was a good faith promise of confidentiality by Boston College representatives.

11. I believe that the prospect of subpoena-driven access to private oral history projects will place a pall over similar undertakings elsewhere. Already, people in the field of oral history from across the country are monitoring the outcome of this case with evident apprehension.

12. Our two interviewers confided in a recent telephone conference call that they were genuinely apprehensive about the outcome of this development in terms of their own welfare, and said that they felt certain many of the interviewees would be similarly concerned. I have personal reason to believe that such angst is not misplaced. The United States Consul General in Belfast, who had been planning for an October thank-you reception at Stormont for me and others involved in the Irish Institute's work on behalf of the peace process, recently advised that I should not plan on coming to Belfast in such a public venue for the time being as my safety could be at risk in the present environment. I can, therefore, identify with the anxiety that many of the participants in the Belfast Project will experience if Boston College is required to surrender the interview materials of Dolours Price.

13. I am perplexed by the fact that governmental authorities in the United Kingdom apparently instigated the subpoena to Boston College. They have done so despite the fact that they must be aware that the delicately-constructed power-sharing Executive and Assembly in Northern Ireland could very well be placed under considerable strain by a court-ordered surrender of documents. The fact that these materials are sought by governmental authorities, believed to be the Police Service of Northern Ireland, will almost certainly create needless alarm among otherwise peacefully-reconciled individuals, and risks stoking unrest among combative

elements of that society who would like nothing more than to see the embers of division fanned into flames that would consume the hopes of those who seek reconciliation, rather than recrimination.

Signed under the pains and penalties of perjury.


Dated: June 2, 2011                               /s/ Thomas E. Hachey
                                                  Thomas E. Hachey