UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:  Request from the United Kingdom
Pursuant to the Treaty Between the Government of
the United States of America and the Government
of the United Kingdom on Mutual Assistance in
Criminal Matters in the Matter of Dolours Price

M.B.D. No. 11-MC-91078

**AFFIDAVIT OF ANTHONY McINTYRE**

I, Anthony McIntyre, being duly sworn, state as follows:

1.      I conducted audiotaped oral interviews of Dolours Price for the Belfast Project,

which compiled and archived an oral history of the Northern Ireland conflict.  I cannot be exact

about the dates of the interviews with Dolours Price due to the fact that I kept no records of

them.

2.      My past work has been in journalism and academia.  For a time I served on the

Ethics Council of the National Union of Journalists.

3.      I became involved in the Belfast Project because it had the potential to mine the

richest vein of research on Irish republicanism yet discovered.  As a former member of the Irish

Republican Army and because I had earned a Ph.D. on the Irish Republican Movement, I was in

a unique position to be part of innovative and groundbreaking academic research.

4.      I agreed to conduct interviews with former republican activists on a strictly

confidential basis.  A true and complete copy of the February 26, 2001, Agreement that I signed

undertaking to conduct the interviews is annexed to this statement and marked McIntyre

Attachment 1.

5.      That Agreement refers to a separate agreement between Boston College and Ed
Moloney, the Project Director of the Belfast Project, dated January 31, 2001, which Ed Moloney
provided to me before I signed my Agreement.  A true and complete copy of the January 31,
2001, agreement is annexed to this statement and marked McIntyre Attachment 2.

6.      I promised each person I interviewed for the Belfast Project, including Dolours
Price, the same thing: that the audiotapes and transcripts of that person's interviews would be
deposited in the John J. Burns Library at Boston College, and that the College would keep
confidential the identity of the interviewees and the content of their interviews.  I told the people
I interviewed, including Dolours Price, that I had every reason to believe that a university on
American soil which specialised in Irish affairs would be a tabernacle housing sensitive research
material and as such should be inviolable.  This view was also expressed to me at the time by Ed
Moloney and Robert O'Neill of the Belfast Project at Boston College.

7.      Each interviewee could elect to embargo his or her interviews until after the
interviewee's death, or could instead choose to release them earlier.

8.      It was my certain understanding at the time that I agreed to conduct the interviews
that they would be thoroughly and absolutely protected and in my mind this firmly meant that the
interviews would not be susceptible to any legal process that would require their disclosure.
When the interviewees would ask how the tapes were to be protected, as they always did prior to
the interview process, they were told their contributions were safe from disclosure.  Had this not
have been understood there would have been no recordings sent to Boston College.  I was clearly
of the view that there was no legal situation in which the material could be accessed without the
approval of the interviewees.  I would not have been involved in such a risk fraught venture were
it otherwise.  The level of risk to both myself and those I interviewed was in my view substantial.

In the Belfast project it was necessary, in order to produce raw material of serious historical value, to violate the IRA's code of secrecy.  This was not a venture that I as a researcher, nor the interviewees I spoke with for my research, could approach without the strongest sense of gravitas.

9.      The interviewees signed a donation form for the audiotapes and transcripts of their interviews to be deposited in the Burns Library at Boston College that stated that there would be no access to the materials without their consent prior to their death, and the same guarantees were also given frequently and orally.

10.     Interviewees did not want to have anything in writing in their possession which might associate them with the project.  They did not keep copies of the interview tapes, transcripts, or donation forms.

11.     Dolours Price was offered a donation form, which she signed and which I witnessed and signed.  It was in the same words (except as to the handwritten additions) as the form signed by another interviewee, the late Brendan Hughes, which is annexed to this statement as McIntyre Attachment 3.

12.     I sent Dolours Price's donation form to Boston College.  That was the usual arrangement.  I did not keep records for reasons of security, in order to enhance the protection of the Project and its participants.

