**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

IN RE: Request from the United Kingdom   )
       Pursuant to the Treaty Between the   )
       Government of the United States of   )
       America and the Government of     )     M.B.D. No. 11 mc 91078-RGS
       the United Kingdom on Mutual     )
       Assistance in Criminal Matters in   )
       the Matter of Dolours Price       )

**Government's Opposition to Motion to Quash
and Motion for an Order to Compel**

The United States of America, by and through Assistant United States Attorneys John T.

McNeil and Todd F. Braunstein, respectfully submits this opposition to the motion to quash

submitted by the Trustees of Boston College on behalf of the Boston College John J. Burns

Library, Robert K. O'Neill, the Director of the John J. Burns Library, and Thomas E. Hachey,

Professor of History and Executive Director of the Center for Irish Studies at Boston College

("Respondents"). [D.5]. The government also requests that the Court enter an order compelling

the Respondents to promptly produce the materials responsive to the Commissioner's subpoenas.

As outlined below, the Court must reject the Respondents' invitation to engage in a

balancing of the United Kingdom's need for the subpoenaed material in its criminal investigation

against the Respondents' desire to keep this evidence of criminal conduct confidential. The

applicable mutual legal assistance treaty with the United Kingdom narrowly confines the Court's

discretion to grant motions to quash and compels the Court to enforce the Commissioner's

subpoenas issued in this matter.

Simply put, the Respondents made promises they could not keep – that they would

conceal evidence of murder and other crimes until the perpetrators were in their graves. While

1

the impetus for collecting this evidence was laudable, the promise of absolute confidentiality was flawed.  In the face of a subpoena to advance a criminal investigation – whether it be a domestic grand jury subpoena or a subpoena issued under a mutual legal assistance treaty with a foreign government engaged in a criminal investigation – there is no academic privilege which shields the material from disclosure.

While the Respondents make other equitable and factual claims, including the claims that the researchers will face retribution and that the disclosure of the materials will threaten the political stability in Northern Ireland, those claims falter in the face of close scrutiny.  The researchers themselves, and the subject of the interviews, widely publicized their involvement in this oral history project long before the subpoenas in this case were issued.  Moreover, the Respondents' decision to publicize the issuance of the subpoenas – which had been kept under seal by the United States – belies any claim of such risk.  If there were a substantial risk of retribution, the Respondents' efforts to publicize the subpoenas would compound the purported problem, rather than mitigate it.  In addition, the applicable treaty with the United Kingdom vests the authority to assess any threat to political stability to the Central Authority in the United Kingdom and Attorney General of the United States; that assessment is not left either to the Respondents or to the Court.

### Procedural History

On March 30, 2011, the United States submitted an application to the Court pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland ("UK"), signed December 16, 2004, implementing the Mutual Legal Assistance Agreement with the European Union, signed June 25,

2003, S. Treaty Doc. No. 109-13 ("US-UK MLAT"), and 18 U.S.C. § 3512 (2009).  [D.1].  That

application sought the appointment of Assistant U. S. Attorney Todd Braunstein (or a substitute

or successor designated by the Office of the United States Attorney) as commissioner to collect

evidence from witnesses and to take such other action as necessary to effectuate a request from

law enforcement authorities in the UK.  *Id.*[1]  The application was prompted by a formal request

from the UK for legal assistance in a criminal investigation pending in that country, made

pursuant to the US-UK MLAT.  *Id.*   That investigation involves kidnaping and murder, among

other serious crimes.  *Id.*   On March 31, 2011, the Court granted that application and entered an

order appointing Mr. Braunstein, and any successor so designated by the United States Attorney,

to, among other things, issue subpoenas consistent with the request from the UK.  [D.3].[2]

On or about May 3, 2011, the Commissioner issued three identical subpoenas to the

Respondents.[3]  As noted in the Respondents' motion to quash, those subpoenas sought materials

related to interviews of two UK nationals, Brendan Hughes and Dolours Price. [D.5 at 2-3].  The

return date was May 26, 2011.  While the subpoenas required the personal appearance of each of

the Respondents, they also provided that compliance could be achieved by producing materials

on the required date, as well as the submission of a certification authenticating the materials.

By way of background, and as set forth in the Respondents' affidavits, the materials

---

[1] That application remains under seal as it contains confidential law enforcement information submitted by the UK to the United States, and the UK has requested that it be kept under seal. [D.1]; *see, also* US-UK MLAT Article 7, ¶1.

[2] That order remains under seal, and the government has yet to disclose it to any person.

