Exhibit 8

# The Agreement

**Agreement reached in the multi-party negotiations**

## TABLE OF CONTENTS

**1. Declaration of Support**

**2. Constitutional Issues**

    Annex A: Draft Clauses/Schedules for Incorporation in British Legislation

    Annex B: Irish Government Draft Legislation

**3. Strand One:**

Democratic Institutions in Northern Ireland

**4. Strand Two:**

North/South Ministerial Council

**5. Strand Three:**

British - Irish Council

British - Irish Intergovernmental Conference

**6. Rights, Safeguards and Equality of Opportunity**

Human Rights

United Kingdom Legislation

New Institutions in Northern Ireland

Comparable Steps by the Irish Government

A Joint Committee

Reconciliation and Victims of Violence

Economic, Social and Cultural Issues

**7. Decommissioning**

**8. Security**

**9. Policing and Justice**

Annex A: Commission on Policing for Northern Ireland

Annex B: Review of the Criminal Justice System

**10. Prisoners**

**11. Validation, Implementation and Review**

Validation and Implementation

Review Procedures Following Implementation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ANNEX: Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Ireland.

Tablecontents.htm

## DECLARATION OF SUPPORT

1. We, the participants in the multi-party negotiations, believe that the agreement we have negotiated offers a truly historic opportunity for a new beginning.

2. The tragedies of the past have left a deep and profoundly regrettable legacy of suffering. We must never forget those who have died or been injured, and their families. But we can best honour them through a fresh start, in which we firmly dedicate ourselves to the achievement of reconciliation, tolerance, and mutual trust, and to the protection and vindication of the human rights of all.

3. We are committed to partnership, equality and mutual respect as the basis of relationships within Northern Ireland, between North and South, and between these islands.

4. We reaffirm our total and absolute commitment to exclusively democratic and peaceful means of resolving differences on political issues, and our opposition to any use or threat of force by others for any political purpose, whether in regard to this agreement or otherwise.

5. We acknowledge the substantial differences between our continuing,

and equally legitimate, political aspirations. However, we will endeavour to strive in every practical way towards reconciliation and rapprochement within the framework of democratic and agreed arrangements. We pledge that we will, in good faith, work to ensure the success of each and every one of the arrangements to be established under this agreement. It is accepted that all of the institutional and constitutional arrangements - an Assembly in Northern Ireland, a North/South Ministerial Council, implementation bodies, a British-Irish Council and a British-Irish Intergovernmental Conference and any amendments to British Acts of Parliament and the Constitution of Ireland - are interlocking and interdependent and that in particular the functioning of the Assembly and the North/South Council are so closely inter-related that the success of each depends on that of the other.

6. Accordingly, in a spirit of concord, we strongly commend this agreement to the people, North and South, for their approval.

## CONSTITUTIONAL ISSUES

1. The participants endorse the commitment made by the British and Irish Governments that, in a new British-Irish Agreement replacing the Anglo-Irish Agreement, they will:

(i) recognise the legitimacy of whatever choice is freely exercised by a majority of the people of Northern Ireland with regard to its status, whether they prefer to continue to support the Union with Great Britain or a sovereign united Ireland;

(ii) recognise that it is for the people of the island of Ireland alone, by agreement between the two parts respectively and without external impediment, to exercise their right of self-determination on the basis of consent, freely and concurrently given, North and South, to bring about a united Ireland, if that is their wish, accepting that this right must be achieved and exercised with and subject to the agreement and consent of a majority of the people of Northern Ireland;

(iii) acknowledge that while a substantial section of the people in Northern Ireland share the legitimate wish of a majority of the people of the island of Ireland for a united Ireland, the present wish of a majority of the people of Northern Ireland, freely exercised and legitimate, is to maintain the Union and, accordingly, that Northern Ireland's status as part of the United Kingdom reflects and relies upon that wish; and that it would be wrong to make any change in the status of Northern Ireland save with the consent of a majority of its people;

(iv) affirm that if, in the future, the people of the island of Ireland exercise their right of self-determination on the basis set out in sections (i) and (ii) above to bring about a united Ireland, it will be a binding obligation on both Governments to introduce and support in their respective Parliaments legislation to give effect to that wish;

(v) affirm that whatever choice is freely exercised by a majority of the people of Northern Ireland, the power of the sovereign government with jurisdiction there shall be exercised with rigorous impartiality on behalf of all the people in the diversity of their identities and traditions and shall be founded on the principles of full respect for, and equality of, civil, political, social and cultural rights, of freedom from discrimination for all citizens, and of parity of esteem and of just and equal treatment for the identity, ethos, and aspirations of both communities;

(vi) recognise the birthright of all the people of Northern Ireland to identify themselves and be accepted as Irish or British, or both, as they may so choose, and accordingly confirm that their right to hold both British and Irish citizenship is accepted by both Governments and would not be affected by any future change in the status of Northern Ireland.

2. The participants also note that the two Governments have accordingly undertaken in the context of this comprehensive political agreement, to propose and support changes in, respectively, the Constitution of Ireland and in British legislation relating to the constitutional status of Northern Ireland.

ANNEX A

## DRAFT CLAUSES/SCHEDULES FOR INCORPORATION IN BRITISH LEGISLATION

1. (1) It is hereby declared that Northern Ireland in its entirety remains part of the United Kingdom and shall not cease to be so without the consent of a majority of the people of Northern Ireland voting in a poll held for the purposes of this section in accordance with Schedule 1.

(2) But if the wish expressed by a majority in such a poll is that Northern Ireland should cease to be part of the United Kingdom and form part of a united Ireland, the Secretary of State shall lay before Parliament such proposals to give effect to that wish as may be agreed between Her Majesty's Government in the United Kingdom and the Government of Ireland.

2. The Government of Ireland Act 1920 is repealed; and this Act shall have effect notwithstanding any other previous enactment.

## SCHEDULE 1

## POLLS FOR THE PURPOSE OF SECTION 1

1. The Secretary of State may by order direct the holding of a poll for the purposes of section 1 on a date specified in the order.

2. Subject to paragraph 3, the Secretary of State shall exercise the power under paragraph 1 if at any time it appears likely to him that a majority of those voting would express a wish that Northern Ireland should cease to be part of the United Kingdom and form part of a united Ireland.

3. The Secretary of State shall not make an order under paragraph 1 earlier than seven years after the holding of a previous poll under this Schedule.

4. (Remaining paragraphs along the lines of paragraphs 2 and 3 of existing Schedule 1 to 1973 Act.)

ANNEX B

IRISH GOVERNMENT DRAFT LEGISLATION TO AMEND THE CONSTITUTION

Add to Article 29 the following sections:

7.

1. The State may consent to be bound by the British-Irish Agreement done at Belfast on the day of 1998, hereinafter called the Agreement.

1. Any institution established by or under the Agreement may exercise the powers and functions thereby conferred on it in respect of all or any part of the island of Ireland notwithstanding any other provision of this Constitution conferring a like power or function on any person or any organ of State appointed under or created or established by or under this Constitution. Any power or function conferred on such an institution in relation to the settlement or resolution of disputes or controversies may be in addition to or in substitution for any like power or function conferred by this Constitution on any such person or organ of State as aforesaid.

