UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: Request from the United Kingdom Pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom on Mutual Assistance in Criminal Matters in the Matter of Dolours Price | M.B.D. No. 11-MC-91078 |

**MEMORANDUM OF TRUSTEES OF BOSTON COLLEGE IN REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO QUASH SUBPOENAS AND IN OPPOSITION TO GOVERNMENT'S MOTION TO COMPEL (LEAVE TO FILE GRANTED ON JULY 11, 2011)**

Pursuant to leave granted by this Court pursuant to L.R. 112.1 and L.R. 7.1 on July 11, 2011, trustees of Boston College, on their own behalf and on behalf of Professor Thomas E. Hachey and Dr. Robert K. O'Neill (collectively, "Boston College"), submit this memorandum in reply to the Government's Opposition to Motion to Quash and in opposition to the Government's Motion for an Order to Compel.

Boston College regrets, and rejects, the Government's unfounded assertion on the first page of the Government's Opposition to Motion to Quash (Gov. Opp. at 1) that Boston College's Motion seeks to "keep this evidence of criminal conduct confidential" and to "conceal evidence of murder and other crimes until the perpetrators were in their graves." There is no justification for attributing that nefarious intent to Boston College. For one, it is pure speculation that the Belfast Project interviews with Dolours Price contain any such evidence. More importantly, Boston College explained on the first page of its Motion to Quash (B.C. Motion at 1) that the purpose of its Motion is to obtain this Court's determination of the proper balance between two issues of substantial public importance: assistance to what is described to be a foreign criminal

investigation of decades-old crimes, on the one hand, and, on the other, the protection of academic research into the causes of the historical violence in Northern Ireland.

Boston College submits this Memorandum in Reply to the Government's Opposition to deal with five issues raised in the Government's Opposition that Boston College challenges.

1. <u>Boston College has not breached any secrecy sought by the Government.</u>

To the extent the Government appears to suggest that Boston College has acted in a manner that is contrary to the Government's desire to keep this matter under seal, the facts do not support that assertion. In its Opposition, the Government points out that certain of its filings have been sealed at the Government's request and that the United Kingdom requested that the matter be kept under seal (*see* Gov. Opp. at. 2, 3 n.3, and 16-17). However, nothing in the subpoenas served on Boston College indicated that the subpoenas were under seal or subject to any other requested confidentiality, and nothing instructed Boston College to file its response under seal. In fact, prior to filing Boston College's Opposition on the public record, counsel for the university consulted with the Assistant United States Attorney to ask whether the Government would request that Boston College file its Opposition under seal, and was informed that the Government made no such request. In addition, the Government itself moved to unseal all the papers in this case except for the original application for the appointment of a commissioner to issue the subpoenas (D. 4). The Government's motion was allowed on June 1, 2011.

In a related argument, the Government asserts that publicity regarding the Government's issuance of the subpoenas, which it attributes to Boston College, belies the university's contention that it is important to protect the confidentiality of the Dolours Price interview materials that Boston College holds (Gov. Opp. at 16-18). Boston College as an institution has not sought such publicity. To the extent particular individuals associated with the Belfast Project

have voiced their concerns to the press about the subpoenas, those individuals did not violate any confidentiality obligations imposed by the Government or required by the Belfast Project. Rather, they expressed their concerns in an attempt to raise awareness of the important interests at stake in this matter that otherwise might not have been known to the public.

    2.    The Government's arguments about the mandates of the MLAT apply to the Executive, not the Judicial, branch.

The Government devotes a substantial portion of the Argument section of its Opposition (Gov. Opp. 5-9) to the contention that the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the US-UK MLAT) obligates this Court to comply with a request from the United Kingdom under the US-UK MLAT. *See, e.g.*, Gov. Opp. 7 ("Under the US-UK MLAT, the United States is *obligated* to obtain the documentary evidence requested in this instance and provide it to the authorities in the UK. The treaty *obligation* extends to *federal courts* called upon to enforce such a . . . . request [italics added]").

