UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: Request from the United Kingdom ) <br> Pursuant to the Treaty Between the ) <br> Government of the United States of ) <br> America and the Government of ) <br> the United Kingdom on Mutual ) <br> Assistance in Criminal Matters in ) <br> the Matter of Dolours Price ) | M.B.D. No. 11 mc 91078-JLT |

### Government's Opposition to Motion For Leave to Intervene

The United States of America, by and through Assistant United States Attorneys John T. McNeil and George B. Henderson, II, respectfully submits this opposition to the *Motion For Leave To Intervene* submitted by Ed Moloney and Anthony MacIntyre. [D.18.]

As explained in more detail below, the affirmative claims that Messrs Moloney and MacIntyre seek to bring against the Attorney General are legally unfounded and provide no basis for intervention. Their central claim, that the Attorney General failed to fulfill his obligations under the 2004 Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland ("U.K."), implementing the 2003 Mutual Legal Assistance Agreement with the European Union, S. Treaty Doc. No. 109-13 ("US-UK MLAT"), is foreclosed by Article 1, § 3 of the US-UK MLAT, which states that the Treaty "is intended solely for mutual legal assistance between the Parties. . . [and] shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request." The putative intervenors' proposed claims for relief under the Administrative Procedure Act, the Declaratory Judgment Act, and the mandamus statute fail for essentially the same reason -- there is simply no law that supports a claim for relief against the Attorney General.

The putative intervenors' proposed constitutional claims under the First and Fifth Amendments are likewise flawed. Mr. MacIntyre may not assert rights under the U.S. Constitution because he neither resides in the U.S. nor claims to be a U.S. citizen living abroad. With regard to Mr. Moloney's constitutional claims, his assertion that enforcement of the subpoenas would violate his Fifth Amendment "right to life" is factually unsupported and it runs counter to the Supreme Court's jurisprudence under the Due Process clause. His First Amendment claim is without merit for the same reasons set forth in the government's opposition to Boston College's motion to quash. When these considerations are applied in the context of Rule 24 of the Federal Rules of Civil Procedure, it is evident that neither intervention as of right nor permissive intervention is warranted.

## Background

The procedural history and factual background to this matter have been described in prior filings in this case and need not be repeated here. On August 31, 2011, Ed Moloney and Anthony MacIntyre filed a Motion For Leave To Intervene ("Motion") accompanied by a proposed Interveners' Complaint for Declaratory Judgment, Writ of Mandamus And Injunctive Relief ("Complaint"). [D.18.] Messrs Moloney and MacIntyre had previously signed affidavits that were submitted by the respondents Trustees of Boston College on behalf of the Boston College John J. Burns Library, Robert K. O'Neill, and Thomas E. Hachey. [D.5-4 and D.5-5.] The proposed Complaint names Attorney General Eric H. Holder, Jr. as the defendant.

In their motion and Complaint, the putative interveners assert that their interest in this action is "in their duty of confidentiality to their sources, and in their personal safety and that of their sources." Motion at 3; *see* Complaint at ¶¶ 26, 27. Their Complaint alleges that the

Attorney General has failed to perform, or has improperly performed, certain non-discretionary duties owed to the putative interveners under the US-UK MLAT.  They assert that the Attorney General was obliged to consult with the U.K. regarding the U.K.'s obligations under a separate treaty -- the US-UK Extradition Treaty-- which they claim is relevant to the MLAT request for assistance.  They also claim that the subpoenas violate their First and Fifth Amendment rights.  The Complaint seeks relief under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 - 706, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Court's mandamus authority, 28 U.S.C. § 1361.

## Argument

### A.     The US-UK MLAT Does Not Provide a Private Right of Enforcement

The principle contention of the proposed Complaint asserts that the Attorney General failed to properly fulfill his obligations under the US-UK MLAT and that the Court should therefore enter specific relief against the Attorney General.  The contention rests on two provisions of the US-UK MLAT.  First, the Complaint asserts that the Attorney General has failed to properly fulfill his obligation to consult with his counterpart in the U.K. with regard to "rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty," pursuant to Article 18, § 1 of the US-UK MLAT.  *See* Complaint ¶¶ 6-7, 12.  Second, the Complaint asserts that the Attorney General failed to give due regard to Article 3, § 1 of the US-UK MLAT, which sets forth certain reasons why the Attorney General may refuse assistance.[1]  *See* Complaint ¶¶ 16-17.  The Complaint asks that the Court "remand" the

---

[1] Article 3, § 1 provides in part that the Central Authority (i.e., the Attorney General) may refuse assistance if:

matter and order the Attorney General to make findings and engage in consultations pursuant to Articles 3 and 18 of the MLAT. The Complaint further asks that the Court issue certain declarations. Complaint at pp. 23-24.

