# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------------------x

|  |  |
|---|---|
| IN RE: Request from the United Kingdom Pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom on Mutual Assistance in Criminal Matters in the Matter of Dolours Price. | : M.B.D. No.: <br> : <u>11-MC-91078 (WGY)</u> <br> : <br> : **ECF** <br> : <br> : **INTERVENOR'S** <br> : **REPLY** <br> : **MEMORANDUM** <br> : <br> : <u>**Leave to file pursuant to**</u> <br> : <u>**L.RR. 7.1(b)(3) granted**</u> <br> : <u>**on November 21, 2011**</u> |

-------------------------------------------------------------------------------x :

## MEMORANDUM OF INTERVENORS IN REPLY TO GOVERNMENT'S OPPOSITION TO INTERVENORS' MOTION FOR LEAVE TO INTERVENE

### <u>Oral Argument Requested</u>

Ed Moloney and Anthony MacIntyre (collectively, the "Intervenors"), by and through undersigned counsel, Eamonn Dornan of Dornan & Associates PLLC, 10-40 Jackson Avenue, Long Island City, New York 11101, appearing *pro hac vice*, and James J. Cotter, III MA BBO 101620, Attorney at Law, Post Office Box 270, N. Quincy, MA 02171, pursuant to leave of the Honorable Court granted in accordance with L.R. 112.1 and L.R. 7.1(b)(3), submit this Reply Memorandum in response to the Government's Opposition to Motion for Leave to Intervene.  The Intervenors respectfully request oral argument.

The Intervenors seek, *inter alia*, the Honorable Court's determination and declaration regarding the failure of the Attorney General is relation to his duties, including nondiscretionary duties, under the US-UK Mutual Legal Assistance Treaty ("US-UK MLAT")[1] upon which the Government has relied in issuing, on behalf of the United Kingdom, the Subpoenas for the tape recordings ("Tapes") which constitute the subject

---

[1] Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland ("U.K.") of 2004, implementing the 2003 Mutual Legal Assistance Agreement with the European Union, S. Treaty Doc. No. 109-13.

matter of this case.  The Government submits in its Opposition to Motion for Leave to

Intervene that the Intervenors are foreclosed by Article 1, § 3 of the US-UK MLAT from

challenging any such failure of the Attorney General, and that, effectively, the Government's

actions or inactions arising from its international obligations under the US-UK MLAT are

immune from judicial review.

The Government, in submitting that the Intervenors have no constitutional claims under

the First and Fifth Amendments, further seeks to restrain the jurisdictional reach and scope of

the Constitution of the United States, which the Attorney General is sworn to support and

defend.  The Government further argues that Rule 24 of the Federal Rules of Civil Procedure

is inapplicable, and the Intervenors submit that intervention by right or permissive is

warranted.

### A.  The Intervenors' Federal Law Rights have not been Extinguished by the Provisions of the US-UK MLAT

The Government posits that the Intervenors are barred from asserting any private right

of action pursuant to Article 1, § 3 of the US-UK MLAT, which states that the Treaty "is

intended solely for mutual legal assistance between the Parties. . . [and] shall not give rise to

a right on the part of any private person to obtain, suppress, or exclude any evidence, or to

impede the execution of a request."   However, this provision is best understood by reference

to the original, master agreement, namely the Agreement on Mutual Legal Assistance

Between the United States of America and the European Union ("Master MLAT"), which

contains the additional language that an MLAT shall not "expand *or limit* rights otherwise

available under domestic law."  Master MLAT at Article 3(5), emphasis added.  Neither does

the absence of this language in the US-UK MLAT lead to any express limitation of rights

available under domestic law.

More particularly, in issuing the subpoenas, the Government could not rely on any

provision of the US-UK MLAT, but was required to invoke the Honorable Court's

discretionary authority under 18 U.S.C. §3512, which in turn allows the Intervenors to raise a challenge under F.R. Crim.P. 17(c)(2), pursuant to which the Honorable Court may quash the subpoenas if compliance would be "unreasonable or oppressive."

As 18 U.S.C. §3512 came into effect on October 19, 2009, after the self-executing US-UK MLAT, the Honorable Court is not faced with the same dilemma as the Ninth Circuit in *In re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d 557 (9th Cir. 2011), which found that the MLAT in question trumped the substantive aspects of the pre-existing statute, 28 U.S.C. § 1782, which provided for international legal assistance subject to a district court's broad discretion to deny a request.