13.     I believe I conducted around ten interviews with Dolours Price but I cannot be certain as I kept no records.

14.     I provided Dolours Price with no copies of the tapes or transcripts.

15.     Dolours Price did agree to the tapes and transcripts of her interviews being kept at Boston College, subject to the agreement of utter confidentiality and that they would not be released until after her death or, if before death, with her expressed permission.

16.     There is no other documentation that Price signed that had terms about the disclosure of her interviews or what would happen to the tapes and transcripts of them. Traceability was kept to a minimum.

17.     I absolutely object now to disclosure of the Dolours Price interview materials on a number of grounds.  The whole Belfast Project would be compromised beyond repair.  I believe it would lead to personal devastation on the part of Dolours Price, who cooperated with the project in eminently good faith on the understanding of confidentiality in a bid to contribute to the historical record in order that society would better understand the dynamics of the conflict in Northern Ireland.  I understand that she now suffers serious depression and would in my view be deeply traumatized were the confidentiality guarantees given to her by me not to be honored. Moreover, we will never be able to more fully understand these dynamics we seek to investigate if those who possess vital information are dissuaded from parting with it as a result of demands. Without such information, the raw history will be squeezed out of oral archiving.  People will only talk about what is safe, and will couch their involvement in terms which are less than direct. The subpoena has the potential to destroy much history construction and by extension public understanding well outside of Boston College.

18.     I believe there is a personal risk to my safety and the safety of my family if the tapes and transcripts of my interviews with Dolours Price are not kept confidential.  When the book Voices From The Grave was published, part based on interviews I had conducted for the Belfast Project with Brendan Hughes, the home next door to my own was attacked with

excrement in what the media and myself believe was a case of mistaken identity.  There were

reports in the press of death threats to myself, to and which Professor Thomas Hachey of Boston

College responded by issuing a public statement condemning the threats.  I am of the view that

the more the Belfast Project interviews reveal about how deeply matters of the IRA were

discussed, the greater the danger that I as the primary researcher will face.

19.     The people who were interviewed will certainly feel betrayed if their materials are

not kept confidential.  More importantly, though, other members of the IRA who were not

interviewed may, given the umbrage they are likely to feel at frank discussion of IRA matters,

take actions out of vengeful motivations.  I certainly would not feel safe were these interviews to

be released.  Since the publication of <u>Voices From The Grave</u> I have been of the view that the

optimum situation for myself is that the interviews are not released in my lifetime.  However, as

this was not part of the original contract there is little I can do to alter that.  An additional factor

in the manner in which the Price interviews may be disclosed is the involvement of

governmental authorities in the United Kingdom.  Were the interviews to be released as

originally intended for the purposes of historical record, I would feel on safer ground than I do

with them being released as possible evidence.  Involvement in the gathering of evidence, even

though that was never the intent, and is now vigorously protested, increases the level of risk

substantially.

/s/  Anthony McIntyre                    Declared before me MEL FERGUSON, a notary public, by
                                         ANTHONY McINTYRE who is personally known to me,
                                         at 1 Clare Street in the City/~~County~~ of
                                         Dublin this 2 day of June 2011

                                          /s/ Mel Ferguson
                                         Notary Public
                                                   Mel Ferugson
                                                   Notary Public            [Notary seal]
                                                   1 Clare Street
                                                   Dublin 2
                                                   Commissioned for Life

- 5 -

Agreement

between Ed Moloney, Director of Boston College/Burns Library Project to interview members of Irish Republican Paramilitary and Political organisations regarding their role in the 'Troubles' and Anthony McIntyre, Lead Project Researcher

This Agreement (known hereafter as Agreement B) is governed by the terms of an earlier Agreement (known hereafter as Agreement A) reached between the Trustees of Boston College and Ed Moloney regarding the above-mentioned project which was signed between them on January 31st, 2001

Ed Moloney hereby appoints Dr. Anthony McIntyre to the position of Lead Project Researcher on the salary, terms and conditions outlined in Agreement A.

The purpose of Agreement B is to outline the responsibilities of Anthony McIntyre as Lead Project Researcher.