[3] The subpoenas issued by the Commissioner are being filed separately under seal.  The substance of them has been outlined in the Respondents' motion. [D.5 at 2-3].

requested were recordings made by a former Irish Republican Army ("IRA") member and Boston College researcher, Anthony McIntyre, between 2001 and 2006. [D.5 at Moloney Affidavit]. The interviews were conducted by Mr. McIntyre, under the supervision of Ed Moloney, as part of a Boston College oral history project which came to be known as "the Belfast Project." *Id*. The interviews with Mr. Hughes became the subject of a book published in 2010 entitled *Voices from the Grave*, *Two Men's War in Ireland* (Public Affairs 2010) by Mr. Moloney. A documentary film bearing the same name was produced using the Belfast Project interviews. *See Voices from the Grave* (Deer Lake Films 2010) (Ed Moloney, co-producer). That documentary is widely available on the Internet. At the time the subpoenas in this case were issued, the original interview materials were in the possession of the Respondents.

Ms. Price's interviews by Boston College were the subject of news reports published in Northern Ireland in 2010, in which Ms. Price admitted her involvement in the murder and "disappearances" of at least four persons whom the IRA targeted: Jean McConville, Joe Lynskey, Seamus Wright, and Kevin McKee. *See* Exhibits 1 and 2. Moreover, according to one news report, the reporter was permitted to listen to portions of Ms. Price's Boston College interviews. *Id*.

Mr. Hughes and Ms. Price were both admitted members of the IRA. In November 1973, Ms. Price was convicted in connection with her involvement in the detonation of several car bombs in central London, including the bombings of the Old Bailey courthouse and Scotland Yard. *See* Exhibit 3 *(Car-bomb Terrorists Face Sentencing Today, Glasgow Herald,* November 15, 1973). As noted above, Ms. Price has also admitted her involvement in the unsolved murder and "disappearances" of at least four persons.

4

On May 26, 2011, Boston College produced much of the subpoenaed materials related to Brendan Hughes.  The materials included recordings, transcripts and computer files contained on disks.  On June 2, 2011, after receiving a one week extension to produce the Price materials, the Respondents filed the instant motion to quash. [D.5]  Since the time of the Respondents' motion the parties have largely resolved the Respondents' claim of overbreadth through narrowing the scope of the subpoenas. [D.5 at 15-16]  The government is not responding to that argument at this time, as it expects the issue to be moot.

### Argument

I.    **The Mutual Legal Assistance Treaty Between the United States and the United Kingdom Narrowly Confines the Court's Discretion**.

Relying on a standard applicable to the subpoena of documents in domestic civil litigation – *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1998) – the Respondents press the Court to engage in a balancing test, in which the Court weighs the requestor's need for the information against the objector's interest in confidentiality and the potential injury from disclosure. [D.5 at 7-8]  The Respondents argue that the release to the UK of the materials subpoenaed would: (i) violate the interviewee's expectation of privacy; (ii) pose a risk of serious harm to participants of the Belfast Project; and (iii) deter individuals from participating in future oral history projects similar to the Belfast Project.  *Id*.  The Respondents also rely on a series of policy arguments, claiming, among other things, that the subpoenas impinge on "academic freedom", pose a risk to the taking of oral histories in general, are inconsistent with the 1998 Good Friday Agreement in Northern Ireland, and may threaten the peace in that region.  *Id*.

The Court must reject the Respondents' legal analysis and its invitation to engage in an

evaluation of the UK's need for the subpoenaed material.  As outlined below, the Court's

discretion is narrowly circumscribed by the US-UK MLAT, and the Respondents have failed to

establish any of the limited grounds on which the Court has authority to quash the subpoenas.

### A.    Applicable Treaty

The subpoenas in this case were issued pursuant to the US-UK MLAT. [D.3].  This treaty

is self-executing and has the same force as a federal statute.  *See In re: Commissioner's*

*Subpoenas*, 325 F.3d 1287, 1291 (11th Cir. 2003)(upon entry into force, MLATs become "a law

of this land on par with a federal statute"); *Bishop v. Reno*, 210 F.3d 1295, 1299 (11th Cir.

2000)(treaties and statutes are on "full parity," and "the 'rule of equality' prohibits implementing

statutory law that renders any treaty term nugatory"); *Cannon v. United States Dept. of Justice*,

597 F.2d. 1290, 1297 (5th Cir. 1992).  Courts are bound to give effect to mutual legal assistance

treaties because they are self-executing; to the extent that a MLAT provision is inconsistent with

a pre-existing statutory provision, the MLAT supersedes that provision.  *See In re Subpoena*

*Issued to Mary Erato*, 2 F.3d 11, 15 (2nd Cir. 1993).

In this case, the US-UK MLAT requires that, "the Requested Party ***shall*** take whatever

steps it deems necessary to give effect to requests received from the Requesting Party.  The

courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other

orders necessary to execute the request."  US-UK MLAT at Article 5, ¶1 (emphasis added).