1. If the Government declare that the State has become obliged, pursuant to the Agreement, to give effect to the amendment of this Constitution referred to therein, then, notwithstanding Article 46 hereof, this Constitution shall be amended as follows:

i. the following Articles shall be substituted for Articles 2 and 3 of the Irish text:

"2. [Irish text to be inserted here]

3. [Irish text to be inserted here]"

ii. the following Articles shall be substituted for Articles 2 and 3 of the English text:

"Article 2

It is the entitlement and birthright of every person born in the island of
Ireland, which includes its islands and seas, to be part of the Irish nation.
That is also the entitlement of all persons otherwise qualified in
accordance with law to be citizens of Ireland. Furthermore, the Irish
nation cherishes its special affinity with people of Irish ancestry living
abroad who share its cultural identity and heritage.

Article 3

1. It is the firm will of the Irish nation, in harmony and friendship, to unite
all the people who share the territory of the island of Ireland, in all the
diversity of their identities and traditions, recognising that a united Ireland
shall be brought about only by peaceful means with the consent of a
majority of the people, democratically expressed, in both jurisdictions in
the island. Until then, the laws enacted by the Parliament established by
this Constitution shall have the like area and extent of application as the
laws enacted by the Parliament that existed immediately before the
coming into operation of this Constitution.

2. Institutions with executive powers and functions that are shared
between those jurisdictions may be established by their respective
responsible authorities for stated purposes and may exercise powers and
functions in respect of all or any part of the island."

iii. the following section shall be added to the Irish text of this Article:

"8. [Irish text to be inserted here]"

and

iv. the following section shall be added to the English text of this Article:

"8. The State may exercise extra-territorial jurisdiction in accordance with
the generally recognised principles of international law."

4. If a declaration under this section is made, this subsection and
subsection 3, other than the amendment of this Constitution effected
thereby, and subsection 5 of this section shall be omitted from every
official text of this Constitution published thereafter, but notwithstanding
such omission this section shall continue to have the force of law.

5. If such a declaration is not made within twelve months of this section
being added to this Constitution or such longer period as may be provided
for by law, this section shall cease to have effect and shall be omitted
from every official text of this Constitution published thereafter.

## STRAND ONE

### DEMOCRATIC INSTITUTIONS IN NORTHERN IRELAND

1. This agreement provides for a democratically elected Assembly in Northern Ireland which is inclusive in its membership, capable of exercising executive and legislative authority, and subject to safeguards to protect the rights and interests of all sides of the community.

**The Assembly**

2. A 108-member Assembly will be elected by PR(STV) from existing Westminster constituencies.

3. The Assembly will exercise full legislative and executive authority in respect of those matters currently within the responsibility of the six Northern Ireland Government Departments, with the possibility of taking on responsibility for other matters as detailed elsewhere in this agreement.

4. The Assembly - operating where appropriate on a cross-community basis - will be the prime source of authority in respect of all devolved responsibilities.

**Safeguards**

5. There will be safeguards to ensure that all sections of the community can participate and work together successfully in the operation of these institutions and that all sections of the community are protected, including:

(a) allocations of Committee Chairs, Ministers and Committee membership in proportion to party strengths;

(b) the European Convention on Human Rights (ECHR) and any Bill of Rights for Northern Ireland supplementing it, which neither the Assembly nor public bodies can infringe, together with a Human Rights Commission;

(c) arrangements to provide that key decisions and legislation are proofed to ensure that they do not infringe the ECHR and any Bill of Rights for Northern Ireland;

(d) arrangements to ensure key decisions are taken on a cross-community basis;

(i) either parallel consent, i.e. a majority of those members present and voting, including a majority of the unionist and nationalist designations present and voting;

(ii) or a weighted majority (60%) of members present and voting, including at least 40% of each of the nationalist and unionist designations present and voting.

Key decisions requiring cross-community support will be designated in advance, including election of the Chair of the Assembly, the First Minister and Deputy First Minister, standing orders and budget allocations. In other cases such decisions could be triggered by a petition of concern brought by a significant minority of Assembly members (30/108).

(e) an Equality Commission to monitor a statutory obligation to promote equality of opportunity in specified areas and parity of esteem between the two main communities, and to investigate individual complaints against public bodies.

**Operation of the Assembly**

6. At their first meeting, members of the Assembly will register a designation of identity - nationalist, unionist or other - for the purposes of measuring cross-community support in Assembly votes under the relevant provisions above.

7. The Chair and Deputy Chair of the Assembly will be elected on a cross-community basis, as set out in paragraph 5(d) above.

8. There will be a Committee for each of the main executive functions of the Northern Ireland Administration. The Chairs and Deputy Chairs of the Assembly Committees will be allocated proportionally, using the d'Hondt system. Membership of the Committees will be in broad proportion to party strengths in the Assembly to ensure that the opportunity of Committee places is available to all members.

9. The Committees will have a scrutiny, policy development and consultation role with respect to the Department with which each is associated, and will have a role in initiation of legislation. They will have the power to:

• consider and advise on Departmental budgets and Annual Plans in the context of the overall budget allocation;
• approve relevant secondary legislation and take the Committee stage of relevant primary legislation;
• call for persons and papers;
• initiate enquiries and make reports;
• consider and advise on matters brought to the Committee by its Minister.

10. Standing Committees other than Departmental Committees may be established as may be required from time to time.

11. The Assembly may appoint a special Committee to examine and report on whether a measure or proposal for legislation is in conformity with equality requirements, including the ECHR/Bill of Rights. The Committee shall have the power to call people and papers to assist in its consideration of the matter. The Assembly shall then consider the report of the Committee and can determine the matter in accordance with the cross-community consent procedure.

12. The above special procedure shall be followed when requested by the Executive Committee, or by the relevant Departmental Committee, voting on a cross-community basis.

13. When there is a petition of concern as in 5(d) above, the Assembly shall vote to determine whether the measure may proceed without reference to this special procedure. If this fails to achieve support on a cross-community basis, as in 5(d)(i) above, the special procedure shall be followed.

**Executive Authority**

14. Executive authority to be discharged on behalf of the Assembly by a First Minister

and Deputy First Minister and up to ten Ministers with Departmental responsibilities.

15. The First Minister and Deputy First Minister shall be jointly elected into office by the Assembly voting on a cross-community basis, according to 5(d)(i) above.

16. Following the election of the First Minister and Deputy First Minister, the posts of Ministers will be allocated to parties on the basis of the d'Hondt system by reference to the number of seats each party has in the Assembly.

17. The Ministers will constitute an Executive Committee, which will be convened, and presided over, by the First Minister and Deputy First Minister.

18. The duties of the First Minister and Deputy First Minister will include, inter alia, dealing with and co-ordinating the work of the Executive Committee and the response of the Northern Ireland administration to external relationships.

19. The Executive Committee will provide a forum for the discussion of, and agreement on, issues which cut across the responsibilities of two or more Ministers, for prioritising executive and legislative proposals and for recommending a common position where necessary (e.g. in dealing with external relationships).

20. The Executive Committee will seek to agree each year, and review as necessary, a programme incorporating an agreed budget linked to policies and programmes, subject to approval by the Assembly, after scrutiny in Assembly Committees, on a cross-community basis.

21. A party may decline the opportunity to nominate a person to serve as a Minister or may subsequently change its nominee.