Boston College does not dispute the fact that the Treaty does impose such an obligation on the "Central Authority" of the United States, although even that obligation is not absolute.[*] The Central Authority is defined in the Treaty as "the Attorney General or a person or agency designated by him" (US-UK MLAT Art. 2(1)). Nothing in the Treaty binds the Judiciary of the United States. On the contrary, the Treaty states that, when the execution of a request requires judicial action, "the request shall be *presented* to the appropriate authority by the persons

---

[*] Under Art. 3(1)(a) of the US-UK MLAT, the Central Authority may "refuse assistance" if it is "of the opinion" that the request would "impair . . . essential interests or would be contrary to important public policy." Because the Government is pressing for enforcement of its subpoenas to Boston College, it obviously has not chosen to exercise the discretion granted by the US-UK MLAT to decide that the interest in protecting academic research warrants refusing the United Kingdom's request.

appointed by the Central Authority . . . [italics added]" (US-UK MLAT Art. 5(2)).  The mandatory word "shall" that the Government emphasizes in its Opposition (Gov. Opp. at 6-7) refers to the Central Authority, not to the Judiciary.  The Judiciary is instead "presented" with the request for a decision, which decision it makes in the exercise of its authority as an independent branch of government.

No treaty can require this Court to act merely as an obedient servant to carry out demands made by a foreign government.  As explained in a 2011 Ninth Circuit decision when just that contention was made by the Government in a similar MLAT case, *In re Search of the Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d 557, 572 (9th Cir. 2011) (italics added):

> The enforcement of a subpoena is an exercise of judicial power.  According to the government, the executive branch has the authority to exercise that power directly, because the district court is required, by virtue of an MLAT request, to compel the production of requested documents.  *The government's position leads to the inescapable and unacceptable conclusion that the executive branch, and not the judicial branch, would exercise judicial power.*
>
> . . . .
>
> *The Constitution's separation of powers does not permit either the legislative or executive branch to convert the judicial branch into a mere functionary.*  Instead, the Constitution requires that 'no provision of law "impermissibly threaten[] the institutional integrity of the Judicial Branch."' *Mistretta v. United States*, 488 U.S. 361, 383 (1989) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986)).

This fundamental principle, rooted in the watershed decision of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), that established the independence of the Judiciary in the United States, belies the Government's argument that this Court lacks authority to hear and determine the issues Boston College presents in its Motion to Quash.

      3.      The MLAT itself recognizes that public policy interests may be weighed
in considering what information is subject to compulsory disclosure.

Despite the Government's argument that courts are bound by the US-UK MLAT to compel production of materials sought by a foreign authority, the Government at the same time acknowledges that courts have the authority to refuse to order production of materials, or to modify the scope of the materials that are to be produced, when the court concludes that United States constitutional rights or other federally recognized privileges are implicated by the request (Gov. Opp. at 8-9 and 8 n. 4 (quoting legislative history for the 1994 version of the US-UK MLAT that explains that testimonial privileges "usually available in proceedings in the United States" are not overridden by the terms of the Treaty; the 1994 version of the Treaty is identical to the current 2004 version in all respects material to the issues raised in this case)).

Boston College shows in its Motion to Quash (B.C. Mot. at 9-12) that the First Circuit and other federal courts in fact have weighed the important interests in protecting academic research against the needs for compelled disclosure in response to subpoenas. The Government contends that such weighing is not appropriate in criminal proceedings, because the federal courts do not recognize an absolute privilege to protect the work of academic researchers, and have expressly rejected an analogous absolute privilege for reporters (Gov. Opp. at 13-15).

Nowhere in its Motion to Quash does Boston College claim that there is an absolute "researcher's privilege" or absolute constitutional right that blocks disclosure of the materials sought in the subpoenas. Boston College does demonstrate that, under the *Cusumano* and other precedents, courts do weigh the degree of protection that should be afforded to those involved in gathering information for a public purpose, and the courts have referred to that weighing process in criminal (*United States v. LaRouche Campaign*, 841 F.2d 1176, 1181 (1st Cir. 1988) (news reporter)), not just civil, settings (B.C. Mot. at 9-12).

In *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998), the First Circuit found the interest in protecting academic research materials to be grounded, as is the interest in protecting news reporters' materials, in the First Amendment. Those precedents are the ones on which Boston College relies in asking this Court to weigh the interest in protecting the academic research at issue here from compulsory disclosure. The Treaty recognizes that constitutional and other recognized protections that weigh against compelled disclosure are factors that may be taken into consideration (UK-US MLAT Art. 8(2), which states that a person may be "compelled to . . . [produce evidence] *in accordance with the requirements of the law* of the Requested Party [in this case, the United States; italics added]."

The remainder of the Government's Opposition focuses on decisions that hold inapplicable to MLAT subpoena proceedings the broad discretion given courts under 28 U.S.C. § 1782 to enforce subpoenas (Gov. Opp. at 11-13). Those cases are not germane to the issues Boston College has raised in its Motion to Quash, because the university's Motion makes no reference to § 1782 and does not rely on the broad judicial discretion established by it to determine whether to enforce the subpoenas at issue in this case.