The primary flaw in these arguments is that the US-UK MLAT by its terms does not give rise to any private rights. Article 1, § 3 of the MLAT provides:

> This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Courts considering this provision have uniformly ruled that private persons have no legal right to enforce an MLAT. For example, in *U.S. v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 658-659 (3d Cir. 2002), the court considered a claimant's argument that the seizure and subsequent forfeiture of his money violated the then-existing version of the US-UK MLAT because the United States was obligated to consult with the United Kingdom's Home Secretary before seizing the accounts. Relying on the identical language of Article 1, § 3 quoted above, the court ruled that "the treaty explicitly states that it is not intended to provide a private remedy," and held, "[t]herefore, even it if is assumed for argument's sake that the United States violated the MLAT, Claimants have no private right to enforce its terms." 286 F.3d at 659.

---

> (a) the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy; [or]
>
> * * *
>
> (c) the request relates to an offence that is regarded by the Requested Party as:
>> (I) an offence of a political character . . . .

4

Another example is *United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007), where the defendant asserted that evidence was improperly admitted at trial against him because it was gathered in violation the MLAT between the Netherlands and the United States. The court first held that the evidence was not obtained in violation of the MLAT, and then ruled:

> A second reason [defendant's] MLAT argument fails is that he cannot demonstrate that the treaty creates any judicially enforceable individual right that could be implicated by the government's conduct here. As the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels. *See Head Money Cases*, 112 U.S. 580, 598 (1884) (noting that "treaty is primarily a compact between independent nations" and "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it"). For any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases. Thus, a proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply "a strong presumption against inferring individual rights from international treaties." *United States v. De La Pava*, 268 F.3d 157, 164 (2d Cir. 2001).

506 F.3d at 129-130.

The district court in *U.S. v. Chitron Electronics Co. Ltd.*, 668 F.Supp.2d 298, 306-307 (D. Mass. 2009) (Saris, D.J.), reached the same conclusion in rejecting a defendant's claim that a summons was ineffective because service of the summons failed to comply with the MLAT between the United States and China. The court stated succinctly, "the MLAT does not create a private right of enforcement of the treaty." *Id*. *See generally Medellin v. Texas*, 552 U.S. 491, 505-506 (2008); *United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) ("treaties do not generally create rights that are privately enforceable in the federal courts."). The holdings of these cases are consistent with the cases discussed in the *Government's Opposition to Motion to Quash and*

5

*Motion for an Order to Compel* [D. 7] concerning the proper scope of judicial review under the US-UK MLAT, *In re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d 557, 572 (9th Cir. 2011), and *In re: Commissioner's Subpoenas*, 325 F.3d 1287, 1291 (11th Cir. 2003). In short, the US-UK MLAT bestows no legal rights on the putative intervenors.[2]

### B.  Neither the Administrative Procedure Act, the Declaratory Judgment Act, Nor the Court's Mandamus Authority Provide Any Basis For Relief

The proposed Complaint is not rescued by its invocation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), the Declaratory Judgment Act, 28 U.S.C. § 2201, or the Court's mandamus authority, 28 U.S.C. § 1361. Before considering the applicability of each of these statutes to the present circumstance, however, it should be noted that these claims must be viewed through the lense of the doctrine of sovereign immunity, as the claims against the Attorney General, whom the putative intervenors seek to sue in his official capacity,[3] are in effect claims against the sovereign. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (an official-capacity suit is "in all respects other than name, to be treated as a suit against the entity," and not against the individual). The Court therefore lacks jurisdiction over such claims absent an

---

[2] The putative intervenors also rely on language from the extradition treaty between the United States and Great Britain. *See Extradition Treaty between the United States and the United Kingdom of Great Britain*, Treaty Number 108-23, signed March 31, 2003 ("US-UK Extradition Treaty"). Plainly, any reliance on this treaty is misplaced. This matter addresses subpoenas for information under the US-UK MLAT. There has been no request for extradition of any person from the United States. The potential for a future request for extradition of a person from this country is purely speculative. Moreover, to the extent that the U.K. were to request extradition of any person from the Republic of Ireland, that matter will be resolved by the courts in the U.K. and the Republic of Ireland, without any reference to the US-UK Extradition Treaty.