Here, the Honorable  Court's broad discretion under the later-in-time 18 U.S.C. §3512 is indisputable:

> "Upon application, duly authorized by an appropriate official of the Department of Justice, of an attorney for the Government, a Federal judge *may* issue such orders as *may* be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses." 18 U.S.C. §3512(a)(1);

> "Any order issued by a Federal judge pursuant to paragraph (1) *may* include the issuance of —(D) an order requiring the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things, or both." 18 U.S.C. §3512(a)(2).

Accordingly, in considering the Subpoena request, the Honorable Court may consider the discretionary factors set forth at *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247-49, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004),  including whether "the person from whom discovery is sought is a participant in the foreign proceeding"; "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; and whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." *Id.*, 542 U.S. at 264-65, 124 S.Ct. 2466.

3

The Intervenors seek to challenge the Government's "unduly intrusive or burdensome" request and "unreasonable or oppressive" actions or inactions in light of proceedings which the Intervenors posit will not take place.  The Intervenors' rights arise, then, under domestic law, namely the implementation of the US-UK MLAT through the filter of 18 U.S.C. §3512. The US-UK MLAT neither extinguishes the Intervenors' rights under domestic law, nor permits the Government to circumvent the Federal Rules in its pursuit of a Subpoena requests.

Indeed, despite the Government's assertions to the contrary, it is clear that Congress never intended for the US-UK MLAT to create a class of super-subpoena, impervious to judicial review.  Rather, the limits on a private right of action pursuant to the US-UK MLAT must, by plain reading of the treaty provisions, be limited solely to those documents and materials which the MLAT parties already have in their custody and control, and cannot, without judicial authority, fetter private documents in the custody of third parties.  These may only be obtained by subpoena, subject to the Federal Rules.

The prohibition on a private right of action in the US-UK MLAT is also more limited in its application than the Government proposes in that it is "aimed specifically at [criminal] defendants, to prevent them from making MLAT requests."  See R. N. Lyman, *Compulsory Process in a Globalized Era:  Defendant Access to Mutual Legal Assistance Treaties*, 47:1 Virginia Journal of International Law, p. 266 (Fall 2006).   See also, *United Kingdom v. U.S.*, 238 F.3d 1312, 1314 (11th Cir. 2001) [There is no provision for private parties, *such as individual criminal defendants in the English (or American) courts*, to request the production of information. See MLAT, art. 1, ¶ 3."  (emphasis added)]; *In Re Lavan* (E.D.Cal. 3-23-2011) *6 ("The MLAT with the United Kingdom *specifically excluded criminal defendants* from the ability to request production of information.") [Emphasis added].

Indeed, all of the cases cited by the Government prohibiting the relief of a private right of action involve attempts by criminal defendants to invoke rights which the requisite MLAT specifically prohibits.  (See Opposition, D. 24, pp. 4-5.)  For example, in *U.S. v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 658-659 (3d Cir. 2002), the statute at issue, 18 U.S.C. § 1955(d), had authorized seizure and forfeiture to the United States of property, including money, used in violation of the provisions of 18 U.S.C. § 1955, which prohibited illegal gambling.   Accordingly, the Government in *U.S. v. $734,578.82 in U.S. Currency* was already seized of the property and could readily exchange it under the express terms of the MLAT.

In *United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007), relied upon by the Government, the criminal defendant made no claim on appeal that the Government's investigation violated any United States law.  More importantly, the *Rommy* court confirmed that "The admissibility of evidence in a United States court depends solely on compliance with United States law."  In the case at bar, the Intervenors submit that, following the same rationale, the Government must be subject to the same Federal laws which pertain to every domestic subpoena request.

The district court in *U.S. v. Chitron Electronics Co. Ltd.*, 668 F.Supp.2d 298, 306-307 (D. Mass. 2009), also relied upon by the Government, dismissed the criminal defendant's argument under an MLAT as it found that "the MLAT only becomes operative if a request is made by the United States to China for assistance with the service of a summons" which request had not been made by the United States.  Here, there is no dispute that the US-UK MLAT has become operative.

In the case at bar, the Government is not entitled to the Tape recordings subject to subpoena as a matter of law, but must pursue its subpoena request only pursuant to the Honorable Court's discretionary authority under 18 U.S.C. §3512, and subject to the rigors of

F.R. Crim.P. 17(c)(2).  The Intervenors respectfully submit that the question as to whether or not compliance with the subpoena requests in this case would be "oppressive or unreasonable" must necessarily include an examination of the Government's compliance, and that of the United Kingdom, with the terms of the US-UK MLAT.