A programme of future work shall be submitted by Anthony McIntyre and agreed by Ed Moloney on a monthly basis throughout the length of the contract.

Anthony McIntyre agrees to maintain an acceptable rate of progress, averaging at least one interview per week for the duration of the contract. He will be responsible for ensuring that each interview is transcribed, indexed and then shipped to the John J Burns Library of Boston College where it will be safely deposited and coded according to terms agreed under Agreement A. Transcribed interviews must be neatly typed and indexed according to established oral history practice. One copy will be saved on a computer disc and another printed out. Both shall be conveyed to Boston College.

Anthony McIntyre will also keep a record of every financial transaction (travel expenses, per diem etc) and give copies of these to Ed Moloney on a monthly basis.

Anthony McIntyre will sign an agreement of confidentiality with each interviewee according to the terms outlined in Agreement A. He will also abide by the terms of Agreement A in relation to interviewees who are unwilling to be be recorded on either audio or video tape.

Agreed to this _____ 26th _____ day of February 2001

_____
Ed Moloney, Project Director

_____
Anthony McIntyre - Senior Lead Researcher

Witnessed by:

_____

Witnessed by:

_____

# Belfast Project, Phase I

## Agreement
### between the Trustees of Boston College and Edward Moloney, Project Director, to Interview Members of Irish Republican Paramilitary Organizations and Provisional Sinn Fein Regarding their Role in the "Troubles."

The Trustees of Boston College (hereinafter, the "Sponsor") agree to enter into a two-year contract with Project Director Edward Moloney (hereinafter, "Project Director"), Belfast, Northern Ireland, for the purpose of documenting, on audio and/or video tape, interviews with members of the Provisional Irish Republican Army and Provisional Sinn Fein regarding their involvement in the "Troubles" from 1969 to the present. While the primary objective of this project is to document the role of individual members of the Provisional Irish Republican Army and Provisional Sinn Fein in the "Troubles," these interviews will not be limited to members of the PIRA or PSF. Rather, they may include members of all Republican paramilitary and political organizations.

The Project shall commence on or about February 1, 2001 and continue through January 31, 2002. The Sponsor reserves the right to review the project at the end of the first year and may or may not continue funding for a second year at its discretion. The Project may be extended to a third year by mutual agreement between the Sponsor and the Project Director.

The Project Director has full discretion to hire or fire the lead project researcher/interviewer and transcribers.

The Project Director agrees to oversee the interview process in Northern Ireland or Ireland and to maintain an acceptable rate of progress, averaging at least one interview per week--conducted, transcribed and deposited at Boston College--while adhering to strict standards of historical accuracy.

The Project Director agrees to maintain tight fiscal control over the Project, and at the end of each calendar year to provide the Sponsor with a detailed record of all expenses, including receipts for all purchases of equipment and supplies.

The Sponsor agrees to pay the Project Director (part-time) a stipend in the amount of £Stg 7,500 per annum.

The Sponsor agrees to pay the Lead Project Researcher (full-time) a stipend in the amount of £Stg 25,000 per annum.

The Sponsor agrees to pay costs of transcriptions in an amount not to exceed £Stg 5,000 per annum. Costs estimates in excess of this budgeted amount require the prior approval of the Sponsor. Transcriptions will be done in Northern Ireland, and original copies of the transcriptions, along with the original tape(s), will be delivered to the John J. Burns Library of Boston College promptly and safely. The means of conveyance will be determined by mutual consent.

The Sponsor agrees to purchase appropriate equipment necessary to the recording and transcribing of interviews, including a camera, an audio tape recorder, archival-quality tapes, and related supplies, e.g., batteries. Equipment is to be purchased by the Project Director. A budget of £Stg 5,000 has been allocated for this purpose. Costs in excess of this figure must be approved in advance by the Sponsor.

Belfast Project:  Agreement between Trustees of Boston College and Edward Moloney
Page 2 of 2

An additional sum of £Stg 2,000 per annum is allocated for miscellaneous expenses, including travel and postage.  Transcriptions and tapes will be expressed mailed weekly from Belfast to Boston.