Moreover, "[w]hen execution of the request requires judicial or administrative action, the request

***shall*** be presented to the appropriate authority by the persons appointed by the Central Authority

of the Requested Party."  *Id*. at ¶2 (emphasis added).  "The method of execution specified in the

request ***shall*** be followed to the extent that it is not incompatible with the laws and practices of

the Requested Party."  *Id*. at ¶3 (emphasis added).

Under the US-UK MLAT, the United States is obligated to obtain the documentary evidence requested in this instance and provide it to the authorities in the UK.  This treaty obligation extends to federal courts called upon to enforce such a request.  *Id*. at Article 5, ¶1. Treaties are contracts negotiated by and entered into between states, *see Trans World Airlines, Inc. v. Franklin Mint Corp*., 466 U.S. 243, 253 (1984), and they are to be liberally interpreted to effectuate the purposes of the contracting parties.  *Nielsen v. Johnson*, 279 U.S. 47, 52 (1929). When conflicting interpretations of treaty provisions are possible, the more liberal interpretation favoring the purposes of the treaty are preferred.  *United States v. Stuart*, 489 U.S. 353, 368 (1989).

In mandatory language, the MLAT imposes an obligation on each party to provide assistance in criminal investigations.  Upon ratification of the US-UK MLAT, the parties specifically accepted this contractual duty to provide assistance under the Treaty provisions.  In the event that the United States fails to produce evidence requested by the UK, the United States runs the risk that our criminal investigations which require the cooperation of UK authorities – whether they be terrorism investigations or international money laundering and narcotics investigations – would be put in jeopardy.

The US-UK MLAT permits the "Central Authority" of the United States, in this case the Attorney General, *id*. at Article 2, ¶2,  to decline to execute a request, or to limit or delay the execution of such a request, under a number of limited specified circumstances.  *Id*. at Article 5, ¶4 (permitting the Attorney General to postpone execution or make the execution subject to conditions); Article 3, ¶1(a)(permitting the Attorney General to refuse assistance if the request

impairs its sovereignty, security, or other important interests or would be contrary to important

public policy); Article 3, ¶1(b)(permitting the Attorney General to refuse assistance if the request

conflicts with double jeopardy concerns); Article 3, ¶1(c)(permitting the Attorney General to

refuse assistance if the request relates to a political or military offense). Notably, the US-UK

MLAT reserves the authority decline a MLAT request, or to limit its scope, to the Attorney

General, not the courts. *Id*. at Article 2, ¶2. As is evident from the initial application in this

case, the Attorney General has found no reason to deny the UK request. [D.1-1 at 4-5].

Under the US-UK MLAT and related constitutional principles, the Court must enforce

subpoenas issued pursuant to the treaty, except in two narrowly limited circumstances: where

such enforcement would violate the Constitution, *see In re Premises Located at 840 140th Avenue

NE, Bellevue, Washington*, 634 F.3d 557, 572 (9th Cir. 2011) (concluding that the US-Russia

MLAT – which contains similar language to the US-UK MLAT – requires the district court to

enforce subpoenas unless such enforcement would "offend constitutional guarantees"); or where

such enforcement would violate a federally recognized testimonial privilege (*e.g.* attorney/client,

spousal), *see* US-UK MLAT Article 8, ¶2.[4] Neither of these circumstances is present in the

---

[4]Article 8, ¶2 grants authority to compel the testimony or the production of documents in response to a MLAT request, "in accordance with the requirements of the law of the Requested Party." No court has interpreted this language in the US-UK MLAT and the Departments of State and Justice did not submit a technical analysis when presenting this MLAT to the Senate. However, this language mirrors the language used in the predecessor US-UK MLAT. *See Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters*, signed January 6, 1994, S. Treaty Document 104-2. The Technical Analysis of this predecessor MLAT notes that, "a witness questioned in the United States pursuant to a Treaty request from the United Kingdom is guaranteed the right to invoke any of the testimony privileges (e.g., attorney-client, inter-spousal) usually available in proceedings in the United States, as well as the constitutional privilege against self-incrimination." *Treaty with the United Kingdom on Mutual Legal Assistance in Criminal Matters*, S. Exec. Rep. 23, 104th Cong., 2d

instant case.