22. All the Northern Ireland Departments will be headed by a Minister. All Ministers will liaise regularly with their respective Committee.

23. As a condition of appointment, Ministers, including the First Minister and Deputy First Minister, will affirm the terms of a Pledge of Office (Annex A) undertaking to discharge effectively and in good faith all the responsibilities attaching to their office.

24. Ministers will have full executive authority in their respective areas of responsibility, within any broad programme agreed by the Executive Committee and endorsed by the Assembly as a whole.

25. An individual may be removed from office following a decision of the Assembly taken on a cross-community basis, if (s)he loses the confidence of the Assembly, voting on a cross-community basis, for failure to meet his or her responsibilities including, inter alia, those set out in the Pledge of Office. Those who hold office should use only democratic, non-violent means, and those who do not should be excluded or removed from office under these provisions.

## Legislation

26. The Assembly will have authority to pass primary legislation for Northern Ireland in devolved areas, subject to:

(a) the ECHR and any Bill of Rights for Northern Ireland supplementing it which, if the courts found to be breached, would render the relevant legislation null and void;

(b) decisions by simple majority of members voting, except when decision on a cross-community basis is required;

(c) detailed scrutiny and approval in the relevant Departmental Committee;

(d) mechanisms, based on arrangements proposed for the Scottish Parliament, to ensure suitable co-ordination, and avoid disputes, between the Assembly and the Westminster Parliament;

(e) option of the Assembly seeking to include Northern Ireland provisions in United Kingdom-wide legislation in the Westminster Parliament,

especially on devolved issues where parity is normally maintained (e.g. social security, company law).

27. The Assembly will have authority to legislate in reserved areas with the approval of the Secretary of State and subject to Parliamentary control.

28. Disputes over legislative competence will be decided by the Courts.

29. Legislation could be initiated by an individual, a Committee or a Minister.

**Relations with other institutions**

30. Arrangements to represent the Assembly as a whole, at Summit level and in dealings with other institutions, will be in accordance with paragraph 18, and will be such as to ensure cross-community involvement.

31. Terms will be agreed between appropriate Assembly representatives and the Government of the United Kingdom to ensure effective co-ordination and input by Ministers to national policy-making, including on EU issues.

32. Role of Secretary of State:

   (a) to remain responsible for NIO matters not devolved to the Assembly,    subject to regular consultation with the Assembly and Ministers;

   (b) to approve and lay before the Westminster Parliament any Assembly    legislation on reserved matters;

   (c) to represent Northern Ireland interests in the United Kingdom Cabinet;

   (d) to have the right to attend the Assembly at their invitation.

33. The Westminster Parliament (whose power to make legislation for Northern Ireland would remain unaffected) will:

(a) legislate for non-devolved issues, other than where the Assembly legislates with the approval of the Secretary of State and subject to the control of Parliament;

(b) to legislate as necessary to ensure the United Kingdom's international obligations are met in respect of Northern Ireland;

(c) scrutinise, including through the Northern Ireland Grand and Select Committees, the responsibilities of the Secretary of State.

34. A consultative Civic Forum will be established. It will comprise representatives of the business, trade union and voluntary sectors, and such other sectors as agreed by the First Minister and the Deputy First Minister. It will act as a consultative mechanism on social, economic and cultural issues. The First Minister and the Deputy First Minister will by agreement provide administrative support for the Civic Forum and establish guidelines for the selection of representatives to the Civic Forum.

### Transitional Arrangements

35. The Assembly will meet first for the purpose of organisation, without legislative or executive powers, to resolve its standing orders and working practices and make preparations for the effective functioning of the Assembly, the British-Irish Council and the North/South Ministerial Council and associated implementation bodies. In this transitional period, those members of the Assembly serving as shadow Ministers shall affirm their commitment to non-violence and exclusively peaceful and democratic means and their opposition to any use or threat of force by others for any political purpose; to work in good faith to bring the new arrangements into being; and to observe the spirit of the Pledge of Office applying to appointed Ministers.

### Review

36. After a specified period there will be a review of these arrangements, including the details of electoral arrangements and of the Assembly's procedures, with a view to agreeing any adjustments necessary in the interests of efficiency and fairness.

Annex A

## Pledge of Office

To pledge:

 (a) to discharge in good faith all the duties of office;

 (b) commitment to non-violence and exclusively peaceful and democratic    means;

(c) to serve all the people of Northern Ireland equally, and to act in accordance    with the general obligations on government to promote equality and prevent    discrimination;

(d) to participate with colleagues in the preparation of a programme for government;

(e) to operate within the framework of that programme when agreed within the Executive Committee and endorsed by the Assembly;

(f) to support, and to act in accordance with, all decisions of the Executive Committee and Assembly;

(g) to comply with the Ministerial Code of Conduct.

## CODE OF CONDUCT

Ministers must at all times:

- observe the highest standards of propriety and regularity involving impartiality, integrity and objectivity in relationship to the stewardship of public funds;
- be accountable to users of services, the community and, through the Assembly, for the activities within their responsibilities, their stewardship of public funds and the extent to which key performance targets and objectives have been met;
- ensure all reasonable requests for information from the Assembly, users of services and individual citizens are complied with; and that Departments and their staff conduct their dealings with the public in an open and responsible way;
- follow the seven principles of public life set out by the Committee on Standards in Public Life;
- comply with this code and with rules relating to the use of public funds;
- operate in a way conducive to promoting good community relations and equality of treatment;
- not use information gained in the course of their service for personal gain; nor seek to use the opportunity of public service to promote their private interests;
- ensure they comply with any rules on the acceptance of gifts and hospitality that might be offered;
- declare any personal or business interests which may conflict with their responsibilities. The Assembly will retain a Register of Interests. Individuals must ensure that any direct or indirect pecuniary interests which members of the public might reasonably think could influence their judgement are listed in the Register of Interests;

## STRAND TWO

## NORTH/SOUTH MINISTERIAL COUNCIL

1. Under a new British/Irish Agreement dealing with the totality of relationships, and related legislation at Westminster and in the Oireachtas, a North/South Ministerial Council to be established to bring together

those with executive responsibilities in Northern Ireland and the Irish Government, to develop consultation, co-operation and action within the island of Ireland - including through implementation on an all-island and cross-border basis - on matters of mutual interest within the competence of the Administrations, North and South.

2. All Council decisions to be by agreement between the two sides. Northern Ireland to be represented by the First Minister, Deputy First Minister and any relevant Ministers, the Irish Government by the Taoiseach and relevant Ministers, all operating in accordance with the rules for democratic authority and accountability in force in the Northern Ireland Assembly and the Oireachtas respectively. Participation in the Council to be one of the essential responsibilities attaching to relevant posts in the two Administrations. If a holder of a relevant post will not participate normally in the Council, the Taoiseach in the case of the Irish Government and the First and Deputy First Minister in the case of the Northern Ireland Administration to be able to make alternative arrangements.

3. The Council to meet in different formats:

 (i) in plenary format twice a year, with Northern Ireland representation led by the First Minister and Deputy First Minister and the Irish Government led by the Taoiseach;

 (ii) in specific sectoral formats on a regular and frequent basis with each side represented by the appropriate Minister;

 (iii) in an appropriate format to consider institutional or cross-sectoral matters (including in relation to the EU) and to resolve disagreement.