   4.  Dolours Price had no ability to, and did not, disclose tape-recordings of her Belfast Project interviews to a newspaper reporter.

To sow doubt whether Dolours Price in fact expected and relied on the confidentiality of her Belfast Project interviews, the Government mistakenly asserts that "according to one news report" a reporter has been "permitted [by Dolours Price] to listen to portions of Ms. Price's Boston College interviews" (Gov. Op. at 4, citing Exs. 1 and 2 to the Government's Opposition).

The Government's sole support for this mistaken assertion is a news clipping (Exhibit 1 to the Government's Opposition) of an article in the February 21, 2010, edition of <u>Sunday Life</u>, a small Belfast weekly newspaper (Moloney Affidavit (D. 5-5), ¶ 31). But that article does not say

that the tape recordings heard by the reporter were from Dolours Price's Belfast Project interviews. The Government assumes that the article's report of the reporter hearing certain tape recordings of Dolours Price (Ex. 1, ¶¶ 3, 7, and 20) refers to the same tape recordings that the article later describes as Dolours Price's "taped confessions of her role in the abductions to academics at Boston University [*sic*]" (*id.*, ¶ 30). That assumption is wrong.

Anthony McIntyre, the person who interviewed Dolours Price for the Belfast Project, swears that neither Dolours Price nor any of the others he interviewed for the Belfast Project were provided the tape recordings of their interviews (McIntyre Affidavit (D. 5-4), ¶¶ 10 and 14). In his affidavit in support of Boston College's Motion to Quash, the Director of the Belfast Project, Ed Moloney, explains that Dolours Price gave a tape-recorded interview to a reporter for a different newspaper, the <u>Irish News</u>, that the tapes of that interview were passed on to a reporter for <u>Sunday Life</u>, and that it is the tape recordings of Dolours Price's interview with the <u>Irish News</u> that the <u>Sunday Life</u> reporter apparently was allowed to hear (Moloney Affidavit (D. 5-5), ¶ 31).

There is no evidence that Dolours Price has disclosed the tapes of her Belfast Project interviews to anyone.

5.   <u>Boston College has observed customary oral history protocols.</u>

Finally, the Government contends that Boston College overstates the need for confidentiality in oral history research (Gov. Opp. at 20). The Government asserts in support of its contention that the forms at "many other universities" do not promise absolute confidentiality. But the Government does not focus on oral history projects that require the kind of confidentiality needed to obtain a historical record of events as traumatic as the Troubles in Northern Ireland. Instead, the Government cites a selective sample of three documents relating to oral history projects undertaken at the University of Hawaii, Indiana University, and the

- 8 -

University of Chicago (*id.*).  The subject matters to which those forms relate (the Hawaii form is, from its own terms, used to interview people about an "interesting event" (D. 7-11 at 3), and the Chicago one is, again from its own terms, apparently focused on "economics" issues (*id.*, at 7-8) are obviously different from the Belfast Project.

      Moreover, while the three forms selected by the Government to attach to its Opposition indeed do not promise "absolute confidentiality," they also do not inform participants of the threat of a government subpoena for their materials.  Indeed, Indiana University's form, typical of many used in academic oral history projects, includes an option for the interviewee to include restrictions on the deed of gift that may limit the rights of the University, as well as an option to remain anonymous and have the tapes of interviews closed to use (*id.*, at 6).  As explained in the affidavit of Professor Clifford Kuhn, past president of the Oral History Association (D. 5-3, ¶¶ 4 and 5), the compelled disclosure of sensitive information creates a daunting impediment to collecting candid information about important subjects from willing participants in future oral history projects.  That risk is the one that Boston College asks this Court to weigh in deciding the university's Motion to Quash.

**Conclusion.**

For the reasons set out in its Motion to Quash and this Reply to the Government's Opposition, Boston College requests the Court quash the subpoenas, or in the alternative that the Court establish a process by which the subpoenas can be narrowed to preserve to the maximum extent feasible the confidentiality of the materials sought by the subpoenas.

By its attorneys,

/s/ Jeffrey Swope
Jeffrey Swope (BBO #490760)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, Massachusetts 02199-7613
(617) 239-0100
jswope@eapdlaw.com

Dated: July 15, 2011

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 15, 2011.

/s/ Jeffrey Swope