[3] Paragraph 32 of the Complaint states in part, "The Attorney General is sued herein in his official capacity."

unambiguous waiver of sovereign immunity. *See generally, United States v. Idaho*, 501 U.S. 1, 6-7 (1993), and cases cited; *see also McLellan Hwy. Corp. v. United States*, 95 F. Supp. 2d 1, 14-15 (D. Mass. 2000) ("A plaintiff bringing suit against the United States is 'required to set forth in the complaint the specific statute containing a waiver of the government's immunity from suit'"), quoting *Warminster Township Municipal Auth. v. United States*, 903 F. Supp. 847, 849 (E.D. Pa.1995). Exceptions to the doctrine of sovereign immunity are very narrow. *See Muirhead v. Mecham*, 427 F.3d 14, 18-19 (1st Cir. 2005).

### 1. The Administrative Procedure Act Provides No Right of Action Here

The APA can, in some circumstances, effectuate a waiver of sovereign immunity. *Bowen v. Massachusetts*, 487 U.S. 879 (1988). However, the right to judicial review in the APA is dependent on the existence of some substantive law that gives rise to rights and obligations. Here, the law that the putative intervenors rely upon, the US-UK MLAT, expressly denies them any rights under it. An instructive case is *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 942-943 (D.C. Cir. 1998), in which private parties sued to enforce a decision of the International Court of Justice ("ICJ") which had held that America's support of military actions by the so-called "Contras" against the government of Nicaragua violated both customary international law and a treaty between the United States and Nicaragua. The court of appeals first held that domestic law provided no basis for enforcing the judgment of the ICJ. 859 F.2d at 935-942. The court then addressed whether the APA provided any independent basis for relief. The court held:

> In theory, a law such as the APA could supersede these limitations
> in the ICJ statute, transforming ICJ decisions into legal standards
> for domestic judicial review. But, as Professor Davis explains, the

> APA does not possess such generative capacity. "Because the APA provision on reviewability is *always* dependent on other law, the law of reviewability is essentially the same as it would be without any APA provision." 5 K. Davis, *Administrative Law Treatise* § 28.1, at 256 (2d ed. 1984) (emphasis in original); *see also id.* at § 29.1. In sum, the APA does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law.

*Id.* at 942-943. This reasoning compels the conclusion that the US-UK MLAT, which expressly denies private parties any rights under it, vitiates any substantive basis for reviewing the Attorney General's decision to provide assistance, and thus eliminates any basis for APA review.

The APA's own statutory limitations are congruent with the holding of the court in *Committee of United States Citizens Living in Nicaragua*. Thus, the APA by its terms does not apply where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). *See generally Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984); *Sarit v. U.S. Drug Enforcement Admin.*, 987 F.2d 10, 16-17 (1st Cir. 1993). To the extent the US-UK MLAT may be regarded as a "statute," Article 1, § 3 of the MLAT effectively precludes judicial review of the Attorney General's actions.

Likewise, the APA does not apply to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney*, 470 U.S. 821 (1985) (holding that an agency's decision not to undertake certain enforcement action is not subject to judicial review under the APA). It is apparent from the text of the US-UK MLAT that the determinations of the Attorney General challenged in this case are textually committed entirely to his discretion. Under Article 3, § 1(a), the Attorney General "may" refuse assistance if "the Requested Party is of the opinion that the request, if granted, would impair its sovereignty,


security, or other essential interests or would be contrary to important public policy." Under Article 3, § 1(c)(I), the Attorney General "may" refuse assistance if "the request relates to an offence that is regarded by the Requested Party as: (1) an offence of a political character." The words "may," "of the opinion," and "regarded by the Requested Party" convey complete discretion. To recognize a right to judicial review of such determinations would entangle the courts in national policy decisions about what would "impair" the United States' "sovereignty, security, or other essential interests" or would be "contrary to important public policy." Accordingly, particularly when such determinations impact often-delicate foreign relations, the Supreme Court has recognized that courts are ill-equipped to make such decisions. *See, e.g., Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *see also In re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d at 572-573 ("[t]he court's role in this context is limited, however, and must be tempered by the recognition that 'the field of foreign affairs' is one that 'the Constitution entrusts to the President and the Congress.'") (quoting *Zschernig v. Miller*, 389 U.S. 429, 432 (1968)).