Additionally, if the Intervenors' constitutional claims are found to be valid, then they are further entitled to relief in the form of declaratory relief quashing the subpoenas. (Intervenors' Complaint, D. 18, para e, p.24).  In a case where the request for assistance is in violation of the Constitution, an order prohibiting compliance would be appropriate.  See *In Re 840 140th Ave. NE, Bellevue, Washington,* 634 F.3d at 571-573.

Otherwise, as discussed below, the Intervenors are not seeking to "obtain, suppress or exclude any evidence or to impede the execution of a request," but rather to enforce the Government's compliance with clearly defined standards under the US-UK MLAT.  If the Intervenors' claims based on the failure of the Attorney General to follow the MLAT standards are upheld, the Intervenors seek not to quash, but, rather, to remand the matter to the Attorney General to act on the request based on proper consideration of the MLAT standards.

There is no prohibition in the MLAT, or elsewhere, that prohibits the enforcement of specific MLAT standards.  If innocent non-criminal-defendants such as the Intervenors and Boston College have no entitlement to enforce such standards, then the provisions are rendered entirely meaningless, contrary to law.  See *Pielage v. McConnell,* 516 F.3d 1282 (11th Cir. 2008).

**B.  The Intervenors are Entitled to Relief under the Administrative Procedure Act, the Declaratory Judgment Act, and for a Writ of Mandamus**

The Government submits that claims which the Intervenors have raised pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), the Declaratory Judgment Act, 28 U.S.C. § 2201, or the Court's mandamus authority at 28 U.S.C. § 1361 are

unfounded, and that the Honorable Court lacks jurisdiction over these claims absent an express waiver of sovereign immunity.

As the Government concedes, however, the APA effectuates a waiver of sovereign immunity, and Section 702 of the APA expressly waives the federal government's sovereign immunity in actions for non-monetary relief against an agency or officer thereof brought under the general federal question jurisdictional statute.  *Rico v. U.S.*, 490 F.3d 50. 59 (1st Cir. 2007).

Whereas the APA does not itself confer subject matter jurisdiction [see *Califano v. Sanders*, 430 U.S. 99, 107 (1977)] the Federal Question Statute at 28 U.S.C. §1331 confers jurisdiction over a suit that "arises under" a "right of action" created by the APA. See *Bowen v. Massachusetts*, 487 U.S. 879, 891 n.16 (1988).

As discussed below, the Intervenors' cause of action lies under the APA as they will suffer legal, constitutional and/or physical harm as a result of the failure of the Attorney General to comply with his obligations under the US-UK MLAT.  The Intervenors have standing and they are entitled to judicial review of the lawfulness of the Attorney General's action or inaction.

### (i)        The APA Provides Grounds for Judicial Review

As the First Circuit set forth in *Conservation Law Foundation, Inc. v. Busey*, 79 F.3d 1250, 1261 fn42 (1st Cir. 1996), "an implied right of action is not a predicate for a right of judicial review under the APA."  The central purpose of the APA is to "provid[e] a broad spectrum of judicial review of agency action." *Id, citing Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Therefore, "[a] cause of action for review of [agency] action is available [under the APA] absent some clear and convincing evidence of legislative intention to preclude review." *Id.*

The Government contends that "to the extent the US-UK MLAT may be regarded as a 'statute,' Article 1, § 3 of the MLAT effectively precludes judicial review of the Attorney General's actions."  Article 1, § 3 does no such thing.  It states that "[t]he provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."  The Article relates to private rights regarding evidence, discussed above, but is silent on judicial review of the Attorney General's compliance with the terms of the US-UK MLAT.  Absent clear and convincing language, the Intervenors are entitled to review under the APA.

The Government has argued that there is no substantive law that would give rise to a right to judicial review under the APA.  (Opposition, D.24, p.7.)  The court in *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1335 (Fed. Cir. 2008), however, addressed a plaintiff's attempt to review a treaty decision.  There, the court found no prudential standing restraints and stated that, "there need be no indication of congressional purpose to benefit the would-be-plaintiff" because the review provisions of the APA are "generous."  *Canadian Lumber Trade Alliance*, 517 F.3d at 1335 citing Clarke, supra at 399-400.