The Project Director will require the interviewer and the interviewee to sign an agreement of confidentiality, stipulating that neither will disclose to third parties the existence and scope of the Belfast Project without the permission of the Sponsor.

In the event the interviewee prefers not to be recorded either on audio tape or video tape, a transcription of the interview will be made and signed by the interviewer and the interviewee and witnessed by a notary public as a complete and accurate transcription of the interview.   In the event that the interviewee is reluctant even to sign a notarized transcription of the interview, a reputable third party should be present during the interview and sign a notarized statement that the transcription is complete and accurate to the best of his or her recollection.  In situations of doubt, the Project Director will consult with the Sponsor to determine an acceptable solution.

The Project Director will develop a standard coding system for all interviews. The transcribed and tape/video recorded interviews will be given an anonymous numerical/alphabetical identity and stored both in Belfast and at Boston College. A separate key to this code shall be kept and be accessible only to the Project Director and to the Burns Librarian.  The key should be kept only in Boston and should only be transported to Boston by hand (i.e., during the Burns Librarian's visits to Ireland).

The statements of authenticity should also be kept separate from the transcripts/tapes and stored alongside the key to the codes at Boston College.  The interviewee should be fully apprised in writing of this system.

Each interviewee is to be given a contract guaranteeing to the extent American law allows the conditions of the interview and the conditions of its deposit at the Burns Library, including terms of an embargo period if this becomes necessary, as outlined herein.  An appropriate user model, such as Columbia University's Oral History Research Office Guidelines statement, should be adopted.

An oversight committee is to be appointed to assure that the strictest standards of historical documentation are to be followed.  Members of this committee must include, but not be limited to, the Executive Director of Irish Programs at Boston College, the Director of the Irish Studies Program at Boston College and the Burns Librarian of Boston College.

Agreed to this __31st__ day of January, 2001

_____
Edward Moloney, Project Director

_____
For the Trustees of Boston College

Witnessed by:

_____

Witnessed by:

_____



# BOSTON COLLEGE

JOHN J. BURNS LIBRARY

## John J. Burns Library
## Boston College
Chestnut Hill, Massachusetts 02467

## AGREEMENT FOR DONATION

BRENDAN HUGHES
### (Name of Donor)

### CONDITIONS OF DONATION

1.  I do hereby transfer to the Trustees of Boston College possession of the tape recordings and transcripts of my interviews conducted on *30/3/02 - 2/8/02* . These recordings and transcripts are to be deposited in the John J. Burns Library, Boston College, Chestnut Hill, Massachusetts 02467, to be preserved in such a manner as may best serve the educational, intellectual and historical objectives of its oral history and related programmes.

2.  I assign to the Trustees of Boston College absolute title thereto, including whatever copyright I may own in the contents of these tapes and transcripts.

3.  Access to the tapes and transcripts shall be restricted until after my death except in those cases where I have provided prior written approval for their use following consultation with the Burns Librarian, Boston College. Due to the sensitivity of content, the ultimate power of release shall rest with me. After my death the Burns Librarian of Boston College may exercise such power exclusively.

4.  Additional conditions.* THIS AGREEMENT DOES NOT IN ANY MANNER PROHIBIT MY USAGE OF ANY MATERIAL I MAY HAVE DISCLOSED WITHIN INTERVIEWS C/01 - C/15 FOR ANY MEMOIRS, BOOKS, ARTICLES OR BROADCASTS WHICH I MAY DECIDE TO WORK WITH AT ANY POINT IN THE FUTURE

_____                    12 DECEMBER 2002
(Donor)                                     (Date)

10 D DIVIS TOWER                            02890 322508
(Address)                                   (Telephone #)

BELFAST 12 NORTHERN IRELAND
Brendan McSwiney (PhD)                      _____  12/December/2002
_____                    (Fax #)          (e-mail)
(Burns Librarian)                           (Date)

*If none, write "None" and draw a "Z" through the blank space that follows.

### Burns-Belfast Project: Donor Agreement Form