While the government also relied upon 18 U.S.C.§ 3512 in applying for the appointment

of a commissioner to subpoena documents on behalf of the UK, with the exception of search

warrants to be issued in the United States, that statute merely provides a procedural mechanism

for the efficient execution of a MLAT request. *See* 18 U.S.C.§ 3512 (e); 155 CONG. REC.  S6807-

01 (2009).  It does not vest the U.S. courts with discretion to evaluate MLAT requests where

none exists under the applicable treaty. *Id*. at S6,810 ("the proposed legislation would not alter

U.S. obligations or authorities under existing bilateral and multilateral law enforcement

treaties"). Congress enacted Section 3512 to make it "easier for the United States to respond to

these requests by allowing them to be centralized and by putting the process for handling them

within a clear statutory scheme."  *Id.* (Statement of Sen. Whitehouse).  It enables the United

States to respond "more quickly . . . to foreign evidence requests.  These efforts will assist [the

United States] with [its] investigations as foreign authorities will be urged to respond in kind to

our evidence requests in a speedy manner."  155 CONG. REC. H10,093 (2009)(Statement of Rep.

Schiff).[5]

---

Sess. at 20 (1996).

[5]  Prior to the negotiation of MLATs and the passage of 18 U.S.C.§ 3512, Courts relied on 28 U.S.C.§ 1782 to enforce both civil and criminal letters rogatory.  Section 1782 provided not only a procedural mechanism to obtain evidence for foreign requestors, but also vested courts with the discretion to narrow or decline to issue legal process to obtain evidence.  *See In re: Commissioner's Subpoenas* 325 F.3d at 1290 (noting the "wide discretion in the district court to refuse the request" and explaining that MLATs streamlined the process and limited the court's discretion).  Curtailing the discretionary aspect of 28 U.S.C. § 1782 was one of the purposes of modern mutual legal assistance treaties, which have now been negotiated and ratified with more than 60 nations.  *Id*.  *See also*, 3 *Nanda and Pansius, Litigation of International Disputes in U.S. Courts*, § 17:52 (2008). "Mutual Legal Assistance Treaties are often the preferred method of obtaining legal assistance.  [MLATs] provide at least three advantages: reciprocity; the reduction

**B.** **The Respondents have failed to Demonstrate that Compliance with the Subpoenas would Violate the Constitution or a Cognizable Privilege.**

The Respondents have failed to establish any grounds on which to quash the subpoenas. They neither assert nor establish that enforcement of the subpoenas would violate their constitutional right. Moreover, they make no claim of a cognizable federal privilege. As such, the Court should deny Respondents' motion to quash and enter an order compelling them to comply with the subpoenas.

As noted above, Respondents' reliance on *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1998) is misplaced. The First Circuit's decision in *Cusumano* was controlled by Fed.R.Civ.P. 45 and the limits placed on civil discovery requests set forth in Fed.R.Civ.P. 26(b)(2). *Id*. at 714. By contrast, this matter is governed by the mutual international obligations imposed by the US-UK MLAT outlined above. More importantly, *Cusumano* and the other civil discovery cases relied upon by the Respondents fail to address the core issues relevant here: the reciprocal obligations of the United States and the UK under the applicable MLAT; the fact that this is a sovereign seeking the information as part of an official investigation, rather than a private party; and the fact that the UK is engaged in a criminal investigation rather than civil litigation.[6]

_____

(if not elimination) of the court's discretion under § 1782; and the streamlining of evidence procurement processes." *Id.  See also In re Request from Canada Pursuant to the Treaty Between the United States and Canada On Mutual Legal Assistance in Criminal Matters*, 155 F. Supp. 2d 515, 517-20 (M.D.N.C. 2001).

[6]These latter two factors are particularly relevant in this instance because authorities in the UK have an affirmative obligation to investigate unsolved murders under the European

10

The Respondents have failed to cite a single case which holds that the limits outlined in

Fed.R.Civ.P. 26(b)(2) are applicable to subpoenas issued by an authorized MLAT commissioner.

Moreover, they acknowledge that courts have not recognized an "academic privilege" akin to the

attorney/client privilege or the Fifth Amendment protection against self-incrimination. [D.5 at

10].  While courts may engage in weighing the need for confidentiality of academic research in

civil discovery disputes, *see, e.g. Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583,

593-99 (1st Cir. 1980)(resolving discovery dispute in civil litigation under Fed.R.Civ.P. 26), the

calculus is entirely different when the United States is acting under its international obligations to

comply with a MLAT request in a criminal investigation.