4. Agendas for all meetings to be settled by prior agreement between the two sides, but it will be open to either to propose any matter for consideration or action.

5. The Council:

 (i) to exchange information, discuss and consult with a view to co-operating on matters of mutual interest within the competence of both Administrations, North and South;

 (ii) to use best endeavours to reach agreement on the adoption of common policies, in areas where there is a mutual cross-border and all-island benefit, and which are within the competence of both Administrations, North and South, making determined efforts to overcome any disagreements;

 (iii) to take decisions by agreement on policies for implementation separately in each jurisdiction, in relevant meaningful areas within the competence of both Administrations, North and South;

(iv) to take decisions by agreement on policies and action at an all-island and cross-border level to be implemented by the bodies to be established as set out in paragraphs 8 and 9 below.

6. Each side to be in a position to take decisions in the Council within the defined authority of those attending, through the arrangements in place for co-ordination of executive functions within each jurisdiction. Each side to remain accountable to the Assembly and Oireachtas respectively, whose approval, through the arrangements in place on either side, would be required for decisions beyond the defined authority of those attending.

7. As soon as practically possible after elections to the Northern Ireland Assembly, inaugural meetings will take place of the Assembly, the British/Irish Council and the North/South Ministerial Council in their transitional forms. All three institutions will meet regularly and frequently on this basis during the period between the elections to the Assembly, and the transfer of powers to the Assembly, in order to establish their modus operandi.

8. During the transitional period between the elections to the Northern Ireland Assembly and the transfer of power to it, representatives of the Northern Ireland transitional Administration and the Irish Government operating in the North/South Ministerial Council will undertake a work programme, in consultation with the British Government, covering at least 12 subject areas, with a view to identifying and agreeing by 31 October 1998 areas where co-operation and implementation for mutual benefit will take place. Such areas may include matters in the list set out in the Annex.

9. As part of the work programme, the Council will identify and agree at least 6 matters for co-operation and implementation in each of the following categories:

(I) Matters where existing bodies will be the appropriate mechanisms for co-operation in each separate jurisdiction;

(ii) Matters where the co-operation will take place through agreed implementation bodies on a cross-border or all-island level.

10. The two Governments will make necessary legislative and other enabling preparations to ensure, as an absolute commitment, that these bodies, which have been agreed as a result of the work programme, function at the time of the inception of the British-Irish Agreement and the transfer of powers, with legislative authority for these bodies transferred to the Assembly as soon as possible thereafter. Other arrangements for the agreed co-operation will also commence contemporaneously with the transfer of powers to the Assembly.

11. The implementation bodies will have a clear operational remit. They will implement on an all-island and cross-border basis policies agreed in

the Council.

12. Any further development of these arrangements to be by agreement in the Council and with the specific endorsement of the Northern Ireland Assembly and Oireachtas, subject to the extent of the competences and responsibility of the two Administrations.

13. It is understood that the North/South Ministerial Council and the Northern Ireland Assembly are mutually inter-dependent, and that one cannot successfully function without the other.

14. Disagreements within the Council to be addressed in the format described at paragraph 3(iii) above or in the plenary format. By agreement between the two sides, experts could be appointed to consider a particular matter and report.

15. Funding to be provided by the two Administrations on the basis that the Council and the implementation bodies constitute a necessary public function.

16. The Council to be supported by a standing joint Secretariat, staffed by members of the Northern Ireland Civil Service and the Irish Civil Service.

17. The Council to consider the European Union dimension of relevant matters, including the implementation of EU policies and programmes and proposals under consideration in the EU framework. Arrangements to be made to ensure that the views of the Council are taken into account and represented appropriately at relevant EU meetings.

18. The Northern Ireland Assembly and the Oireachtas to consider developing a joint parliamentary forum, bringing together equal numbers from both institutions for discussion of matters of mutual interest and concern.

19. Consideration to be given to the establishment of an independent consultative forum appointed by the two Administrations, representative of civil society, comprising the social partners and other members with expertise in social, cultural, economic and other issues.

ANNEX

Areas for North-South co-operation and implementation may include the following:

1. Agriculture - animal and plant health.

2. Education - teacher qualifications and exchanges.

3. Transport - strategic transport planning.

4. Environment - environmental protection, pollution, water quality, and waste   management.

5. Waterways - inland waterways.

6. Social Security/Social Welfare - entitlements of cross-border workers and   fraud control.

7. Tourism - promotion, marketing, research, and product development.

8. Relevant EU Programmes such as SPPR, INTERREG, Leader II and their   successors.

9. Inland Fisheries.

10. Aquaculture and marine matters

11. Health: accident and emergency services and other related cross-border   issues.

12. Urban and rural development.

Others to be considered by the shadow North/ South Council.

## STRAND THREE

### BRITISH-IRISH COUNCIL

1. A British-Irish Council (BIC) will be established under a new British-Irish Agreement to promote the harmonious and mutually beneficial development of the totality of relationships among the peoples of these islands.

2. Membership of the BIC will comprise representatives of the British and Irish Governments, devolved institutions in Northern Ireland, Scotland and Wales, when established, and, if appropriate, elsewhere in the United Kingdom, together with representatives of the Isle of Man and the Channel Islands.

3. The BIC will meet in different formats: at summit level, twice per year; in specific sectoral formats on a regular basis, with each side represented by the appropriate Minister; in an appropriate format to consider cross-sectoral matters.

4. Representatives of members will operate in accordance with whatever procedures for democratic authority and accountability are in force in their respective elected institutions.

5. The BIC will exchange information, discuss, consult and use best endeavours to reach agreement on co-operation on matters of mutual interest within the competence of the relevant Administrations. Suitable issues for early discussion in the BIC could include transport links, agricultural issues, environmental issues, cultural issues, health issues, education issues and approaches to EU issues. Suitable arrangements to be made for practical co-operation on agreed policies.

6. It will be open to the BIC to agree common policies or common actions. Individual members may opt not to participate in such common policies and common action.

7. The BIC normally will operate by consensus. In relation to decisions on common policies or common actions, including their means of implementation, it will operate by agreement of all members participating in such policies or actions.

8. The members of the BIC, on a basis to be agreed between them, will provide such financial support as it may require.

9. A secretariat for the BIC will be provided by the British and Irish Governments in co-ordination with officials of each of the other members.

10. In addition to the structures provided for under this agreement, it will be open to two or more members to develop bilateral or multilateral arrangements between them. Such arrangements could include, subject to the agreement of the members concerned, mechanisms to enable consultation, co-operation and joint decision-making on matters of mutual interest; and mechanisms to implement any joint decisions they may reach. These arrangements will not require the prior approval of the BIC as a whole and will operate independently of it.

11. The elected institutions of the members will be encouraged to develop interparliamentary links, perhaps building on the British-Irish Interparliamentary Body.

12. The full membership of the BIC will keep under review the workings of the Council, including a formal published review at an appropriate time after the Agreement comes into effect, and will contribute as appropriate to any review of the overall political agreement arising from the multi-party negotiations.