      Similarly, whether and in what fashion the Attorney General was obliged to request consultation with his counterpart in the U.K. under Article 18, § 1 of the US-UK MLAT, is subject to the unconstrained discretion of the Attorney General. Section 1, which the putative intervenors rely on, provides that "[t]he Parties, or Central Authorities" shall consult, "at the request of either . . . if either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty." The duty to consult arises only "at the request" of either Party. The treaty imposes no obligation to make a request, thus leaving that

decision entirely to the discretion of the Party. "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative - 'the political' - departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). The traditional presumption against judicial review of such matters brings the putative intervenors' claims squarely within the APA exception as applied in *Heckler v. Chaney*, which involved an analogous context -- an agency's discretion to refuse to take enforcement action. *See id.*, 470 U.S. at 832 ("an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2).").

### 2. The Declaratory Judgment Act Does Not Help the Putative Intervenors

The Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide an independent basis of jurisdiction for the putative intervenors' claims against the Attorney General. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("[T]he operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.") (internal quotation marks and citations omitted); *accord, Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir.1996) ("the Declaratory Judgment Act . . . [does not] constitute a waiver of sovereign immunity because the Act 'neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief.'") (quoting *McCarthy v. Marshall*, 723 F.2d 1034, 1037 (1st Cir.1983)).[4] As demonstrated above, there is no

---

[4] *See also*, *Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto*, 522 F.3d 1, 5 (1st Cir. 2008) ("That Act merely 'makes available an added anodyne for disputes that

independent basis for jurisdiction of the claims asserted in the Complaint; consequently the Declaratory Judgment Act is of no avail.

### 3. Mandamus Is Not Available Here

It is well-established that the writ of mandamus will issue "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *accord, Heckler v. Ringer*, 466 U.S. 602, 616 (1984) ("The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."); *and see In re City of Fall River, Massachusetts*, 470 F.3d 30, 32 (1st Cir. 2006) ("Mandamus is regarded as an extraordinary writ reserved for special situations."). As discussed previously, Article 1, § 3 of the US-UK MLAT makes it clear that the Attorney General owes no legal duty under that treaty to the putative intervenors. This forecloses any possibility of mandamus relief.

### C. The Complaint's Constitutional Claims Do Not Support Intervention

Both putative intervenors claim violations of their First and Fifth Amendment rights. Mr. MacIntyre's constitutional claims may quickly be dispatched because, as a non-resident alien living in Ireland [*see* Complaint ¶31], he has no rights under our Constitution. "It is well established that certain constitutional protections available to persons inside the United States are

---

come within the federal courts' jurisdiction on some other basis.'") (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir.1995));

unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson v. Eisentrager*, 339 U.S. 763, 784-85 (1950) (same); *see also Bridges v. Wixon*, 326 U.S. 135, 148, 161 (1945) (observing that *resident* aliens have First Amendment rights, but noting that "an alien obviously brings with him no constitutional rights"); *Boumediene v. Bush*, 476 F.3d 981, 991 (D.C. Cir. 2007) ("Precedent in this court and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States."). Mr. MacIntyre does not reside in United States or claim to be a U.S. citizen; therefore, he has no standing to invoke rights under the Constitution.

With regard to Mr. Moloney, he has no First Amendment interest distinguishable from that of Boston College, and he has no standing to assert the First Amendment rights of other persons. Mr. Moloney was an agent of Boston College at the time he participated in the Belfast Project. [D.18-2 at ¶13 (incorporating agreement at Attachment 1)]. The agreements under which the interviews were conducted were between Boston College and the interviewees, and the agreements were executed by the Boston College Burns Librarian, not Mr. Moloney. [*Id*. at ¶29 (incorporating agreement at Attachment 3)]. As a result, Mr. Moloney does not have independent rights or obligations under those agreements. Importantly, Mr. Moloney has not been subpoenaed to testify or to produce documents in this matter. As a result, Mr. Moloney's past employment by Boston College has not conferred on him some unique status or Constitutional right; his claimed First Amendment right is indistinguishable from that of any other person living in this country. Moreover, as set forth in the *Government's Opposition to*