The Intervenors have also requested that the Honorable Court remand this matter to the Attorney General with instructions that his decision to provide legal assistance to the PSNI/UK be reviewed in light of the requirements of Articles 1 sec. 1bis, 3 sec. 1(a) and (c)(i) and 18 sec. 1. of the MLAT (collectively, the "MLAT Standards").  These sections provide that a request for legal assistance:

> a.      <u>shall</u> not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place. MLAT Article 1 sec. 1bis (emphasis added);

> b.      may be refused if the "Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy."  MLAT Article 3 sec. 1 (a);

c.      may be refused if the "requests relates to an offence that is regarded by the Requested Party as (i) an offence of a political character." MLAT Article 3 sec. (c) (i); and,

d.      <u>shall</u> require the Parties or Central Authority to "consult promptly at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular request...Such consultation may in particular take place if, in the opinion of either Party or Central Authority…either Party has rights or obligations under another bilateral or Multilateral agreement relating to the subject matter of this Treaty."  MLAT Article 18 sec. 1. (Emphasis added.)

The Government submitted, citing *Heckler v. Chaney*, 470 U.S. 821 (1985), that the APA does not apply, in that it is apparent from the text of the US-UK MLAT that the "determinations of the Attorney General challenged in this case are textually committed entirely to his discretion," such that they are precluded by  5 U.S.C. § 701(a)(2).

However, apart from the clearly mandatory nature of some of the Attorney General's duties at Article 1 sec. 1bis  and Article 18 sec.1 of the US-UK MLAT, the Court in *Heckler* also stated that the presumption of unreviewability may be rebutted "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id*. at 832-33, 105 S.Ct. 1649.   As the First Circuit set forth in *Taylor v. U.S. Dept. Of Labor*, 440 F.3d 1, 9 (1st Cir. 2005) stated: "In other words, where there is a sufficient or meaningful standard provided in the governing statute, courts have something "against which to judge the agency's exercise of discretion," and judicial review is allowed.  *Citing Heckler*, 470 U.S. at 830, 105 S.Ct. 1649.

The "agency discretion" exception, therefore, is a "very narrow exception" to be "narrowly construed" and "should be invoked only where the substantive statute left the courts with no law to apply."  *Id. citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).  "If no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretions."  *Id.*

Here, however, through the MLAT Standards, the court has clearly codified law to apply and has "judicially manageable standards" against which to judge and evaluate the actions or inactions of the Attorney General.  The MLAT Standards are "definite standards" and "judicially enforceable."  *See Medellin v. Texas*, 522 U. S. 491, 550, 556, 561 (Breyer, J., dissenting)(2008).

### (a)   Intervenors Have Set Forth a Case or Controversy and, Therefore, Have Sufficient Article III Standing

In order to obtain review under the Administrative Procedure Act (the "APA"), an aggrieved party must have Article III standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was designed to protect some threatened concrete interest of the [party] who must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the party. *Massachusetts Independent Certification v. Johanns*, 486 F. Supp. 2d 105 (D. Mass 2007). The Article III requirement for standing is rather "modest."  *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116 (1st Cir. 1999) (Lynch, Cir. J. concurring and citing Wright, Miller and Kane, Federal Practice and Procedure, (2nd 1986), sec. 1901 at 288.)

In order to determine if a party has standing, the court reviews three elements.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-562 (1992):

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (quotations and internal citations omitted).

The injuries alleged by the Intervenors are concrete and particularized in that the injuries affect the Intervenors "in a personal and individual way." *Lujan, supra* 504 U.S. 560,

ftn. 1. The Intervenors have alleged that personal harm will occur if the Tapes are released (Intervenors' Complaint, D. 18, para. 28-29, 55, pp. 13, 22) and the affidavits attached to the Boston College Motion to Quash support these allegations.  (See McIntyre Affidavit, D. 5-4, para. 18, pp. 18-19.)  The Intervenors also suggest that the constitutional rights which they seek to protect are, clearly, more constitutionally sufficient for Article III standing than the injury conferring standing in Massachusetts Independent Certification (which discussed insufficient standards for the labeling of organic food).  *Id*. at 486 F. Supp. 2d at 34.

Additionally, the harm which may befall the Intervenors is imminent.  If the Tapes are released, the harm to the Intervenor Moloney's First Amendment rights will occur immediately upon such release.  Because Intervenor McIntyre lives in the Republic of Ireland, he may be subject immediately to reprisals by disgruntled paramilitaries.