Two cases interpreting similar MLAT provisions reflect the narrow scope of the Court's

discretion in this case.  The Ninth Circuit recently upheld the district court's denial of a motion to

quash a commissioner's subpoena in *In re Premises Located at 840 140th Avenue NE, Bellevue,*

*Washington*, 634 F.3d at 572.  In that case, documents were subpoenaed upon a request from the

---

Convention for the Protection of Human Rights and Fundamental Freedoms.  Article 2 of the
Convention provides that the right to life "shall be protected by law."  Article 1 of the
Convention provides that member States "shall secure within their jurisdiction the rights and
freedoms defined in Section I of this Convention," including the right to life identified in Article
2.  The European Court of Human Rights has "consistently held" that these two provisions
"require[] that there should be some form of effective official investigation when individuals
have been killed as the result of the use of force."  *Rantsev v. Cyprus and Russia*, 7 Jan. 2010, §
232 (citing *McCann and Others v. United Kingdom*, 27 Sept. 1995, § 161, Series A no. 324;
*Kaya v. Turkey*, 19 Feb. 1998, § 86, *Reports* 1998-I; *Medova v. Russia*, 15 Jan. 2009, no.
25385/04, § 103).  More broadly, Article 2 "requires the State to secure the right to life by
putting in place effective criminal law provisions to deter the commission of offences against the
person backed up by law enforcement machinery for the prevention, suppression and punishment
of breaches of such provisions."  *Id.* at § 218.  The authorities "must act of their own motion
once the matter has come to their attention.  They cannot leave it to the initiative of the next-of-
kin either to lodge a formal complaint or to take responsibility for the conduct of any
investigative procedures."  *Id.* at § 232.

Russian Federation under a similarly worded MLAT. The respondents filed a motion for a protective order which would have effectively quashed the subpoena, claiming that the Russian government's investigation was corrupt and illegal. The Ninth Circuit rejected the respondents' claim that the broad discretion to quash a subpoena under 28 U.S.C. § 1782 applied in the context of a modern MLAT request. *Id*. at 570. The court concluded that the MLAT with the Russian Federation narrowly proscribed those instances in which the United States could decline the request and that the district courts lacked discretion to quash MLAT subpoenas absent a valid constitutional claim. *Id*. at 571-72.

Likewise, the Eleventh Circuit in *In re: Commissioner's Subpoenas*, 325 F.3d at 1291, vacated a district court decision quashing subpoenas for testimony issued pursuant to the MLAT between the US and Canada. The court rejected the claim that the US-Canadian MLAT – which contains similar language as the US-UK MLAT – only permitted the enforcement of requests when such enforcement was "consistent with the entire substantive law of the Requested State." 325 F.3d at 1295. Among other things, the court reasoned that the MLAT's specified narrow limits on refusing assistance would be rendered meaningless if courts had discretion to apply all of U.S. substantive law to reject requests made under the treaty. *Id*. at 1295-97. The Eleventh Circuit concluded that district courts should not evaluate MLAT subpoenas under the standards applicable to domestic subpoenas or under the law pertaining to requests under 28 U.S.C.§ 1782. *Id*. Instead, MLATs should be given a liberal construction to effectuate their intended purpose – mutual assistance in criminal investigations and proceedings – and courts should enforce MLAT subpoenas absent some express provision in the applicable MLAT which gives the courts discretion. *Id*. at 1297-98. Notably, the Respondents have not argued that the US-UK MLAT

12

specifically authorizes the kind of balancing analysis they propose.

Both the Ninth and the Eleventh circuits rejected just what the Respondents are pressing this Court to do: to graft onto the US-UK MLAT substantive restrictions found nowhere in the treaty, and to apply a standard for evaluating subpoenas based on the Federal Rules of Civil Procedure. The Respondents seek to have the Court recognize a "quasi-privilege" for academic research – one which is dubious even under civil domestic law - and then weigh that "quasi-privilege" against the law enforcement interests present in the UK. The US-UK MLAT provides no such remedy for recipients of commissioner's subpoenas, and grafting these procedures and substantive law conflict with the core purpose of the treaty.

## II.  Even if the Court were to Engage in a Balancing Analysis, It Should Deny the Motion to Quash

While the Court should not engage in the type of balancing analysis urged by the Respondents, even if the Court were to do so, it should deny the motion to quash. There is a compelling need for the authorities in the UK to investigate the potential crimes set forth in the government's application, including murder and kidnaping. Moreover, as outlined below, the Court should discount many of the equitable claims and factual assertions made by the Respondents.

As a starting point, the Court should look to the cases developed in the context of domestic grand jury subpoenas rather than subpoenas for civil discovery under Fed.R.Civ.P. 26. The Court should do so because the UK is involved in a criminal investigation which necessarily demands a breadth akin to a grand jury investigation. *See, e.g. Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)(noting that the grand jury has powers of investigation and inquisition, "whose

inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result

of the investigation . . ." quoting *Blair v. United States,* 250 U.S. 273, 282 (1919)).

The most analogous cases are those in which journalists have been subpoenaed to testify

before a federal grand jury.  Yet, even those cases pose a greater burden on the government than

that which would be applicable here, because the Constitution and the courts have long

recognized the unique role which news reporters play in our constitutional system. *See, e.g.,*

*Branzburg*, 408 U.S. at 681; *New York Times Co. v. Sullivan*, 376 U.S. 254, 268-71 (1964).   The

limited protections afforded news reporters in the context of a grand jury subpoena should be

greater than those to be afforded academics engaged in the collection of oral history.