## BRITISH-IRISH INTERGOVERNMENTAL CONFERENCE

1. There will be a new British-Irish Agreement dealing with the totality of relationships. It will establish a standing British-Irish Intergovernmental Conference, which will subsume both the Anglo-Irish Intergovernmental Council and the Intergovernmental Conference established under the 1985 Agreement.

2. The Conference will bring together the British and Irish Governments to promote bilateral co-operation at all levels on all matters of mutual interest within the competence of both Governments.

3. The Conference will meet as required at Summit level (Prime Minister and Taoiseach). Otherwise, Governments will be represented by appropriate Ministers. Advisers, including police and security advisers, will attend as appropriate.

4. All decisions will be by agreement between both Governments. The Governments will make determined efforts to resolve disagreements between them. There will be no derogation from the sovereignty of either Government.

5. In recognition of the Irish Government's special interest in Northern Ireland and of the extent to which issues of mutual concern arise in relation to Northern Ireland, there will be regular and frequent meetings of the Conference concerned with non-devolved Northern Ireland matters, on which the Irish Government may put forward views and proposals. These meetings, to be co-chaired by the Minister for Foreign Affairs and the Secretary of State for Northern Ireland, would also deal with all-island and cross-border co-operation on non-devolved issues.

6. Co-operation within the framework of the Conference will include facilitation of co-operation in security matters. The Conference also will address, in particular, the areas of rights, justice, prisons and policing in Northern Ireland (unless and until responsibility is devolved to a Northern Ireland administration) and will intensify co-operation between the two Governments on the all-island or cross-border aspects of these matters.

7. Relevant executive members of the Northern Ireland Administration will be involved in meetings of the Conference, and in the reviews referred to in paragraph 9 below to discuss non-devolved Northern Ireland matters.

8. The Conference will be supported by officials of the British and Irish Governments, including by a standing joint Secretariat of officials dealing with non-devolved Northern Ireland matters.

9. The Conference will keep under review the workings of the new British-Irish Agreement and the machinery and institutions established under it, including a formal published review three years after the Agreement comes into effect. Representatives of the Northern Ireland Administration will be invited to express views to the Conference in this context. The Conference will contribute as appropriate to any review of the overall political agreement arising from the multi-party negotiations but will have no power to override the democratic arrangements set up by this Agreement.

## RIGHTS, SAFEGUARDS AND EQUALITY OF OPPORTUNITY

### Human Rights

1. The parties affirm their commitment to the mutual respect, the civil rights and the religious liberties of everyone in the community. Against the background of the recent history of communal conflict, the parties affirm in particular:

  • the right of free political thought;

  • the right to freedom and expression of religion;

  • the right to pursue democratically national and political aspirations;

  • the right to seek constitutional change by peaceful and legitimate means;

  • the right to freely choose one's place of residence;

  • the right to equal opportunity in all social and economic activity, regardless  of class, creed, disability, gender or ethnicity;

  • the right to freedom from sectarian harassment; and

  • the right of women to full and equal political participation.

### United Kingdom Legislation

2. The British Government will complete incorporation into Northern Ireland law of the European Convention on Human Rights (ECHR), with direct access to the courts, and remedies for breach of the Convention, including power for the courts to overrule Assembly legislation on grounds of inconsistency.

3. Subject to the outcome of public consultation underway, the British Government intends, as a particular priority, to create a statutory obligation on public authorities in Northern Ireland to carry out all their functions with due regard to the need to promote equality of opportunity in relation to religion and political opinion; gender; race; disability; age; marital status; dependants; and sexual orientation. Public bodies would be required to draw up statutory schemes showing how they would implement this obligation. Such schemes would cover arrangements for policy appraisal, including an assessment of impact on relevant categories, public consultation, public access to information and services, monitoring and timetables.

4. The new Northern Ireland Human Rights Commission (see paragraph 5

below) will be invited to consult and to advise on the scope for defining, in Westminster legislation, rights supplementary to those in the European Convention on Human Rights, to reflect the particular circumstances of Northern Ireland, drawing as appropriate on international instruments and experience. These additional rights to reflect the principles of mutual respect for the identity and ethos of both communities and parity of esteem, and - taken together with the ECHR - to constitute a Bill of Rights for Northern Ireland. Among the issues for consideration by the Commission will be:

• the formulation of a general obligation on government and public bodies      fully to respect, on the basis of equality of treatment, the identity and ethos of    both communities in Northern Ireland; and

• a clear formulation of the rights not to be discriminated against and to equality of opportunity in both the public and private sectors.

**New Institutions in Northern Ireland**

5. A new Northern Ireland Human Rights Commission, with membership from Northern Ireland reflecting the community balance, will be established by Westminster legislation, independent of Government, with an extended and enhanced role beyond that currently exercised by the Standing Advisory Commission on Human Rights, to include keeping under review the adequacy and effectiveness of laws and practices, making recommendations to Government as necessary; providing information and promoting awareness of human rights; considering draft legislation referred to them by the new Assembly; and, in appropriate cases, bringing court proceedings or providing assistance to individuals doing so.

6. Subject to the outcome of public consultation currently underway, the British Government intends a new statutory Equality Commission to replace the Fair Employment Commission, the Equal Opportunities Commission (NI), the Commission for Racial Equality (NI) and the Disability Council. Such a unified Commission will advise on, validate and monitor the statutory obligation and will investigate complaints of default.

7. It would be open to a new Northern Ireland Assembly to consider bringing together its responsibilities for these matters into a dedicated Department of Equality.

8. These improvements will build on existing protections in Westminster legislation in respect of the judiciary, the system of justice and policing.

**Comparable Steps by the Irish Government**

9. The Irish Government will also take steps to further strengthen the protection of human rights in its jurisdiction. The Government will, taking

account of the work of the All-Party Oireachtas Committee on the
Constitution and the Report of the Constitution Review Group, bring
forward measures to strengthen and underpin the constitutional protection
of human rights. These proposals will draw on the European Convention
on Human Rights and other international legal instruments in the field of
human rights and the question of the incorporation of the ECHR will be
further examined in this context. The measures brought forward would
ensure at least an equivalent level of protection of human rights as will
pertain in Northern Ireland. In addition, the Irish Government will:

   • establish a Human Rights Commission with a mandate and remit
equivalent     to that within Northern Ireland;

   • proceed with arrangements as quickly as possible to ratify the Council
of     Europe Framework Convention on National Minorities (already
ratified by     the UK);

   • implement enhanced employment equality legislation;

   • introduce equal status legislation; and

   • continue to take further active steps to demonstrate its respect for the
different traditions in the island of Ireland.

**A Joint Committee**

10. It is envisaged that there would be a joint committee of representatives
of the two Human Rights Commissions, North and South, as a forum for
consideration of human rights issues in the island of Ireland. The joint
committee will consider, among other matters, the possibility of
establishing a charter, open to signature by all democratic political parties,
reflecting and endorsing agreed measures for the protection of the
fundamental rights of everyone living in the island of Ireland.

**Reconciliation and Victims of Violence**

11. The participants believe that it is essential to acknowledge and address
the suffering of the victims of violence as a necessary element of
reconciliation. They look forward to the results of the work of the
Northern Ireland Victims Commission.