*Motion to Quash and Motion for an Order to Compel* [D.7 at 13-15], the Supreme Court has rejected the notion of a First Amendment privilege to conceal information in the face of a subpoena in a criminal matter. The government's argument, which is incorporated by reference as if fully set forth herein, applies with greater force to Mr. Moloney, who has not received a subpoena and who was simply an agent of Boston College at the time of the interviews.[5]

      Mr. Moloney's Fifth Amendment claim -- the alleged violation of his "constitutional right to life" (Complaint ¶¶ 27, 54) -- lacks factual and legal substance. To begin with, the proposed Complaint is devoid of any facts that would suggest that Boston College's compliance with the subpoenas would create a significant risk to Mr. Moloney's life. His Affidavit expresses concern about the safety of Mr. MacIntyre and Ms. Dolours Price [D.18-2 at ¶ 33], but, tellingly, he expresses no concern that his own safety would be jeopardized by compliance with the subpoenas. This makes sense, inasmuch as he makes no claim that he was a member of the IRA nor does he claim that he was subject to a code of silence; he does not allege that he himself disclosed confidential information about the IRA in the course of the interviews; and he lives in the United States, far from the locus of the historic conflict. The bald allegation in the Complaint that compliance with the subpoenas will create risk to his personal safety is purely speculative, and absent supporting facts should be rejected. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a formulaic recitation of the elements of a cause of action will not do. Factual

---

[5] Applying the rubric of sovereign immunity, the same reasons argued in the government's opposition to Boston College's motion to quash (D.7 at pp. 10-21) explain why the Attorney General did not exercise his delegated authority in an unconstitutional manner. *See Muirhead v. Mecham*, 427 F.3d at 19 (in order to overcome sovereign immunity, plaintiff must demonstrate that "the officer exercise[d] [his statutory] power in an unconstitutional manner.").

13

allegations must be enough to raise a right to relief above the speculative level . . . .") (citations omitted).

In any event, the Fifth Amendment's Due Process clause is simply not implicated here. Any risk at issue here is indirect -- the harm would be inflicted by a third person acting independently and unlawfully. "[A]n indirect and incidental result of the Government's enforcement action . . . does not amount to a deprivation of any interest in life, liberty, or property." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 787 (1980); *accord*, *Castle Rock v. Gonzales*, 545 U.S. 748, 767 (2005) (quoting *O'Bannon* and holding that plaintiff had no procedural due process right to enforcement of a restraining order); *DeShaney v. Winnebago County Department of Soc. Serv.*, 489 U.S. 189, 195 (1989) ("a state's failure to protect an individual against private violence simply does not constitute a violation of the due process clause.").[6] Moreover, the Attorney General's conduct does not "shock the conscience" or otherwise offend substantive due process. *See Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("only the most egregious official conduct" would violate due process principles; "[liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Evans v. Avery*, 100 F.3d 1033 (1st Cir. 1996); *and see Collins v. City of Harker Heights*, 503 U.S. 115 (1992) (holding that the due process clause does not guarantee employees a workplace that is free from unreasonable risks); *compare McIntyre v. United States*, 336 F. Supp. 2d 87, 107 (D. Mass. 2007). In short, the putative intervenors' constitutional claims are unfounded and form no basis for intervention.

---

[6] *And see Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1041 (D.C. Cir. 1998).

### D. Intervention Is Not Proper Under Rule 24 of the Federal Rules of Civil Procedure

The putative intervenors invoke Fed. R. Civ. P. 24(a) and (b) in support of their motion to intervene, although they fail to cite any supporting case law. Putting aside whether civil Rule 24 is even applicable to this case[7], it is evident that the Rule does not allow intervention here.[8]

#### 1. Neither Mr. MacIntyre and Nor Mr. Moloney May Intervene As of Right

Rule 24(a)(2) allows intervention to anyone who:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To qualify under this provision, the person must have a "direct, substantial, *legally protectable* interest in the proceedings." *Travelers Indemnity Co. v. Dingwell*, 884 F.2d 629, 638 (1st Cir. 1989); *see also Donaldson v. United States*, 400 U.S. 517, 531 (1971) ("significantly protectable interest"). As aptly stated by the Fifth Circuit in *New Orleans Public Service, Inc. v. United Gas Pipeline Co.*, 732 F.2d 452, 464 (5th Cir. 1984) (*en banc*), "What is required is the interest be one which the *substantive law* recognizes as belonging to or being owned by the applicant."