There also could not be a more clear or direct casual connection between the injury to the Intervenors' First Amendment rights and the failure of the Attorney General to adhere to the MLAT Standards.  The moment the Tapes are released, the confidentiality promised to the interviewees will be irrevocably destroyed without any further acts of independent third parties.

While this Court cannot control paramilitary groups, it can decide not to give those groups cause to seek retribution by quashing the Subpoenas.  It is not, therefore, merely speculative if such relief would redress the Intervenors' claims.  The "link in the chain of causation between the challenged Government conduct and the asserted injury" is sufficiently strong to sustain the Intervenors' standing.  See *Allen v. Wright*, 468 U.S. 737, 758-759 (1983).

If this Court decides that the Tapes should not be released, clearly there will be no harm and the Intervenors' claims will have been redressed.  The Intervenors have also requested, in the alternative, that this Court remand to the Attorney General his decision to

issue the Subpoenas with instructions that the PSNI/UK request be reviewed in conformance with the MLAT Standards. (Intervenors' Complaint, D. 18, para (a), p. 23.) The Intervenors believe, as argued below, that the subpoena request, if properly considered in light of the MLAT Standards, should not issue.

In view of the foregoing, the Intervenors have satisfied the rather "modest" requirements for Article III standing. They have made sufficient allegations at this stage of the litigation. See *Lujan,* 504 U.S. at 561; *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008).

> (b)     **The Intervenors have Prudential Standing**

In addition to Article III standing, a party seeking relief under the APA must also have prudential standing which is determined by the zone of interest test. *Harvey v. Veneman*, 396 F.3d 28 (1st Cir. 2005). In order to satisfy the zone of interest test for prudential standing courts first discern the interests arguably to be protected or regulated by the statute, and then determine whether the plaintiff's interests arguably fall within that same zone of interests [*City National Credit Union Association v. First National Bank Trust*, 522 U.S. 479, 492 (1998)]; only a party claiming an interest that is marginally related to or inconsistent with the purpose implicit in the statute should be precluded from judicial review under this test. *Clarke v Securities Indus. Association*, 479 U.S. 388, 389 (1987). *Massachusetts Independent Certification*, 486 F. Supp. 2d at 117-118 (emphasis added).

The zone of interest test is not meant to be "especially demanding." *Clarke, supra*, 479 U.S. at 399. The Intervenors' interest is that there should be adherence by the Attorney General with the MLAT Standards lest the Intervenors' constitutional right to life and First Amendment rights be jeopardized. To suggest that the purposes of the MLAT ignore or are not cognizant of these interests is to suggest that the Attorney General may grant a request for legal assistance without regard to (a) the consequences of such a request for those individuals

and institutions, such as the Intervenors and Boston College, who will be adversely affected

and (b) policies established by bilateral treaties such as the Good Friday Agreement ("GFA")

and US-UK Extradition Treaty.

In addition to fostering reciprocal legal assistance between the United States and other

nations, what other purpose would the MLAT Standards have if not also to protect innocent

third parties against the effects of intrusive, unwarranted, constitutionally offensive or bad

faith requests?  An "essential interest" and "important public policy" consideration is the

protection of innocent, non-defendant individuals and institutions from oppressive or

unreasonable requests.

Because it is assumed that all provisions of treaties have significance, these provisions

are not mere window dressing to be arbitrarily applied or not.   Treaties, like statutes, should

be construed so that "no words are treated as being meaningless, redundant or mere

surplusage."  *Pielage v. McConnell*, 516 F.3d 1282 (11th Cir. 2008).

The exceptions in the MLAT Standards are not mere surplusage.  In addition to

Article III standing, the Intervenors have also alleged sufficient facts for prudential standing.