Nonetheless, even in the context of a grand jury subpoena issued to a news reporter, the

Supreme Court has found that "there is no First Amendment privilege to refuse to answer the

relevant and material questions asked during a good-faith grand jury investigation." *Branzburg v.*

*Hayes*, 408 U.S. at 708;  *In re Special Proceedings*, 373 F.3d 37, 44 -45 (1st Cir. 2004)(noting the

importance of criminal investigations, the usual obligation of citizens to provide evidence, and

the lack of proof that news-gathering required such a privilege); *In re Grand Jury Subpoena,*

*Judith Miller,* 438 F.3d 1141, 1147(D.C. Cir. 2006) ("Unquestionably, the Supreme Court

decided in *Branzburg* that there is no First Amendment privilege protecting journalists from . . .

providing evidence to a grand jury regardless of any confidence promised by the reporter to any

source. The Highest Court has spoken and never revisited the question. Without doubt, that is the

end of the matter.").  As noted by the Fifth Circuit,

> The Supreme Court . . . [concluded] that newsreporters have the same obligation
> to testify before a grand jury as any other citizen. *See [Branzburg]* at 690, 92 S.Ct.
> at 2661. Although the Court recognized that it would be a burden, albeit an

"uncertain" one, for newsreporters to reveal their sources, it held that the public's interest in law enforcement outweighed the concerns of the press.  *See id.* at 690-91, 92 S.Ct. at 2661-62. Consequently, the Court explicitly rejected a qualified newsreporters' privilege shielding confidential source information from grand juries.  *See id.* at 702-08, 92 S.Ct. at 2667-70. The Court instructed that the needs of the press are not to be weighed against the needs of the government in considering grand jury subpoenas. *See id.* at 705-06, 92 S.Ct. at 2668-69.

*United States v. Smith*, 135 F.3d 963, 968 (5th Cir. 1998); *see also United States v. Larouche Campaign*, 841 F.2d 1176, 1178 n.4 (1st Cir. 1988)(expressly rejecting the notion that there is a common law privilege for reporters to shield their sources and other information).[7]

Of particular importance is *Branzburg's* conclusion that courts should not get "embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance." 408 U.S. at 705-06.  Likewise, the Court should not engage in just such a preliminary assessment of the UK's need for information in its criminal investigation.[8]

---

[7]While Justice Powell's concurring opinion in *Branzburg* noted that there are some narrow constitutional limits on subpoenas issued to reporters in the context of a grand jury investigation, those limits apply only when grand jury investigations are being conducted to harass reporters or where there are otherwise no legitimate law enforcement needs for the information.  *Branzburg*, 408 U.S. at 710.  Even under Justice Powell's standard, the Respondents have made no credible demonstration which supports a motion to quash the subpoenas, and none exists.  As set forth in the government's initial application, there is ample basis to conclude that the UK is engaged in a bona fide criminal investigation. [D.1-1 at 6-20].

[8] Even in the context of a request under 28 U.S.C. §1782 for information from a reporter, the Seventh Circuit found:

> The federal interest in cooperating in the criminal proceedings of friendly foreign nations is obvious; and it is likewise obvious that the news-gathering and reporting activities of the press are inhibited when a reporter cannot assure confidential source of confidentiality.  Yet that was *Branzburg* and it is evident from the result in that case that the interest of the press in maintaining the confidentiality of sources is not absolute.

*McKevitt v. Pallasch*, 339 F.3d 530, 532 (7th Cir. 2003)(rejecting a claim for a reporter's privilege when the reporter's recordings were to be used in a UK prosecution).

While the Court is not required to do so given the standards outlined above, in the event it chooses to evaluate the Respondents' factual claims, it should review them with great skepticism. Moreover, in the event that the Court intends to credit the core allegations contained in the affidavits submitted by the Respondents, the government requests a hearing and an opportunity to cross-examine each of the affiants regarding their claims.

For instance, the Respondents' claim that the disclosure of the Price interview will put Ms. Price, Mr. Moloney, Mr. McIntyre, and Mr. Hachey at risk of retaliation from the IRA is speculative. They claim that the IRA enforces a "code of silence" and that "those who were perceived as having violated that code were subject, under IRA rules, to punishment by death . . ." [D.5 at 6]. Yet each of these individuals has already widely publicized their involvement in the Belfast Project, as has Boston College. Mr. Moloney has published a book that details the contents of two interviews, and outlines the nature and scope of the project. *See Voices From the Grave* at Preface & Introduction. Mr. McIntyre's involvement in conducting interviews of former IRA members is detailed in that book and in a related film documentary. It is clear that Mr. McIntyre participated in the widespread publication of his role in conducting interviews of former IRA members. *Id*. Likewise, Ms. Price publicly admitted to her membership in the IRA and to her involvement in the murder and disappearance of a number of IRA opponents. *See* Exhibits 1 and 2. Moreover, she has publicly admitted that she made recordings of her involvement in the IRA in connection with a project at a Boston-based university. *Id*.