12. It is recognised that victims have a right to remember as well as to
contribute to a changed society. The achievement of a peaceful and just
society would be the true memorial to the victims of violence. The
participants particularly recognise that young people from areas affected
by the troubles face particular difficulties and will support the
development of special community-based initiatives based on
international best practice. The provision of services that are supportive
and sensitive to the needs of victims will also be a critical element and
that support will need to be channelled through both statutory and

community-based voluntary organisations facilitating locally-based self-help and support networks. This will require the allocation of sufficient resources, including statutory funding as necessary, to meet the needs of victims and to provide for community-based support programmes.

13. The participants recognise and value the work being done by many organisations to develop reconciliation and mutual understanding and respect between and within communities and traditions, in Northern Ireland and between North and South, and they see such work as having a vital role in consolidating peace and political agreement. Accordingly, they pledge their continuing support to such organisations and will positively examine the case for enhanced financial assistance for the work of reconciliation. An essential aspect of the reconciliation process is the promotion of a culture of tolerance at every level of society, including initiatives to facilitate and encourage integrated education and mixed housing.

## RIGHTS, SAFEGUARDS AND EQUALITY OF OPPORTUNITY

### Economic, Social and Cultural Issues

1. Pending the devolution of powers to a new Northern Ireland Assembly, the British Government will pursue broad policies for sustained economic growth and stability in Northern Ireland and for promoting social inclusion, including in particular community development and the advancement of women in public life.

2. Subject to the public consultation currently under way, the British Government will make rapid progress with:

(i) a new regional development strategy for Northern Ireland, for consideration in due course by a the Assembly, tackling the problems of a divided society and social cohesion in urban, rural and border areas, protecting and enhancing the environment, producing new approaches to transport issues, strengthening the physical infrastructure of the region, developing the advantages and resources of rural areas and rejuvenating major urban centres;

(ii) a new economic development strategy for Northern Ireland, for consideration in due course by a the Assembly, which would provide for short and medium term economic planning linked as appropriate to the regional development strategy; and

(iii) measures on employment equality included in the recent White Paper ("Partnership for Equality") and covering the extension and strengthening of anti-discrimination legislation, a review of the national security aspects of the present fair employment legislation at the earliest possible time, a new more focused Targeting Social Need initiative and a range of

measures aimed at combating unemployment and progressively eliminating the differential in unemployment rates between the two communities by targeting objective need.

3. All participants recognise the importance of respect, understanding and tolerance in relation to linguistic diversity, including in Northern Ireland, the Irish language, Ulster-Scots and the languages of the various ethnic communities, all of which are part of the cultural wealth of the island of Ireland.

4. In the context of active consideration currently being given to the UK signing the Council of Europe Charter for Regional or Minority Languages, the British Government will in particular in relation to the Irish language, where appropriate and where people so desire it:

• take resolute action to promote the language;

• facilitate and encourage the use of the language in speech and writing in public and private life where there is appropriate demand;

• seek to remove, where possible, restrictions which would discourage or work against the maintenance or development of the language;

• make provision for liaising with the Irish language community, representing their views to public authorities and investigating complaints;

• place a statutory duty on the Department of Education to encourage and facilitate Irish medium education in line with current provision for integrated education;

• explore urgently with the relevant British authorities, and in co-operation with the Irish broadcasting authorities, the scope for achieving more widespread availability of Teilifís na Gaeilige in Northern Ireland;

• seek more effective ways to encourage and provide financial support for Irish language film and television production in Northern Ireland; and

• encourage the parties to secure agreement that this commitment will be sustained by a new Assembly in a way which takes account of the desires and sensitivities of the community.

5. All participants acknowledge the sensitivity of the use of symbols and emblems for public purposes, and the need in particular in creating the new institutions to ensure that such symbols and emblems are used in a manner which promotes mutual respect rather than division. Arrangements will be made to monitor this issue and consider what action might be required.

**DECOMMISSIONING**

1. Participants recall their agreement in the Procedural Motion adopted on 24 September 1997 "that the resolution of the decommissioning issue is an indispensable part of the process of negotiation", and also recall the provisions of paragraph 25 of Strand 1 above.

2. They note the progress made by the Independent International Commission on Decommissioning and the Governments in developing schemes which can represent a workable basis for achieving the decommissioning of illegally-held arms in the possession of paramilitary groups.

3. All participants accordingly reaffirm their commitment to the total disarmament of all paramilitary organisations. They also confirm their intention to continue to work constructively and in good faith with the Independent Commission, and to use any influence they may have, to achieve the decommissioning of all paramilitary arms within two years following endorsement in referendums North and South of the agreement and in the context of the implementation of the overall settlement.

4. The Independent Commission will monitor, review and verify progress on decommissioning of illegal arms, and will report to both Governments at regular intervals.

6. Both Governments will take all necessary steps to facilitate the decommissioning process to include bringing the relevant schemes into force by the end of June.

**SECURITY**

1. The participants note that the development of a peaceful environment on the basis of this agreement can and should mean a normalisation of security arrangements and practices.

2. The British Government will make progress towards the objective of as early a return as possible to normal security arrangements in Northern Ireland, consistent with the level of threat and with a published overall strategy, dealing with:

  (i) the reduction of the numbers and role of the Armed Forces deployed in  Northern Ireland to levels compatible with a normal peaceful society;

  (ii) the removal of security installations;

  (iii) the removal of emergency powers in Northern Ireland; and

  (iv) other measures appropriate to and compatible with a normal peaceful  society.

3. The Secretary of State will consult regularly on progress, and the

response to any continuing paramilitary activity, with the Irish Government and the political parties, as appropriate.

4. The British Government will continue its consultation on firearms regulation and control on the basis of the document published on 2 April 1998.

5. The Irish Government will initiate a wide-ranging review of the Offences Against the State Acts 1939-85 with a view to both reform and dispensing with those elements no longer required as circumstances permit.

## POLICING AND JUSTICE

1. The participants recognise that policing is a central issue in any society. They equally recognise that Northern Ireland's history of deep divisions has made it highly emotive, with great hurt suffered and sacrifices made by many individuals and their families, including those in the RUC and other public servants. They believe that the agreement provides the opportunity for a new beginning to policing in Northern Ireland with a police service capable of attracting and sustaining support from the community as a whole. They also believe that this agreement offers a unique opportunity to bring about a new political dispensation which will recognise the full and equal legitimacy and worth of the identities, senses of allegiance and ethos of all sections of the community in Northern Ireland. They consider that this opportunity should inform and underpin the development of a police service representative in terms of the make-up of the community as a whole and which, in a peaceful environment, should be routinely unarmed.

2. The participants believe it essential that policing structures and arrangements are such that the police service is professional, effective and efficient, fair and impartial, free from partisan political control; accountable, both under the law for its actions and to the community it serves; representative of the society it polices, and operates within a coherent and co-operative criminal justice system, which conforms with human rights norms. The participants also believe that those structures and arrangements must be capable of maintaining law and order including responding effectively to crime and to any terrorist threat and to public order problems. A police service which cannot do so will fail to win public confidence and acceptance. They believe that any such structures and arrangements should be capable of delivering a policing service, in constructive and inclusive partnerships with the community at all levels, and with the maximum delegation of authority and responsibility, consistent with the foregoing principles. These arrangements should be based on principles of protection of human rights and professional integrity and should be unambiguously accepted and actively supported by the entire community.