---

[7] There is a substantial question as to whether the Rules of Civil Procedure apply to this motion to intervene. As noted in the *Government's Opposition to Motion to Quash and Motion for an Order to Compel* [D.7], the subpoenas were issued under the US-UK MLAT and concern a criminal investigation. The rules related to civil discovery do not control; rather, the US-UK MLAT governs the scope of the Court's discretion in this matter. Without waiving the argument that Fed. R. Civ. P. 24 is inapplicable, even if the Court applies this rule, it should reject the motion to intervene.

[8] Rule 24(a)(1) has no potential application here. It provides for intervention as of right to anyone who "is given an unconditional right to intervene by a federal statute."

(Emphasis in original.) "An interest that is too contingent or speculative—let alone an interest that is wholly nonexistent—cannot furnish a basis for intervention as of right." *Ungar v. Arafat*, 634 F.3d 46, 51-52 (1st Cir. 2011). As the discussion in sections A, B, and C of the argument above demonstrates, neither of the putative intervenors has a legally protectable interest in these proceedings. All of the legal rights asserted by them are foreclosed by established legal principles.

The claim that comes the closest to having any potential viability is Mr. Moloney's claim of a First Amendment violation. Intervention on that claim, however, flounders under Rule 24(a)(2) because "existing parties adequately represent that interest." While normally an intervenor need only make a "minimal" showing that the representation afforded by a named party is inadequate, "in cases where the intervenor's ultimate objective matches that of the named party, a rebuttable presumption of adequate representation applies." *B. Fernández & Hnos., Inc. v. Caribbean Warehouse Logistics, Inc.*, 440 F.3d 541, 545-546 (1st Cir. 2006). The objective of Mr. Moloney's First Amendment claim, stripped of its superfluous baggage, is identical to that of Boston College's motion -- the quashing of the subpoenas. The Court must presume, therefore, that to the extent that Mr. Moloney has a cognizable First Amendment interest in this matter, it is adequately represented by Boston College.

The motion to intervene fails to rebut this presumption. It offers no explanation why Mr. Moloney's First Amendment interest is distinguishable from that of Boston College and why any such interest is not adequately represented by Boston College. None of the papers filed on his behalf suggest that his First Amendment interest is "sufficiently different in kind or degree from those of the named party," *B. Fernández & Hnos., Inc.*, 440 F.3d at 546, or that there is any

"adversity of interest, collusion, or nonfeasance." *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979). Notably, Mr. Moloney's Complaint relies on the same Affidavit that Boston College has already submitted in support of its motion to quash. Mr. Moloney's First Amendment argument is, for all practical purposes, the same as Boston College's. *See* Complaint ¶¶ 25-26. In short, there is no basis for intervention as of right.

### 2.      The Court Should Deny Permissive Intervention

Rule 24(b) of the Federal Rules of Civil Procedure provides that, "on timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Clause (A) has no potential application here because there is no federal statute that gives either putative intervenor a conditional right to intervene.

The only claim that potentially qualifies under clause (B) is Mr. Moloney's First Amendment claim, inasmuch as it is essentially the same as Boston College's First Amendment objection. Nonetheless, the Court should deny intervention because Mr. Moloney's participation as a party at this stage would add nothing of value, and only generate confusion concerning the relevant issues and potentially delay resolution of the case. "The discretion afforded to the district court under Rule 24, substantial in any event, is even broader when the issue is one of permissive intervention." *R & G Mortg. Corp. v. Federal Home Loan Mortg. Corp.*, 584 F.3d 1, 11 (1st Cir. 2009). It appears that, if permitted to intervene, Mr. Moloney would seek to inject his political speculations and arguments about the motives of the U.K. government and the intentions of the Good Friday Agreement, as well as speculative legal theories such as the Attorney General's obligations under the US-UK MLAT, the extradition treaty between the U.K.

and the Republic of Ireland, and the like.  As explained in parts A, B, and C of this memorandum, none of these issues is legally germane to this proceeding.  Inasmuch as his participation will only detract from a prompt resolution of this matter, the Court should deny permissive intervention.

## Conclusion

For the foregoing reasons the Court should deny the motion of Messrs MacIntyre and Moloney to intervene.

                                       Respectfully submitted,

                                       CARMEN M. ORTIZ
                                       UNITED STATES ATTORNEY

Date: September 21, 2011        By:     */s/ John T. McNeil*
                                       John T. McNeil
                                       George B. Henderson, II
                                       Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                       */s/ John T. McNeil*
                                       John T. McNeil
                                       Assistant United States Attorney