**(ii)     The Declaratory Judgment Act and/or a Writ of Mandamus  Warrants Judicial Review**

In determining whether the actions of the Attorney General were in accordance with

the law, and whether the matter should be remanded, the Intervenors respectfully submit that

the Honorable Court should inquire if, prior to granting the PSNI/UK request for issuing the

Subpoenas, the Attorney General adhered to the MLAT Standards and:

     a.     consider whether or not a prosecution or referral would take place in the UK against Dolours Price, a resident of the Republic of Ireland, for crimes allegedly committed in the Republic of Ireland, in which case the UK would have neither personal jurisdiction nor subject matter jurisdiction (MLAT, Article I sec. 1bis.);

     b.     consider if the request would "impair [the United States'] sovereignty, security, or other essential interests or would be contrary to important public policy" (Id. at Article 3 sec. 1(a));

     c.     consider if the Subpoenas related to an offence that is regarded by the United States as "an offence of a political character" (Id. at sec. 1(c)(i));

     d.     consider if the United States had "rights or obligations under another bilateral or multilateral agreement relating to the subject matter of the Treaty," such as the GFA and the Extradition Treaty, in which event the Attorney General "shall consult promptly" with the PSNI/UK.  (Id. at Article 18 sec. 1 (emphasis added)); or,

     e.     consider whether or not granting the request would "offend a constitutional guaranty" or if the information produced by the request "would be used in a foreign judicial proceeding that departs from our concepts of fundamental due process and fairness" See *In Re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d at 572.

It is further submitted that if the Attorney General had evaluated the PSNI/UK request for legal assistance in conformity with the explicit MLAT Standards, he would not have issued the Subpoenas.  As discussed above, because the MLAT sets forth the standards against which this Court may evaluate the action of the Attorney General and, in view of the narrow exception of "agency discretion", the agency discretion exception is inapplicable.

For the reasons set forth above, the Attorney General has failed to meet the clearly defined and codified MLAT Standards which permits judicial review of his actions and inactions.

### C.  The Intervenor's Constitutional Claims Support Intervention

As raised in their proposed Complaint, the Intervenors have raised constitutional claims, which cannot be diluted by the US-UK MLAT.  As the Government concedes, at the very least Mr. Moloney has asserted First Amendment rights similar to Boston College, and as asserted above, he has Article III and prudential standing to assert such rights.

### D.  Intervention Is Permissible Under Fed. R Civ P., Rule 24 Procedure

The Intervenors' believe that this matter presents the first instance where the PSNI/UK has attempted to employ use the US-UK MLAT for conduct occurring during the course of the Northern Ireland conflicts (the "Troubles").  Such a request is in direct contradiction of both the letter and spirit of the Good Friday Agreement (the "GFA") that was intended to "wipe the slate clean."  (Moloney Affidavit, D. 5-5, para.7, p. 2.)  As argued

below, it was the explicit recognition of the GFA by the Senate in its ratification of a intertwined treaty, the US-UK Extradition Treaty (see Intervenors' Complaint, D. 18, para. 8-10, pp. 5-7), that politically-motivated offenses arising as a result of the Troubles would not continue to be the source of prosecution by the PSNI/UK.

This Court's determination, therefore, will be particularly crucial with respect to MLAT requests that are, like this one, seeking assistance with prosecutions that offend our Constitution or "would lead to an egregious violation of human rights" [see *In Re Premises Located at 840 140th Avenue NE, Bellevue, Washington*, 634 F.3d 557, 572 (9th Cir. 2011)] or are otherwise in violation of law, including, without limitation, the MLAT Standards, discussed below.

    (i)   The standards for determining Intervenors' Motion to Intervene are to be applied broadly and in favor of intervention.

The Intervenors have moved to intervene because the resolution of the subject matter of this action, the production or nonproduction of the Tapes, will affect not just the existing parties hereto, but the Intervenors as well.  The impact on the Intervenors will not be merely theoretical or academic, but substantive, concrete and real.  Indeed, if the relief requested by the Intervenors is not granted, the Subpoenas enforced and the Tapes released, the lives and safety of the Intervenors and their confidantes will be placed in jeopardy.  (Intervenors' Complaint, D. 18, para. 27, 29, 55, pp. 13, 22.)

The requirements for intervention are generally interpreted broadly in favor of intervention.  *Donnelly v. Glickman*, 159 F. 3d 405, 409 (9th Cir. 1998); *Yorkshire v. Internal Revenue Service*, 26 F.3d. 942, 944 (9th Cir. 1994).  Contrary to the Government's Opposition To Motion For Leave To Intervene (D.24, the "Opposition"), the bulk of which addresses the merits of the Intervenors' claims (D.24, pp. 1-15), intervention cannot be "resolved by reference to the ultimate merits of the claim the Intervenors seek to assert unless the

allegations are frivolous on their face." *Turn Key Gaming Inc. v. Oglala Sioux Tribe,* 164 F.3d 1080, 1081 (8th Cir. 1999).