Equally telling is that Boston College and the other Respondents have undertaken to widely publicize the issuance of the subpoenas in this case as well as the scope and nature of the Belfast Project. As the Court is aware, the UK requested that this matter be kept under seal.

16

[D.1-1 at 2].  The United States respected that request, filing its application under seal, and issuing subpoenas in a manner consistent with keeping this matter from public attention.

By contrast, shortly after receiving the subpoenas Boston College and the other Respondents widely publicized the issuance of the subpoenas.  *See* Exhibits 4, 5, 6 *(Secret Archive of Ulster Troubles Faces Subpoena, New York Times*, May 13, 2011; *BC Faces Dilemma over Irish Archive, Boston Globe*, May 14, 2011 at A1;*BC Asks for Irish Project Secrecy*, *Boston Globe*, June 9, 2011, at A1).   Moreover, rather than file its motion to quash under seal – a motion which includes detailed affidavits about the project and the alleged risks to its participants – it filed those materials on the record.  As reflected in the attached affidavits, both Mr. Moloney and Mr. McIntyre – who allegedly face risk from disclosure of the involvement in this project – participated in Boston College's  public filings in this case.

Several conclusions can be drawn from this.  First, the fact of the Price interviews by Boston College has been widely known for more than a year and nothing has happened to Ms. Price, Mr. Moloney, Mr. McIntyre, or Mr. Hachey.[9]  Second, the persons who are allegedly at the greatest risk placed themselves in that position long before the subpoenas were ever issued.  Third, since receiving the subpoenas the Respondents have done nothing but exacerbate this alleged problem rather than mitigate it.  If there genuine risks to the safety of Ms. Price, Mr. Maloney, Mr. Hachey, and Mr. McIntyre, Boston College would not have made such a public

---

[9]Mr. McIntyre claims that, as a result of the publication of *Voices from the Grave*, excrement was placed on his neighbor's home and he believes that the malicious conduct was intended for him.  However, there is no evidence that Mr. McIntyre reported the incident to law enforcement authorities in Ireland or Northern Ireland, and the relevant law enforcement authorities have no record of such a report.  *See* Exhibit 7.  Had Mr. McIntyre believed it was more than an ugly prank, he could have taken steps to protect himself, including reporting the matter to local authorities.

spectacle of the issuance of the subpoenas and their motion to quash.  *See* Exhibits 4, 5, 6.[10]  In

short, if there is any risk – which is a doubtful proposition – compliance with the subpoenas does

little to increase it.[11]

The Respondents also claim that the UK investigation may not be in good faith because,

"the government of the United Kingdom has indicated by its actions a policy not to pursue events

that occurred before the [Good Friday Agreement] peace accords." [D.5 at 8].  While the

Respondents and Mr. Maloney may wish this was so, it is not in fact the case.  The Good Friday

Agreement did not grant general amnesty.  *See* Exhibit 8 *(Agreement Reached in Multi-Party*

*Negotiations* (April 10, 1998) also known as the "Good Friday Agreement").  While many have

called for such a general amnesty and for a truth and reconciliation commission similar to that

which forged the new government in South Africa, there has never been an agreement among the

factions in Northern Ireland for either.  *See, e.g. Dealing with the Past in Northern Ireland: The*

*Recommendations of the Consultative Group on the Past*, Secretary of State for Northern Ireland

(June 2009) at pg. 24 (noting the "developing practice in international law points strongly against

amnesties" and that "some politicians and victims [believe] that the route of investigation and

prosecution should be left open").  Moreover, the investigation and prosecution of crimes

committed during the Troubles continue at a regular pace.  *See, e.g.* Exhibit 9 (Judicial

---

[10]There have also been numerous news stories about the subpoenas in Northern Ireland and Great Britain, which are widely available on the Internet.

[11]Upon information and belief, the statements which Mr. Hachey attributes to the United States Consul General in Belfast, Northern Ireland, regarding personal risk to him are inaccurate. [D.5 at Hachey Affidavit ¶ 12].  In the event that the Court intends to give any credit to Mr. Hachey's affidavit on this issue, the government requests the opportunity to cross-examine Mr. Hachey on this point.