3. An independent Commission will be established to make

recommendations for future policing arrangements in Northern Ireland including means of encouraging widespread community support for these arrangements within the agreed framework of principles reflected in the paragraphs above and in accordance with the terms of reference at Annex A. The Commission will be broadly representative with expert and international representation among its membership and will be asked to consult widely and to report no later than Summer 1999.

4. The participants believe that the aims of the criminal justice system are to:

• deliver a fair and impartial system of justice to the community;

• be responsive to the community's concerns, and encouraging community involvement where appropriate;

• have the confidence of all parts of the community; and

• deliver justice efficiently and effectively.

5. There will be a parallel wide-ranging review of criminal justice (other than policing and those aspects of the system relating to the emergency legislation) to be carried out by the British Government through a mechanism with an independent element, in consultation with the political parties and others. The review will commence as soon as possible, will include wide consultation, and a report will be made to the Secretary of State no later than Autumn 1999. Terms of Reference are attached at Annex B.

6. Implementation of the recommendations arising from both reviews will be discussed with the political parties and with the Irish Government.

7. The participants also note that the British Government remains ready in principle, with the broad support of the political parties, and after consultation, as appropriate, with the Irish Government, in the context of ongoing implementation of the relevant recommendations, to devolve responsibility for policing and justice issues.

ANNEX A

## COMMISSION ON POLICING FOR NORTHERN IRELAND

### Terms of Reference

Taking account of the principles on policing as set out in the agreement, the Commission will inquire into policing in Northern Ireland and, on the basis of its findings, bring forward proposals for future policing structures

and arrangements, including means of encouraging widespread community support for those arrangements.

Its proposals on policing should be designed to ensure that policing arrangements, including composition, recruitment, training, culture, ethos and symbols, are such that in a new approach Northern Ireland has a police service that can enjoy widespread support from, and is seen as an integral part of, the community as a whole.

Its proposals should include recommendations covering any issues such as re-training, job placement and educational and professional development required in the transition to policing in a peaceful society.

Its proposals should also be designed to ensure that:

- the police service is structured, managed and resourced so that it can be effective in discharging its full range of functions (including proposals on any necessary arrangements for the transition to policing in a normal peaceful society);
- the police service is delivered in constructive and inclusive partnerships with the community at all levels with the maximum delegation of authority and responsibility;
- the legislative and constitutional framework requires the impartial discharge of policing functions and conforms with internationally accepted norms in relation to policing standards;
- the police operate within a clear framework of accountability to the law and the community they serve, so:
- they are constrained by, accountable to and act only within the law;

- their powers and procedures, like the law they enforce, are clearly established and publicly available;

- there are open, accessible and independent means of investigating and adjudicating upon complaints against the police;

- there are clearly established arrangements enabling local people, and their political representatives, to articulate their views and concerns about policing and to establish publicly policing priorities and influence policing policies, subject to safeguards to ensure police impartiality and freedom from partisan political control;

- there are arrangements for accountability and for the effective, efficient and economic use of resources in achieving policing objectives;

- there are means to ensure independent professional scrutiny and inspection of the police service to ensure that proper professional standards are maintained;

- the scope for structured co-operation with the Garda Siochana and other police forces is addressed; and
- the management of public order events which can impose exceptional demands on policing resources is also addressed.

The Commission should focus on policing issues, but if it identifies other aspects of the criminal justice system relevant to its work on policing, including the role of the police in prosecution, then it should draw the attention of the Government to those matters.

The Commission should consult widely, including with non-governmental expert organisations, and through such focus groups as they consider it appropriate to establish.

The Government proposes to establish the Commission as soon as possible, with the aim of it starting work as soon as possible and publishing its final report by Summer 1999.

ANNEX B

## REVIEW OF THE CRIMINAL JUSTICE SYSTEM

### Terms of Reference

Taking account of the aims of the criminal justice system as set out in the Agreement, the review will address the structure, management and resourcing of publicly funded elements of the criminal justice system and will bring forward proposals for future criminal justice arrangements (other than policing and those aspects of the system relating to emergency legislation, which the Government is considering separately) covering such issues as:

- the arrangements for making appointments to the judiciary and magistracy, and safeguards for protecting their independence;
- the arrangements for the organisation and supervision of the prosecution process, and for safeguarding its independence;
- measures to improve the responsiveness and accountability of, and any lay participation in the criminal justice system;
- mechanisms for addressing law reform;
- the scope for structured co-operation between the criminal justice agencies on both parts of the island; and
- the structure and organisation of criminal justice functions that might be devolved to an Assembly, including the possibility of establishing a Department of Justice, while safeguarding the essential independence of many of the key functions in this area.
- The Government proposes to commence the review as soon as possible, consulting with the political parties and others, including non-

governmental expert organisations. The review will be completed by
Autumn 1999.

## PRISONERS

1. Both Governments will put in place mechanisms to provide for an
accelerated programme for the release of prisoners, including transferred
prisoners, convicted of scheduled offences in Northern Ireland or, in the
case of those sentenced outside Northern Ireland, similar offences
(referred to hereafter as qualifying prisoners). Any such arrangements will
protect the rights of individual prisoners under national and international
law.

2. Prisoners affiliated to organisations which have not established or are
not maintaining a complete and unequivocal ceasefire will not benefit
from the arrangements. The situation in this regard will be kept under
review.

3. Both Governments will complete a review process within a fixed time
frame and set prospective release dates for all qualifying prisoners. The
review process would provide for the advance of the release dates of
qualifying prisoners while allowing account to be taken of the seriousness
of the offences for which the person was convicted and the need to protect
the community. In addition, the intention would be that should the
circumstances allow it, any qualifying prisoners who remained in custody
two years after the commencement of the scheme would be released at
that point.

4. The Governments will seek to enact the appropriate legislation to give
effect to these arrangements by the end of June 1998.

5. The Governments continue to recognise the importance of measures to
facilitate the reintegration of prisoners into the community by providing
support both prior to and after release, including assistance directed
towards availing of employment opportunities, re-training and/or re-
skilling, and further education.

## VALIDATION, IMPLEMENTATION AND REVIEW

### Validation and Implementation

1. The two Governments will as soon as possible sign a new British-Irish
Agreement replacing the 1985 Anglo-Irish Agreement, embodying
understandings on constitutional issues and affirming their solemn
commitment to support and, where appropriate, implement the agreement
reached by the participants in the negotiations which shall be annexed to
the British-Irish Agreement.

2. Each Government will organise a referendum on 22 May 1998. Subject

to Parliamentary approval, a consultative referendum in Northern Ireland, organised under the terms of the Northern Ireland (Entry to Negotiations, etc.) Act 1996, will address the question: "Do you support the agreement reached in the multi-party talks on Northern Ireland and set out in Command Paper 3883?". The Irish Government will introduce and support in the Oireachtas a Bill to amend the Constitution as described in paragraph 2 of the section "Constitutional Issues" and in Annex B, as follows: (a) to amend Articles 2 and 3 as described in paragraph 8.1 in Annex B above and (b) to amend Article 29 to permit the Government to ratify the new British-Irish Agreement. On passage by the Oireachtas, the Bill will be put to referendum.