Additionally, the rational for intervention may also have particular force "where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through… the framing of issues." *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116-117 (1st Cir. 1999).  The protection of Constitutional rights, compliance with the provisions of bilateral treaties, and the parameters of academic freedom are clearly important issues affecting many persons and institutions beyond the Intervenors.  Of great import and significance is the issue of the lives and safety of the interviewees participating in the Belfast Project, in addition to the Intervenors, whose identities will be revealed by release of the Tapes. (See Affidavit of Thomas E. Hachey In Support of Motion To Quash (the "Hachey Affidavit"), D.5-2, para. 10, p. 4; Affidavit of Ed Moloney In Support of Motion To Quash (the "Moloney Affidavit"), D. 5-5, para. 28, p. 9.)

### (a) The Intervenors should be Permitted to Intervene Pursuant to Fed. R. Civ. P. 24 (a) (2)

As integral participants in the Belfast Project, the Intervenors have a substantial stake in the release of the Tapes to the PSNI/UK.  Their interest is personal in that they have alleged that, if the Tapes are released and made public, their lives and safety and/or the lives and safety of their confidantes will be placed in great danger as a result of retaliation by some faction or former members of the Irish Republic Army (the "IRA").   (Intervenors' Complaint, D. 18   ¶¶ 27, 29, 55, pp. 13, 22; Affidavit of Anthony McIntrye, D. 5-4, ¶ 18, p. 18-19.)

The interest or stake of the Intervenors, therefore, exceeds the "modest" requirement of Fed. R. Civ. P. 24(a)(2).  Moreover, the Supreme Court cases have expanded the notion of "an interest relating to the property and transaction which is the subject matter of the action" without setting "any very firm limits."  *Cotter v. Massachusetts Assn. of Minority Police Enforcement Offices,* 219 F.3d  31, 34 (1st Cir. 2000); *Daggett*, 172 F.3d at 110.  Even without such an expansion by the Supreme Court, the Intervenors' interest in the litigation is substantial.

The test for whether the disposition of an action might have an adverse effect on the ability of intervenors to protect their interest is "practical."  *Daggett*, 172 F.3d at 110, *citing Atlantic Development Corp. v. United States*, 379 F.2d 818, 824-825 (5th Cir. 1967).  Even a "small threat" will suffice.  *Cotter,* 219 F.3d at 35.  A narrow reading of this requirement of Fed. R. Civ. P. 24(a)(2) has been rejected.  *Id. citing* 7C Wright, Miller and Kane, Federal Practice and Procedure, sec. 1908 at 270-271 (2nd ed. 1986).

The Intervenors have raised additional claims, not raised by Boston College, such as the failure of the Attorney General to consider the PSNI/UK request for legal assistance in light of the MLAT Standards prior to issuing the Subpoenas to Boston College.  (Intervenors' Complaint, D. 18, para. 51, pp. 20-21.)  Since the claims based on the failure of the Attorney General to fulfil his obligations under the MLAT have not been raised by Boston College, it is indisputable that if the Subpoenas are enforced and the Tapes are released, the Intervenors' claims under the MLAT will be moot.   The ability of the Intervenors to protect their interests in a meaningful manner will not have been merely impaired or impeded, but, rather, terminated.

The burden required to show an inadequacy of representation is only minimal and is met when the applicant shows that representation of his interest "may be" inadequate.  *Trbovich v. United States*,   404  U.S.  528, 538 n.10, 92 S. Ct. 630 (1972) quoting _Moore's

Federal Practice,  24.09-1[47](1969); (24.03 [3][a][i] (2010).  Doubts regarding adequacy of representation should be resolved in favor of the proposed intervenor because it allows the court to resolve all related disputes in a single action.  *Federal Savings and Loan Insurance Corp. v. Falls Chase Special Taxing District*, 983 F.2d 211, 216 (11th Cir. 1993).

Where the goals of the applicant are the same as those of the plaintiff or defendant, adequacy of representation as of right is presumed, although that presumption can be rebutted.  *Daggett*, 172 F.3d at 9.  Additionally, the presumption is "weak."  *Stone v. First Union Corp.,* 371 F.3d 1305 (11th Cir. 2004).  While both Boston College and the Intervenors seek to quash the Subpoenas based on the constitutional grounds, the Intervenors, but not Boston College, also seek separate relief if this Court does not enter an order quashing the Subpoenas.  If this Court finds the Attorney General did not apply the MLAT Standards to the MLAT Request, the Intervenors are requesting an order remanding this matter to the Attorney General with instructions to consider the request for legal assistance in light of the MLAT Standards.