Communications Office Summary of Judgment in a 2011 conviction for attempted murder committed in 1981 by an IRA member).  In fact, as noted above, law enforcement authorities in the UK are obligated under the European Convention on Human Rights to investigate murders, whether or not they were part of the Troubles in Northern Ireland.  *See supra* at fn 6.

The Respondents also make the extraordinary claim that, "forced disclosure of Belfast Project materials may challenge the delicate political stability that has been achieved in Northern Ireland." [D.9].  While the Respondents may genuinely hold this belief, they have done nothing more than speculate in this regard.  Moreover, the Court is particularly ill-equipped to evaluate the credibility of such a claim.  Certainly, the applicable MLAT does not contemplate that a court in the United States will hold hearings on whether compliance with a MLAT request may or may not result in political instability in a foreign country.  This is precisely the type of assessment left to the Central Authority of the United States, here the Attorney General, and the Central Authority in the UK. *See* US-UK MLAT at Articles 2 and 3. Moreover, the fact that the MLAT request was made and that the subpoenas were issued in this case demonstrate that the Central Authorities in both countries made such an assessment and have determined that the potential gains outweigh any risks. [D.1].

The Respondents also argue that the Court's failure to quash the subpoena will result in harm to the field of oral history: "[i]f confidentiality can be breached by enforced disclosure through the use of subpoena, oral history projects dealing with sensitive or controversial subjects will be difficult, if not impossible, to pursue." [D.5 at 15].  A similar argument for journalists was advanced and rejected in *Branzburg*:

We are admonished that refusal to provide a First Amendment reporter's privilege

19

> will undermine the freedom of the press to collect and disseminate news.  But this
> is not the lesson history teaches us. . .  From the beginning of our country the
> press has operated without constitutional protection for press informants, and the
> press has flourished.

408 U.S. 698-99.  More importantly, even many oral historians recognize that ensuring absolute

protection is not possible.  *See, e.g.* Exhibit 4 (noting that Columbia University cautions

participants that materials may be subject to subpoena).  Notably, the contract between Boston

College and the Belfast Project Director recognized that ensuring absolute protection was not

possible:

> Each interviewee is to be given a contract guaranteeing ***to the extent American
> law allows*** the conditions of the interview and conditions of its deposit at the
> Burns Library, including terms of an embargo period if this becomes necessary, as
> outlined herein.  An appropriate user model, such as Columbia University's Oral
> History Research Office Guidelines statement, should be adopted.

[D.5 at Moloney Attachment 1 (emphasis added)].  In a related letter from Boston College to Mr.

Moloney, the Burns Librarian cautioned Mr. Maloney that, "I cannot guarantee, for example, that

we would be in a position to refuse to turn over documents on a court order without being held in

contempt."  *See* Exhibit 10.[12]

Moreover, the standard forms from many other universities do not include absolute

confidentiality.  *See, e.g.* Exhibit 11 (sample forms).  Thus, the notion that only absolute secrecy

is necessary to conduct sensitive oral history projects is belied by authoritative experts in the

field and by the administrators of Boston College itself.

Even if the Court assumes that the most sensitive oral history projects will be inhibited by

the disclosure of the Price interview materials, that is a necessary cost incurred to investigate

---

[12]  It is unclear how Mr. Maloney ultimately decided to disregard this advice.

20

serious crimes.  As the Supreme Court recognized in *Branzburg*:

> it is obvious that agreements to conceal information relevant to commission of
> crime have very little to recommend them from the standpoint of public policy.
> Historically, the common law recognized a duty to raise the 'hue and cry' and
> report felonies to the authorities. . . It is apparent . . . from our history and that of
> England, that concealment of crime and agreements to do so are not looked upon
> with favor.  Such conduct deserves no encomium . . .

 408 U.S. 696-97.

Finally, the Respondents argue that the Court should quash the subpoenas because to permit their disclosure would violate Ms. Price's expectation of confidentiality. [D.12-13]. In other words, the Respondents request that the Court enforce a promise simply because it was unwisely or mistakenly made.  This too should be rejected because it would turn the law on its head.  To grant the motion to quash would encourage other persons engaged in collecting "oral histories" – whether they be legitimate academics, or the purveyors of pulp fiction collecting 'confessions' about organized crime  – to promise complete confidentiality, relying on the Court to enforce that ill-advised promise.

### Conclusion

Under the applicable treaty, the Court has limited discretion to grant a motion to quash. The Respondents have failed to identify a proper grounds under the US-UK MLAT for such a motion.  As such, the Court must reject the motion to quash and enforce the subpoenas issued in this case.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

Date: July 1, 2011          By:   */s/ John T. McNeil*

John T. McNeil
Todd F. Braunstein
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ John T. McNeil*

John T. McNeil
Assistant United States Attorney