3. If majorities of those voting in each of the referendums support this agreement, the Governments will then introduce and support, in their respective Parliaments, such legislation as may be necessary to give effect to all aspects of this agreement, and will take whatever ancillary steps as may be required including the holding of elections on 25 June, subject to parliamentary approval, to the Assembly, which would meet initially in a "shadow" mode. The establishment of the North-South Ministerial Council, implementation bodies, the British-Irish Council and the British-Irish Intergovernmental Conference and the assumption by the Assembly of its legislative and executive powers will take place at the same time on the entry into force of the British-Irish Agreement.

4. In the interim, aspects of the implementation of the multi-party agreement will be reviewed at meetings of those parties relevant in the particular case (taking into account, once Assembly elections have been held, the results of those elections), under the chairmanship of the British Government or the two Governments, as may be appropriate; and representatives of the two Governments and all relevant parties may meet under independent chairmanship to review implementation of the agreement as a whole.

**Review procedures following implementation**

5. Each institution may, at any time, review any problems that may arise in its operation and, where no other institution is affected, take remedial action in consultation as necessary with the relevant Government or Governments. It will be for each institution to determine its own procedures for review.

6. If there are difficulties in the operation of a particular institution, which have implications for another institution, they may review their operations separately and jointly and agree on remedial action to be taken under their respective authorities.

7. If difficulties arise which require remedial action across the range of institutions, or otherwise require amendment of the British-Irish Agreement or relevant legislation, the process of review will fall to the two Governments in consultation with the parties in the Assembly. Each

Government will be responsible for action in its own jurisdiction.

8. Notwithstanding the above, each institution will publish an annual report on its operations. In addition, the two Governments and the parties in the Assembly will convene a conference 4 years after the agreement comes into effect, to review and report on its operation.

# AGREEMENT

## BETWEEN THE GOVERNMENT OF

## THE UNITED KINGDOM OF

## GREAT BRITAIN AND NORTHERN IRELAND

## AND

## THE GOVERNMENT

## OF IRELAND

The British and Irish Governments:

Welcoming the strong commitment to the Agreement reached on 10th April 1998 by themselves and other participants in the multi-party talks and set out in Annex 1 to this Agreement (hereinafter "the Multi-Party Agreement");

Considering that the Multi-Party Agreement offers an opportunity for a new beginning in relationships within Northern Ireland, within the island of Ireland and between the peoples of these islands;

Wishing to develop still further the unique relationship between their peoples and the close co-operation between their countries as friendly neighbours and as partners in the European Union;

Reaffirming their total commitment to the principles of democracy and non-violence which have been fundamental to the multi-party talks;

Reaffirming their commitment to the principles of partnership, equality and mutual respect and to the protection of civil, political, social, economic and cultural rights in their respective jurisdictions;

Have agreed as follows:

ARTICLE 1

The two Governments:

(i) recognise the legitimacy of whatever choice is freely exercised by a majority of the people of Northern Ireland with regard to its status, whether they prefer to continue to support the Union with Great Britain or a sovereign united Ireland;

(ii) recognise that it is for the people of the island of Ireland alone, by agreement between the two parts respectively and without external impediment, to exercise their right of self-determination on the basis of consent, freely and concurrently given, North and South, to bring about a united Ireland, if that is their wish, accepting that this right must be achieved and exercised with and subject to the agreement and consent of a majority of the people of Northern Ireland;

(iii) acknowledge that while a substantial section of the people in Northern Ireland share the legitimate wish of a majority of the people of the island of Ireland for a united Ireland, the present wish of a majority of the people of Northern Ireland, freely exercised and legitimate, is to maintain the Union and accordingly, that Northern Ireland's status as part of the United Kingdom reflects and relies upon that wish; and that it would be wrong to make any change in the status of Northern Ireland save with the consent of a majority of its people;

(iv) affirm that, if in the future, the people of the island of Ireland exercise their right of self-determination on the basis set out in sections (i) and (ii) above to bring about a united Ireland, it will be a binding obligation on both Governments to introduce and support in their respective Parliaments legislation to give effect to that wish;

(v) affirm that whatever choice is freely exercised by a majority of the people of Northern Ireland, the power of the sovereign government with jurisdiction there shall be exercised with rigorous impartiality on behalf of all the people in the diversity of their identities and traditions and shall be founded on the principles of full respect for, and equality of, civil, political, social and cultural rights, of freedom from discrimination for all citizens, and of parity of esteem and of just and equal treatment for the identity, ethos and aspirations of both communities;

(vi) recognise the birthright of all the people of Northern Ireland to identify themselves and be accepted as Irish or British, or both, as they may so choose, and accordingly confirm that their right to hold both British and Irish citizenship is accepted by both Governments and would not be affected by any future change in the status of Northern Ireland.

ARTICLE 2

The two Governments affirm their solemn commitment to support, and where appropriate implement, the provisions of the Multi-Party Agreement. In particular there shall be established in accordance with the

provisions of the Multi-Party Agreement immediately on the entry into force of this Agreement, the following institutions:

(i) a North/South Ministerial Council;

(ii) the implementation bodies referred to in paragraph 9 (ii) of the section entitled "Strand Two" of the Multi-Party Agreement;

(iii) a British-Irish Council;

(iv) a British-Irish Intergovernmental Conference.

ARTICLE 3

(1) This Agreement shall replace the Agreement between the British and Irish Governments done at Hillsborough on 15th November 1985 which shall cease to have effect on entry into force of this Agreement.

(2) The Intergovernmental Conference established by Article 2 of the aforementioned Agreement done on 15th November 1985 shall cease to exist on entry into force of this Agreement.

ARTICLE 4

(1) It shall be a requirement for entry into force of this Agreement that:

(a) British legislation shall have been enacted for the purpose of implementing the provisions of Annex A to the section entitled "Constitutional Issues" of the Multi-Party Agreement;

(b) the amendments to the Constitution of Ireland set out in Annex B to the section entitled "Constitutional Issues" of the Multi-Party Agreement shall have been approved by Referendum;

(c) such legislation shall have been enacted as may be required to establish the institutions referred to in Article 2 of this Agreement.

(2) Each Government shall notify the other in writing of the completion, so far as it is concerned, of the requirements for entry into force of this Agreement. This Agreement shall enter into force on the date of the receipt of the later of the two notifications.

(3) Immediately on entry into force of this Agreement, the Irish Government shall ensure that the amendments to the Constitution of Ireland set out in Annex B to the section entitled "Constitutional Issues" of the Multi-Party Agreement take effect.

In witness thereof the undersigned, being duly authorised thereto by the respective Governments, have signed this Agreement.

Done in two originals at Belfast on the 10th day of April 1998.

| For the Government of the United Kingdom of Great Britain and Northern Ireland | For the Government of Ireland |
|---|---|

**ANNEX 1**

| The Agreement Reached in the Multi-Party Talks |
|---|

**ANNEX 2**

| Declaration on the Provisions of Paragraph (vi) of Article 1 In Relationship to Citizenship |
|---|

The British and Irish Governments declare that it is their joint understanding that the term "the people of Northern Ireland" in paragraph (vi) of Article 1 of this Agreement means, for the purposes of giving effect to this provision, all persons born in Northern Ireland and having, at the time of their birth, at least one parent who is a British citizen, an Irish citizen or is otherwise entitled to reside in Northern Ireland without any restriction on their period of residence.