To overcome a presumption of adequacy of representation based on an identity of goals, an intervenor "need only offer an adequate explanation as to why is not sufficiently represented by the named party."  *B. Fernandez & Hnos., Inc. v. Caribbean Warehouse Logistics, Inc.*, 440 F.3d 541 (1st Cir. 2000).  The goals of the Intervenors and Boston College, while in some respects similar, are not identical and "similar" does not mean "identical."  *Stone*, 371 F.3d at 1312.    The presumption described in *Daggett* therefore, does not apply or, if it does, it has been rebutted.

Based on the "modest" standard required for a showing of inadequacy of representation, it is clear that, with respect to the claims based on the constitutional right to life, the First Amendment and on the failure of the Attorney General to comply with terms of the MLAT, the Intervenors' interests are not adequately represented by existing parties.

**(b) The Intervenors should be permitted to intervene pursuant to Fed. R. Civ. P 24(b)(2)**

Both the Intervenors and Boston College have advanced legal and factual arguments that would have obligated the Attorney General to decline to provide legal assistance under the MLAT to the PSNI/UK.  At the very least, the Attorney General should have added conditions to compliance with the MLAT Request.

In addressing the standards of Fed. R. Civ. P. 24(b), the Government suggests that intervention would "potentially delay resolution of the case."  (D. 24, p.17 and 18.)   The Government does not, however, explain how or why intervention would cause a "potential" delay.  The mere specter of a "potential delay" raised by the Government is not sufficient to countervail the arguments weighing in favor of intervention.  Furthermore, the Subpoenas relate to alleged crimes committed approximately 40 years ago.  After such a lapse in time, it is somewhat disingenuous to suggest that the matter is now urgent.  Certainly, the PSNI/UK have not thought so.

The decision regarding whether to grant permissive intervention is always subject to the inherent discretionary considerations of equity and judicial economy.  Moore's Federal Practice 3d, sec. 24.10[1].  The Intervenors respectfully suggest that this criteria militates in favor of permissive intervention.

The fact that an applicant for intervention may be helpful in fully developing the case is a reasonable consideration in deciding a motion for permissive intervention.  *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116 (1st Cir. 1999).  The addition of an individual, non-institutional interest will help to develop this case by (a) demonstrating to the Court the impact of its decision on innocent, parties who will be adversely affected by the release of the Tapes; (b) framing the issue of compliance with the MLAT; and, (c) providing assistance for an issue of great public interest.

Whereas the Intervenors could have filed an original action seeking preliminary injunctive relief and moved to have such action consolidated with the present matter, the Intervenors, respecting judicial economy and not intending to delay this matter, chose to be heard through intervention.

**E** **Conclusion**

Based on all of the foregoing, the requirements of Fed. R. Civ. P. 24 (a)(2) and (b) (2) have been satisfied and exceeded and that intervention should be permitted.  If, however, this Court determines that intervention under Fed. R. Civ. P. 24 (a) or (b) is not appropriate, the Intervenors' request that the Complaint for Intervention be treated as an original complaint.

Dated: December 5, 2011
      Long Island City, New York

                                   Respectfully submitted,

                                   DORNAN & ASSOCIATES PLLC

                                   By: /s/Eamonn Dornan
                                   _____
                                   EAMONN DORNAN,ESQ
                                   *Appearing Pro Hac Vice*
                                   1040 Jackson Avenue, Suite 3B
                                   Long Island City, New York 10017
                                   Tel: (718) 707-9997
                                   Fax: (718) 228-5940

                                   LAW OFFICES OF JAMES J. COTTER, III
                                   MA BBO 101620

                                   By: /s/James J. Cotter, III
                                   _____
                                   JAMES J. COTTER, III
                                   (MA BBO 101620)
                                   Post Office Box 270
                                   N. Quincy, MA 02171
                                   Tel. 617 899-0549
                                   Fax 617 984-5858

                                   *Attorneys for Intervenors*
                                   Ed Moloney and Anthony McIntyre

Certificate of Service

I, James J. Cotter III, hereby certify that this document filed through the CM/ECF system was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 5, 2011.

/s/ James J. Cotter III