UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>In RE:  Request from the United</td><td>)</td><td></td></tr>
<tr><td>Kingdom Pursuant to the</td><td>)</td><td></td></tr>
</table>

```
                                    )
In RE:  Request from the United     )
        Kingdom Pursuant to the     )
        Treaty Between the          )
        Government of the United    )
        States of America and the   )
        Government of the United    )
        Kingdom on Mutual           )
        Assistance in Criminal      )
        Matters in the Matter of    )
        Dolours Price               )
                                    )
UNITED STATES OF AMERICA,           )
                Petitioner,         )
        v.                          )
                                    )
TRUSTEES OF BOSTON COLLEGE,         )MISCELLANEOUS BUSINESS
                Movant,             )DOCKET
                                    )NO. 11-91078-WGY
JOHN T. McNEIL¹,                    )
                Commissioner,       )
                                    )
ED MOLONEY, ANTHONY McINTYRE,       )
                Applicants for      )
                Intervention.       )
                                    )
```

MEMORANDUM & ORDER

YOUNG, D.J.                               December 16, 2011

## I.   INTRODUCTION

The Trustees of Boston College ("Boston College") move to
quash or modify subpoenae requesting confidential interviews and
records from the oral history project known as the "Belfast

---

[1] Assistant United States Attorney John T. McNeil replaced
Todd F. Braunstein as the commissioner on September 8, 2011.  ECF
No. 20.  Attorney Braunstein no longer works for the United
States Attorney.  Id.

Project."  The subpoenae were issued by a commissioner pursuant

to 18 U.S.C. § 3512, the United Kingdom Mutual Legal Assistance

Treaty ("UK-MLAT"),[2] and a sealed Order of this Court.[3]  The

government asserts that the terms of the UK-MLAT requires the

Court to grant its order and deny any motion to quash absent a

constitutional violation or a federally recognized testimonial

privilege.  Opp'n Gov't's Mot. Quash & Mot. Order Compel

("Gov't's First Opp'n") 8, ECF. No. 7.  Boston College asks the

Court to review the subpoenae under the standard set forth in

Federal Rule of Criminal Procedure 17(c)(2), where "the court may

quash or modify the subpoena if compliance would be unreasonable

or oppressive."  Mot. Trustees Boston College Quash Subpoenas

("Mot. Quash"), ECF. No. 5.  This Court is asked to determine

what sort of discretion an Article III court has to review or

_____

[2] The current bilateral mutual legal assistance instrument
between the United Kingdom and the United States was signed on
December 16, 2004, integrating the 2003 mutual legal assistance
agreement between the European Union and United States into the
1994 mutual legal assistance agreement with the United Kingdom.
Mutual Legal Assistance Agreement, U.S.-E.U., June 25, 2003, S.
Treaty Doc. No. 109-13, at 350-73 (2006) ("UK-MLAT").  See also
S. Treaty Doc. No. 109-13, at XXXVI (explaining in an Executive
Summary how the 2003 bilateral mutual legal assistance treaty
between the United States and the European Union integrates into
the 1994 mutual legal assistance treaty between the United States
and United Kingdom).

[3] Quite properly, this case was filed under seal.  UK-MLAT
art. 7, Confidentiality and Limitations on Use.  When the
recipient of the subpoenae in question filed its motion to quash
publicly, the Court unsealed the docket in order to respond.  ECF
No. 4.  While the Court issues this opinion publicly as there are
important considerations of judicial transparency here, it
discloses nothing not already in the public record.

quash a subpoena brought under the authority of the UK-MLAT.

## A.    Procedural Posture

On June 7, 2011, Boston College filed a motion to quash or modify the subpoenae.  Mot. Quash, ECF. No. 5.  The subpoenae requested documents and records connected with interviews of two individuals, Brendan Hughes and Dolours Price.  Boston College complied with the requests for documents relating to Brendan Hughes as doing so did not conflict with their self-imposed conditions of confidentiality (Mr. Hughes is deceased).  Boston College then filed a motion to quash or modify the subpoenae on June 6, 2011. Mot. Quash.  The government opposed the motion to quash and requests that the Court enter an order compelling Boston College to produce the materials responsive to the commissioner's subpoenae.  Gov't's First Opp'n 1.  After the government voluntarily narrowed the subpoenae, Boston College filed a new motion to quash.  Mot. Trustees Boston College Quash New Subpoenas ("New Mot. Quash"), ECF No. 12.  The government continues to oppose the motions to quash.  Mem. Opp'n Mot. Quash New Subpoenas, ECF No. 14.

District Court Judge Stearns and District Court Judge Tauro recused themselves from this case, and the case was transferred to this session of the Court on October 5, 2011.  ECF Nos. 8, 30.

## B.    Facts

### 1.    The Subpoenae

The subpoenae referenced in this case were filed under seal and all discussion of their contents is drawn from the public record.  Boston College received the first set of subpoenae on May 5, 2011, which named as recipients the John J. Burns Library at Boston College, Burns Librarian Robert K. O'Neill, and Boston College Professor Thomas E. Hachey.  Mot. Quash 2.  The subpoenae were issued by a commissioner under the authority of 18 U.S.C. § 3512 and the UK-MLAT.  Id.  The subpoenae included demands for the recordings, written documents, written notes and computer records of the interviews of Brendan Hughes and Dolours Price to be produced on May 26, 2011.  Id.  The interview materials of Brendan Hughes were produced in a timely manner to the government because the terms of confidentiality of his interviews ended with his death.  Id. at 3.  By agreement with the United States Attorney's Office, the date for production of other documents was extended to June 2, 2011.  Id.

A second set of subpoenae was served on August 4, 2011 to counsel for Boston College.  New Mot. Quash 2.  These subpoenae additionally demanded the recordings, transcripts and records of "any and all interviews containing information about the abduction and death of Mrs. Jean McConville."  Id. at 2.  Both sets of subpoenae requested documents gathered as part of an oral history project sponsored by Boston College.  Id. at 1-2.

### 2.   The Belfast Project

In 2001, Boston College sponsored the Belfast Project, an

4

oral history project with the goal of documenting in taped
interviews the recollections of members of the Provisional Irish
Republican Army, the Provisional Sinn Fein, the Ulster Volunteer
Force, and other paramilitary and political organizations
involved in the "Troubles" in Northern Ireland from 1969 forward.
Mot. Quash, Ex. 6, Aff. Robert K. O'Neill ("Aff. O'Neill") 2, ECF
No. 5-6.  The research also sought to provide insight into the
minds of people who become personally engaged in violent
conflict.  Mot. Quash, Ex. 5, Aff. Ed Moloney ("Aff. Moloney") 8,
ECF No. 5-5 .  As such, its progenitors saw it as a vital project
to understanding the conflict in Northern Ireland and other
conflicts around the world.  <u>Id.</u>  The Belfast Project was housed
at the Burns Library of Rare Books and Special Collections at
Boston College.  Aff. O'Neill 3-4.  Boston College sponsored the
project due to its ongoing academic interest in Irish Studies and
its prior role in the peace process in Northern Ireland.  <u>Id.</u> at
2.  The Burns Library serves as the archive for a variety of
valuable documents, including an Irish Collection.  <u>Id.</u> at 1.  Ed
Moloney, a journalist and writer, originally proposed the
Project.  Aff. O'Neill 7.  Prior to the commencement of the
Project, Robert K. O'Neill, the Burns Librarian, cautioned
Moloney that although he had not spoken yet with Boston College's
counsel, the library could not guarantee the confidentiality of
the interviews in the face of a court order.  Gov't's First
Opp'n, Ex. 10, Fax from Robert K. O'Neill to Ed Moloney, May 10,

2000, ECF No. 7-10.

The Trustees of Boston College contracted in 2001 with Moloney to become the Project Director for the Belfast Project. Mot. Quash, Ex. 5, Aff. Moloney, Attach. 1, Agreement between Trustees of Boston College and Edward Moloney ("Moloney Agreement"), ECF No. 5-6 . The contract required the Belfast Project Director, interviewers and interviewees to sign a confidentiality agreement forbidding them to disclose the existence or scope of the Project without the permission of Boston College. Id. at 2. The contract also required the adoption of a coding system to maintain the anonymity of interviews. Id. Only Robert K. O'Neill and Ed Moloney would have access to the key identifying the interviewees. Id.

Originally the interviews were to be stored in Boston and in Belfast, Ireland, although ultimately the project leadership decided that interviews could only be stored safely in the United States. Id.; Aff. Moloney 4-5. The interviews were eventually stored in the Burns Library "Treasure Room" with extremely limited access. Aff. O'Neill 3.

Each interviewee of the project was to be given a contract guaranteeing confidentiality "to the extent that American law allows." Aff. Moloney, Attach. 2, Moloney Agreement 2 ("Moloney Attach. 2"), ECF No. 5-5. The contract recommended adopting guidelines for use, similar to those in Columbia University's

6

Oral History Research Office Guidelines.[4]  Id.  The Belfast
Project subsequently employed two researchers to conduct
interviews with members of the Irish Republican Army and the
largest Protestant paramilitary group, the Ulster Volunteer
Force.  Aff. Moloney 9.  One interviewer, Anthony McIntyre,
contracted with Moloney in an agreement governed by the terms of
Moloney's contract with Boston College.  Moloney Attach. 2.
McIntyre's contract required him to transcribe and index the
interviews, as well as abide by the confidentiality requirements
of the Moloney Agreement.  Id.  The interviewers conducted
twenty-six interviews which were subsequently transcribed.
Gov't's Opp'n. Mot. Quash New Subpoenas 2-3, ECF No. 14.

    Although the legal agreement between Moloney and Boston
College was appropriately equivocal in its guarantee of
confidentiality, Boston College asserts that the promises of
confidentiality given to interviewees were absolute.  Mot. Quash
5-6.  Interviewees apparently signed a confidentiality and
donation agreement that promised that access to the interviewee's
record would be restricted until after the death of the
interviewee, except if the interviewee gave prior written
approval following consultation with the Burns Librarian.  Aff.

---

    [4]The government points out that Columbia University oral
history researchers apparently advise interviewees that their
interviews are subject to release under court orders.  Gov't's
First Opp'n 20 (citing Jim Dwyer, Secret Archive of Ulster
Troubles Faces Subpoena, N.Y. Times, May 13, 2011, at ¶ 14, ECF
No. 7-4).

O'Neill, O'Neill Attach. 2, Agreement for Donation by Brendan Hughes, ECF. No. 5-6; Aff. O'Neill 3 (explaining that each interviewee signed a donation agreement largely identical to the Brendan Hughes agreement).  In general, Boston College believes that interviewees conditioned their participation on the promises of strict confidentiality and anonymity.  Mot. Quash 5.  In an affidavit, McIntyre stated that he would not have been involved if he had understood that the interviews might be susceptible to legal process.  Mot. Quash, Ex. 4, Aff. Anthony McIntyre ("Aff. McIntyre") 2, ECF No. 5-4.

Boston College further alleges that the premium on confidentiality in the Belfast Project was exacerbated by the possibility of retaliation by other Irish Republican Army members enforcing their "code of silence."  Mot. Quash 5-6.  Nonetheless, the existence of the Belfast Project is now widely known, and in 2010, Moloney published a book using material from two deceased interviewees.  Aff. Moloney 9.  Moloney also co-produced a documentary film using those interviews that is available online. Gov't's First Opp'n 4.  The interviews with Dolours Price by Boston College were also the subject of several news reports published in Northern Ireland.  <u>E.g.</u>, Gov't's First Opp'n, Ex. 1, Ciaran Barnes, <u>Adams Denies Claims that He Gave Go-ahead for McConville Disappearance</u>, Sunday Life, Feb. 21, 2010, at 6, ECF No. 7-1.

II.   **ANALYSIS**

   A.   **Construing the Governing Statute and Treaty Harmoniously**

   The subpoenae in question were issued by a commissioner authorized pursuant to an Order of this Court, 18 U.S.C. § 3512 and the UK-MLAT.  Mot. Quash, ECF No. 5.  Treaties have the force of law.  <u>Medellin</u> v. <u>Texas</u>, 552 U.S. 491, 505 (2008) (citing <u>Whitney</u> v. <u>Robertson</u>, 124 U.S. 190, 194 (1888)); <u>accord</u> <u>id.</u> (Breyer, J., dissenting) ("[A]ll treaties . . . shall be the supreme Law of the Land." (quoting U.S. Const. art. VI, § 1, cl. 2)).  The Court has the task of interpreting Section 3512 and the UK-MLAT together.

> By the [C]onstitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation.  Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other.  When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other.

<u>Whitney</u>, 124 U.S. at 194 (establishing the "last-in-time rule").  The Court thus will analyze the two laws in chronological order.

   1.   **The United Kingdom Mutual Legal Assistance Treaty**

   Mutual legal assistance treaties are bilateral treaties intended to improve law enforcement cooperation between two nations.  The United States signed a mutual legal assistance treaty with the United Kingdom in 1994.  Treaty with the United

9

Kingdom on Mutual Legal Assistance in Criminal Matters, S. Exec. Rep. No. 104-23 (1996).  In 2003, the United States also signed a mutual legal assistance treaty with the European Union that added new authorities and procedures to the UK-MLAT.  Mutual Legal Assistance Agreement, U.S.-E.U., S. Treaty Doc. No. 109-13 (including Message of the President transmitting the Agreement on Mutual Legal Assistance between the United States and the European Union (EU), signed on June 25, 2003).  The two treaties are integrated, and the relevant parts of the UK-MLAT for purposes of this suit were not affected by the European Union MLAT.  Id. at 350-51 (setting forth new articles to be applied to the 1994 UK-MLAT).  Therefore, the text of the 1994 UK-MLAT applies in its original form for purposes of this analysis.  See id. at XXXVI.

When the United States Senate approved the UK-MLAT, requests for assistance were to be executed under 28 U.S.C. § 1782.  S. Exec. Rep. No. 104-23 (reprinting Technical Analysis of the MLAT between the United States of America and the United Kingdom ("UK-MLAT Technical Analysis")) ("It is not anticipated that the Treaty will require any new implementing legislation. The United States Central Authority expects to rely heavily on the existing authority of the federal courts under Title 28, United States Code, Section 1782, in the execution of

requests.").[5]  Section 1782 has been interpreted by numerous

courts, but was not invoked in this case.  E.g., Intel Corp. v.

Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004) ("We

caution, however, that § 1782(a) authorizes, but does not

require, a federal district court to provide judicial assistance

to foreign or international tribunals.").  Instead, the

government requested a commissioner under 18 U.S.C. § 3512, a new

statute which provides a "clear statutory system" for handling

MLAT requests.  155 Cong. Rec. S6810 (daily ed. June 18, 2009)

(statement of Sen. Whitehouse); see 18 U.S.C. § 3512 (enacted

Oct. 19, 2009).

Two courts of appeals have interpreted a similar question

regarding what discretion an MLAT with an executing statute

confers on United States district courts.  In re the Search of

the Premises Located at 840 140th Avenue NE, Bellevue, Wash., 634

F.3d 557 (9th Cir. 2011); In re Commissioner's Subpoenas, 325

F.3d 1287 (11th Cir. 2003), abrogation in other part recognized

by In re Clerici, 481 F.3d 1324, 1333 n.12 (11th Cir. 2007).

These two cases analyzed the relationship between Section 1782

and two different mutual legal assistance treaties.  Although the

cases are distinguishable, their reasoning is helpful in

interpreting the UK-MLAT and its relationship with 18 U.S.C. §

---

[5] Section 1782 applies civil practice standards.  For a
description of the history of Section 1782, see Intel Corp. v.
Advanced Micro Devices, Inc., 542 U.S. 241, 246-49 (2004).

3512.

### a.   Lessons from the Ninth and Eleventh Circuits

As mentioned above, neither of the courts of appeals that evaluated the incorporation of United States law into an MLAT interpreted the UK-MLAT.  See In re the Search, 634 F.3d 557; In re Commissioner's Subpoenas, 325 F.3d 1287.  Nor did either court interpret 18 U.S.C. § 3512.  See In re the Search, 634 F.3d 557; In re Commissioner's Subpoenas, 325 F.3d 1287.  When the Eleventh Circuit decided In re Commissioner's Subpoena, 18 U.S.C. § 3512 had not been passed.  In In re the Search, the Ninth Circuit was not asked to interpret Section 3512.  See 634 F.3d 557. Additionally, the Ninth Circuit noted the importance of the first-in-time rule in their interpretation of the MLAT.  Id. at 568 ("We therefore must determine whether the treaty superseded the statute's grant of discretionary authority to the district courts.").  The treaties in both of those two cases were executed well after Section 1782.  Treaty on Mutual Legal Assistance Criminal in Matters, U.S.-Can., Mar. 18, 1985, S. Treaty Doc. No. 100-14 (1990); Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Russ. June 17, 1999, S. Treaty Doc. No. 106-22 (2000).  Because of the last-in-time rule, the courts could conclude that the MLAT superseded Section 1782.  See In re the Search, 634 F.3d at 568.

The older of these two cases is In re Commissioner's Subpoenas, in which the Eleventh Circuit concluded that the

12

district court did not have discretion to quash a subpoena brought under the MLAT.  325 F.3d at 1305-06.  When the treaty in question referenced using "the law of the Requested State," the court concluded that the language permitted two alternative interpretations.  Id. at 1297.  Either the treaty would incorporate all laws of the Requested State, including laws providing standards for reviewing letters rogatory, or it "might only refer to the laws providing ways and means for executing valid MLAT requests for assistance."  Id.  The court chose the latter and constructed the Canadian MLAT to use "established procedures set forth in existing laws of the Requested State" but not to have adopted any substantive law of the Requested State. Id.  In part, the Eleventh Circuit supported its conclusion by describing mutual legal assistance treaties as a response intended to avoid the "wide discretion" vested in federal courts in Section 1782.  Compare id. at 1290, with id. at 1297.  But see UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23 ("It is not anticipated that the Treaty will require any new implementing legislation.  The United States Central Authority expects to rely heavily on the existing authority of the federal courts under Title 28, United States Code, Section 1782, in the execution of requests.").  This interpretation was similar to that adopted by the Ninth Circuit in In re the Search, 634 F.3d at 570.

In interpreting the Russian MLAT, the Ninth Circuit also concluded that the phrase "executed in accordance with the laws

13

of the Requested Party except if this Treaty provides otherwise"
did not have a clear meaning.  Id. at 568 (citations omitted).
The court noted that the phrase could mean "subject to the
procedural mechanisms and substantive limitations of the laws of
the Requested Party," or "carried out in accordance with the
procedural mechanisms of the Requested Party."  Id. at 568-69.
The Ninth Circuit found both of these interpretations to be
plausible, and concluded that the Treaty only incorporated
procedural laws based on other evidence of the treaty parties'
intent.  Id.  The court's final construction of the Treaty
language stated that the Treaty parties intended to adopt merely
the procedural mechanisms of Section 1782, but "not as a means
for deciding whether or not to grant or deny the request so
made."[6]  Id. at 570.  Thus the Ninth Circuit interpreted the term
"laws of the Requested State" not to include the substantive laws
of the United States.  Id.

After concluding that the treaty in question removed the
"traditional 'broad discretion'" of federal district courts, the
Ninth Circuit nevertheless determined that the district court had
discretion to review a protective order challenging an MLAT
subpoena by virtue of its constitutional powers.  Id. at 571.

---

[6] The court conceded that this was "an unusual method of
interpreting a law" as the treaty did not "expressly specify the
procedure/substance distinction."  In re the Search, 634 F.3d at
570-71.  In the UK-MLAT, there is also no distinction made in the
treaty between the procedural and substantive laws of the
Requested State.  See UK-MLAT.

The enforcement of a subpoena is an exercise of judicial power. According to the government, the executive branch has the authority to exercise that power directly, because the district court is required, by virtue of an MLAT request, to compel the production of requested documents. The government's position leads to the inescapable and unacceptable conclusion that the executive branch, and not the judicial branch, would exercise judicial power. Alternatively, the government's position suggests that by ratifying an MLAT, the legislative branch could compel the judicial branch to reach a particular result—issuing orders compelling production and denying motions for protective orders—in particular cases, notwithstanding any concerns, such as violations of individual rights, that a federal court may have. This too would be unacceptable. Cf. United States v. Klein, 80 U.S. 128, 146-47 (1871).

The Constitution's separation of powers does not permit either the legislative or executive branch to convert the judicial branch into a mere functionary. Instead, the Constitution requires that "no provision of law 'impermissibly threaten[ ] the institutional integrity of the Judicial Branch.'" Mistretta v. United States, 488 U.S. 361, 383 (1989) (quoting Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 851 (1986)).

Id. at 572.

While this Court wholeheartedly agrees that this is the logical (and unconstitutional) conclusion of the government's assertions here, this Court necessarily must carefully analyze the text of the UK-MLAT and 18 U.S.C. § 3512 to decide what discretion the Court actually has in deciding Boston College's motion to quash.

**b.   Analysis of the UK-MLAT**

**i.   The Text**

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." Abbott v. Abbott, -- U.S. --,

130 S. Ct. 1983, 1990 (2010) (quoting Medellin, 552 U.S. at 506 n.5). The text of the UK-MLAT sheds light on the question whether MLAT requests are intended to afford discretion to judges when reviewing applications for orders or search warrants. See UK-MLAT, art. 5, Execution of Requests. The Treaty embraces the courts as a conduit for MLAT requests in several places. For example, "[t]he courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request." Id. ¶ 1. Within article 5, Execution of Requests, the Treaty states, "[w]hen execution of the request requires judicial . . . action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party." Id. ¶ 2. "The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party." Id. ¶ 3. The government correctly asserts that the meaning of "law of the Requested Party" has not been interpreted in the context of the UK-MLAT. Gov't's First Opp'n 8 n.4. It is an issue of first impression in the First Circuit, particularly considering that 18 U.S.C. § 3512 is now the government's preferred authority for executing MLAT requests.

### ii.  Laws of the Requested State

The Eleventh Circuit concluded that the treaty language "laws of the requested state" cannot simply be read in a

mechanical manner and automatically interpreted as incorporating all of the substantive law of the Requested State.   <u>In re Commissioner's Subpoenas</u>, 325 F.3d at 1303.   Nor can the treaty be interpreted as ignoring the laws of the Requested State, as that would plainly contradict the language of the treaty.   <u>E.g.</u>, UK-MLAT art. 5, ¶ 3 ("The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party."); art. 8, ¶ 1 ("A person in the territory of the Requested Party from whom evidence is requested . . . may be compelled . . . by subpoena or such other method as may be permitted under the law of the Requested Party."); art. 8, ¶ 2 ("A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party."); art. 13, ¶ 2 ("Service of any subpoena or other process by virtue of paragraph (1) of this Article shall not impose any obligation under the law of the Requested Party."); art. 14, ¶ 1 ("The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party, and it is carried out in accordance with the laws of that Party."); art. 16, ¶ 3 ("A Requested Party in control of forfeited proceeds or instrumentalities shall dispose

of them according to its laws."). This Court agrees with both propositions.

"A term appearing in several places in a statutory text is generally read the same way each time it appears." Ratzlaf v. United States, 510 U.S. 135, 143 (1994). This presumption may yield when there is enough variation in the context of the words to conclude that they were used "in different parts of the act with different intent." Atlantic Cleaners & Dyers Inc. v. United States, 286 U.S. 427, 433 (1932). The term "laws of the Requested States" appears multiple times in the UK-MLAT, but unfortunately these references are not clearly identical in context. Some of these references imply an incorporation of substantive law, and some of them may imply merely the incorporation of procedural protections. Compare UK-MLAT art. 8, ¶ 1 ("A person in the territory of the Requested Party from whom evidence is requested . . . may be compelled . . . by subpoena or such other method as may be permitted under the law of the Requested Party."), with art. 16, ¶ 3 ("A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws.").

This opinion does not require the Court to reach a conclusion on every law of the United States that may or may not affect the execution of this Treaty. The Court must however answer the question of whether a federal district court has discretion under some "laws" of the United States to review a

motion to quash subpoenae executed under the UK-MLAT.

### iii. Technical Analysis of the UK-MLAT

Where the text of a treaty is ambiguous, a court may look to other sources to understand the treaty's meaning.  See Abbott, 130 S. Ct. at 1990.  "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." Id. at 1993 (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982)); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.").  Because the relevant MLAT text is from the UK-MLAT signed in 1994, the Senate Report and Technical Analysis of that original 1994 UK-MLAT are germane to this Court's interpretation of the Treaty.  See Mutual Legal Assistance Agreement, U.S.-E.U., S. Treaty Doc. No. 109-13.  The Technical Analysis of the 1994 UK-MLAT submitted to the Senate Committee on Foreign Relations by the Departments of State and Justice was prepared by the United States delegation that conducted the negotiations.  UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23, at 13.

The UK-MLAT Technical Analysis openly contemplates that federal district courts will be involved in the execution of MLAT requests.  The Analysis states that "when a request from the United Kingdom requires compulsory process for execution, the Department of Justice would ask a federal court to issue the

necessary process under Title 28, United States Code, Section
1782 and the provisions of the Treaty." Id. at 17.  Although
Section 1782 is not implicated in this case, this statement from
the Analysis shows that the negotiators of the Treaty were
expecting federal district courts to have a substantive role in
executing requests.[7]  Similarly, the Analysis provides that "if
execution of the request entails action by a judicial authority,
or administrative agency, the Central Authority of the Requested
Party shall arrange for the presentation of the request to that
court or agency at no cost to the other Party."  Id.

### iv.    Discretion of the Court

It is inescapable that the text and context of the UK-MLAT
are ambiguous.  The Treaty text, Technical Analysis, and Senate
Executive Report, however, all indicate some expectations that
federal district courts and United States laws will have a role
in executing MLAT requests.  See id. at 12 ("The Committee
believes that MLATs should not, however, be a source of
information that is contrary to U.S. legal principles.").  At the
very least, "the MLATs oblige each country to assist the other to
the extent permitted by their laws, and provide a framework for
that assistance."  Id. at 11.  Overall, the Treaty language and
Technical Analysis leave the door open for courts to assist in

---

[7]Under 28 U.S.C. § 1782, courts directly review requests for
evidence from foreign individuals and authorities. Courts have
wide discretion under Section 1782.  See Intel, 542 U.S. at 255.

the execution of requests, and do not prevent courts from using United States law in doing so.  To the contrary, the Treaty repeatedly references the laws of the Requested State.  To the extent that the text of the UK-MLAT and 18 U.S.C. § 3512 might directly conflict on this point, the "last-in-time" rule would apply and 18 U.S.C. § 3512 would be last-in-time.  The Court now turns to its analysis of Section 3512.

### 2.   18 U.S.C. § 3512

In 2009, the President signed the Foreign Evidence Request Efficiency Act, 18 U.S.C. § 3512, which was intended to improve Title 18 of the United States Code and aid the Department of Justice in executing requests under mutual legal assistance treaties.  155 Cong. Rec. S6810 (daily ed. June 18, 2009) (statement by Sen. Whitehouse).  The principal purpose of Section 3512 was to streamline foreign evidence requests "mak[ing] it easier for the United States to respond to requests by allowing them to be centralized and by putting the process for handling them within a clear statutory system."  Id.  Practically speaking, the law permits a single Assistant United States Attorney to pursue requests in multiple judicial districts, eliminating duplicative efforts.  Id.; 155 Cong. Rec. H10092 (daily ed. Sept. 30, 2009) (statement of Rep. Schiff).  The law therefore also gives more control to individual district court judges, who may now oversee and approve subpoenae and other orders (but not search warrants) in districts other than their

own.  18 U.S.C. § 3512(f) ("Except as provided under subsection (d), an order or warrant issued pursuant to this section may be served or executed in any place in the United States.").

To date, it appears that no court has had occasion to publish an opinion interpreting 18 U.S.C. § 3512.[8]  This Court therefore is faced with an issue of first impression: whether a federal district court has the inherent or statutory discretion to review a subpoena order issued under the authority of a commissioner appointed by the court under Section 3512.

### a.   The Text

The text of 18 U.S.C. § 3512 is unambiguous in providing discretion to federal judges.  "Upon application, duly authorized by an appropriate official of the Department of Justice, of an attorney of the Government, a Federal judge <u>may</u> issue such orders as may be necessary to execute a request from a foreign authority for assistance."  18 U.S.C. § 3512(a)(1) (emphasis added).  "[A] "Federal judge <u>may</u> also issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both."  <u>Id.</u> § 3512(b)(1) (emphasis added).  "The use of a permissive verb – ["may"] – suggests a discretionary rather than mandatory review process." <u>Rastelli</u> v. <u>Warden, Metro. Corr. Ctr.</u>, 782 F.2d 17, 23 (2d Cir.

---

[8] Searches of Westlaw and Lexis databases as of the date of this memorandum's publication yielded no cases or orders interpreting 18 U.S.C. § 3512.

1986).

The discretion explicit in the use of "may" in the UK-MLAT text is emphasized because Section 3512 also provides that "[a]ny person appointed under an order issued pursuant to paragraph (1) <u>may</u> – (A) issue orders requiring the appearance of a person, or the production of documents or other things, or both."  18 U.S.C. § 3512(b)(2) (emphasis added).  The drafters of Section 3512 are presumed to have intended the same meaning when using the word "may" whether applied to the judiciary or to an appointed commissioner.  <u>Gustafson</u> v. <u>Alloyd Co., Inc.</u>, 513 U.S. 561, 570 (1995) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.") (citations omitted). Both the federal district judge and the appointed commissioner are expected to exercise their discretion in deciding which orders to issue.  18 U.S.C. § 3512.  <u>See</u> *SEALED* Mem. Law Supp. Appl. Order 8, ECF No. 2 (describing the discretion of a commissioner under 18 U.S.C. § 3512).

### b.   Legislative History

Not only is the text unambiguous; the legislative history of Section 3512 strongly supports this interpretation.  The law passed unanimously in the United States Senate and under the suspension of the rules in the House of Representatives. Representative Adam Schiff spoke on the floor of the House of Representatives to explain the legislation.  155 Cong. Rec. H10092 (daily ed. Sept. 30, 2009).  Representative Schiff

explained how the Foreign Evidence Request Efficiency Act would

"streamline the evidence collection process," notably stating

that "Courts will continue to act as gatekeepers to make sure

that requests for foreign evidence meet the same standards as

those required in domestic cases."  Id.  Representative Schiff

also stated that "[t]his legislation would provide clear

statutory authority in one place,"  as  "the current authority to

respond to foreign evidence requests is found in the patchwork of

treaties, the inherent power of the courts, and analogous

domestic statutes."  Id.  In the Senate, Senator Sheldon

Whitehouse introduced the bill and was the only senator to make

relevant comments on the floor of the Senate.  155 Cong. Rec.

S6810 (daily ed. June 18, 2009).  Senator Whitehouse's statement

supports this Court's interpretation of the text and

Representative Schiff's comments:

> Of course, respect for civil liberties demands that we
> not suddenly change the type of evidence that foreign
> governments may receive from the United States or reduce
> the role of courts as gatekeepers for searches.  The
> Foreign Evidence Request Efficiency Act would leave those
> important protections in place, while simultaneously
> reducing the paperwork that the cumbersome process
> imposes on our U.S. Attorneys.

Id.  Senator Whitehouse also submitted a letter from the

Department of Justice into the Congressional Record which

includes similar statements about Section 3512.  Letter from M.

Faith Burton, Acting Assistant Attorney General, 155 Cong. Rec.

S6810 (daily ed. June 18, 2009) ("The proposed legislation

addresses both of these difficulties by clarifying which courts
have jurisdiction and can respond to appropriate foreign requests
for evidence in criminal investigations."). Section 3512 thus
passed with the intent that courts would act as gatekeepers in
using their discretion to review MLAT requests.

### 3.   Harmonizing the UK-MLAT and 18 U.S.C. § 3512

At this point in the analysis, the Court has two options:
Either the Treaty and the statute can fairly be harmonized, or
there is a direct conflict in which case the last-in-time rule
suggests that Section 3512 must control. See Whitney, 124 U.S.
at 194. Courts are encouraged to construe treaties and statutes
so as to avoid conflict. Id. Given the ambiguity of the UK-MLAT
terms incorporating the laws of the United States, see In re the
Search, 634 F.3d at 568, and the clear meaning of Section 3512,
it appears that the two sources of law can operate in harmony.
This conclusion is strengthened by the fact that interpreting the
two as in conflict would not change the outcome, but would
require the Court to exercise the discretion expressed in the
last-in-time law, 18 U.S.C. § 3512.

Just as Section 3512 confers discretion on federal district
judges, the negotiators of the UK-MLAT contemplated the
involvement of judges in executing requests. "When execution of
the request requires judicial or administrative action, the
request shall be presented to the appropriate authority by the
persons appointed by the Central Authority of the Requested

Party."  UK-MLAT art. 5, ¶ 3; <u>accord</u> UK-MLAT Technical Analysis,

S. Exec. Rep. No. 104-23, at 17 ("[W]hen a request from the

United Kingdom requires compulsory process for execution, the

Department of Justice would ask a federal court to issue the

necessary process.").  Of course, the text of the Treaty also

indicates that the execution of Treaty requests would require

implementing statutes.  <u>See</u> UK-MLAT Technical Analysis, S. Exec.

Rep. No. 104-23, at 17 (referring to 28 U.S.C. § 1782).  As

Congress and the President have seen fit to add a new executing

authority for the UK-MLAT in the form of 18 U.S.C. § 3512, this

Court must interpret the UK-MLAT faithfully according to its

original terms and in harmony with existing statutory law.  As it

is stated in Section 3512 and implied by the UK-MLAT, a federal

district judge <u>may</u> issue a subpoena if she agrees the order is

permissible under the laws of the United States.[9]

This Court holds that a United States District Court has the

discretion to review a motion to quash such a subpoena, under the

statutory authority conferred by 18 U.S.C. § 3512 and the

framework articulated in the UK-MLAT.[10]

_____

[9] <u>See</u> Treaty with the United Kingdom on Mutual Legal
Assistance in Criminal Matters, S. Exec. Rep. No. 104-23, at 12
("The Committee believes that MLATs should not, however, be a
source of information that is contrary to U.S. legal
principles.").

[10] This Court need not, and does not, decide to what extent
the laws of the United States are incorporated into the UK-MLAT.
Even if the UK-MLAT terms are interpreted to include only
procedural laws, those procedures as implemented by Section 3512

**B.    Standard of Review to Be Applied to the Motion to Quash**

The Court next must decide what standard of review it should accord to requests under an MLAT.[11]   Boston College requests that the Court use the standard of Federal Rule of Criminal Procedure 17(c)(2) ("Rule 17(c)(2)") to review its motion to quash.   New Mot. Quash 1.   Rule 17(c)(2) states that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."   The government denies that the Rule applies.   See Gov't's Supplemental Opp'n Mot. Quash 4.

Traditionally, judges have wide discretion in reviewing subpoenae.   In re Pantojas, 628 F.2d 701, 705 (1st Cir. 1980) (encouraging district courts to review even grand jury subpoenae).

When Congress adopted 18 U.S.C. § 3512, it expressly included the guidance and constraints of Federal Rule of Criminal Procedure 41 in issuing search warrants.   18 U.S.C. § 3512(a)(2)(A).   Section 3512 does not otherwise mention the Federal Rules of Criminal Procedure.   In conformity with the maxim expressio unius est exclusio alterius, this absence

---

provide for discretion by federal district judges.   See 18 U.S.C. § 3512(b).

[11] A commissioner appointed pursuant to a federal district judge's authority under 18 U.S.C. § 3512 has the discretion to issue subpoenae.   The Court's discretion in this case comes into play when there is a motion to quash or other protective order requested.   See supra at II.A.

suggests the Court ought decline to invoke the Federal Rules of

Criminal Procedure in reviewing MLAT requests.  Castro-Soto v.

Holder, 596 F.3d 68, 73 n.5 (1st Cir. 2010) (noting that "when

parties list specific items in a document, any item not so listed

is typically thought to be excluded." (quoting Lohnes v. Level 3

Commc'ns, Inc., 272 F.3d 49, 61 (1st Cir. 2001)) (citation

omitted)).  This Court is not therefore bound by the Federal

Rules of Criminal Procedure, however the Rules still inform the

Court's standard for reasonableness.

     "What is reasonable depends on the context."  United States

v. R. Enterprises, Inc., 498 U.S. 292, 299 (1991) (holding that

the standard from United States v. Nixon, 418 U.S. 683, 700

(1974), for reviewing subpoenae does not apply in the context of

grand jury proceedings (quoting New Jersey v. T.L.O., 469 U.S.

325, 337 (1985))).  MLAT requests are intended to improve law

enforcement cooperation between nations, and the United States'

law enforcement objectives often rely on speedy and generous help

from treaty signatories.  As a result, the United States has also

committed to responding to requests under MLATs, regardless

whether a dual criminality exists, or the evidence sought would

be inadmissible in United States courts.  See UK-MLAT Technical

Analysis, S. Exec. Rep. No. 104-23, at 15, 18.  One important

aspect of MLAT requests is the need for speed in processing

requests by other nations, as "[s]etting a high standard of

responsiveness will allow the United States to urge that foreign

authorities respond to our requests for evidence with comparable speed." 155 Cong. Rec. S6810 (daily ed. June 18, 2009) (statement of Sen. Whitehouse) (discussing 18 U.S.C. § 3512). Another important requirement of MLAT requests is confidentiality. UK- MLAT art. 7, Confidentiality and Limitations on Use; UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23, at 19 ("The United Kingdom delegation expressed particular concern that information it supplies in response to United States requests receive the same kind of confidentiality accorded exchanges of information via diplomatic channels, and not be disclosed under the Freedom of Information Act.").

These attributes and others draw an obvious comparison between MLAT subpoena requests and grand jury subpoenae. See R. Enters., 498 U.S. at 299 (noting the public's interest in "expeditious administration of the criminal laws" and the "indispensable secrecy of grand jury proceedings") (citations omitted); see also United States v. Blech, 208 F.R.D. 65 (S.D.N.Y. 2002) (declining motion to quash after comparing MLAT request to grand jury subpoena). For example, the government cannot be required to justify the issuance of a grand jury subpoena. R. Enters., 498 U.S. at 297. Under the explicit terms of the UK-MLAT, individuals are similarly precluded from challenging the propriety of MLAT requests.[12] UK-MLAT art. 1, ¶

---

[12] This express disavowal of individual rights to suppress evidence in the UK-MLAT does not, however, impair courts'

3; UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23, at 14.
("Thus, a person from whom records are sought may not oppose the
execution of the request by claiming that it does not comply with
the Treaty's formal requirements."); accord United States v.
Chitron Elec. Co. Ltd., 668 F. Supp. 2d 298, 306-07 (D. Mass.
2009) (Saris, J.).  Like a grand jury subpoena, MLAT subpoenae
are "almost universally issued by and through federal
prosecutors."  Compare Stern v. United States Dist. Court for the
Dist. of Mass., 214 F.3d 4, 16 n.4 (1st Cir. 2000), with 18
U.S.C. § 3512, and UK-MLAT.  Another similarity between MLAT
requests and the grand jury subpoena power is that its broad
investigatory powers are not unlimited.  Compare R. Enter., 498
U.S. at 299 ("The investigatory powers of the grand jury are
nevertheless not unlimited."), with Treaty with the United
Kingdom on Mutual Legal Assistance in Criminal Matters, S. Exec.
Rep. No. 104-23, at 12 ("The Committee believes that MLATs should
not, however, be a source of information that is contrary to U.S.
legal principles.").

---

discretion to review subpoenae under the UK-MLAT as codified in
18 U.S.C. § 3512.  Compare UK-MLAT Technical Analysis, S. Exec.
Rep. No. 104-23, at 14 ("Thus, a person from whom records are
sought may not oppose the execution of the request by claiming it
does not comply with the Treaty's formal requirements, such as
those specified in article 4, or the substantive requirements in
article 3.") (describing art. 1, Scope of Assistance), with id.
at 17 ("Rather, it is anticipated that when a request from the
United Kingdom requires compulsory process for execution, the
Department of Justice would ask a federal court to issue the
necessary process.") (describing art. 5, Execution of Requests).

Grand jury subpoenae are also similar to MLAT requests as both may be sought ex parte when appropriate. E.g., United States v. Castroneves, No. 08-20916-CR, 2009 WL 528251 (S.D. Fl. Mar. 2, 2009) (slip copy); United States v. Kern, Criminal Action No. 07-381, 2008 WL 2224941, at *1 n.2 (S.D. Tex. May 28, 2008). The Supreme Court has encouraged district courts in cases with ex parte representations to "craft appropriate procedures that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays." R. Enters., 498 U.S. at 302. The "district court may require that the Government reveal the subject of the investigation to the trial court in camera, so that the court may determine whether the motion to quash has a reasonable prospect for success before it discloses the subject matter to the challenging party." Id. These similarities encourage this Court to adopt a standard of review that draws from the standard for reviewing grand jury subpoenae.

An MLAT request for subpoena is not, however, a grand jury subpoena. Id. at 297 ("The grand jury occupies a unique role in our criminal justice system."). Notably, a grand jury is independent of all three branches of government and is intended as a "kind of buffer or referee between the Government and the people." In re United States, 441 F.3d 44, 57 (1st Cir. 2006) (quoting United States v. Williams, 504 U.S. 36, 47 (1992)). In

31

contrast, an MLAT request is a direct request by the executive branch on behalf of a foreign power.

Nonetheless, the compelling government interests inherent in an MLAT request suggest that requests properly authorized ought receive deference similar to grand jury subpoenae, which are granted a presumption of regularity.  In re Grand Jury Proceedings, 814 F.2d 61, 71 (1st Cir. 1987) (describing the tension between grand jury independence and the court's role as watchdog to prevent prosecutorial abuse).  While the UK-MLAT and 18 U.S.C. § 3512 grant federal district judges the discretion to review MLAT requests, courts ought adopt a standard of review extremely deferential to requests under an MLAT.  Compare Blech, 208 F.R.D. at 68 ("The defense [] failed to show that the Government's request for witness interviews pursuant to the MLAT are an abuse of the MLAT process or are unfair so as to warrant the exercise of this Court's supervisory powers."), with In re Hampers, 651 F.2d 19, 23 (1st Cir. 1981) (suggesting that well-supported requests for grand jury subpoenae may be opposed on grounds of qualified privilege, but would be unlikely to be quashed); see also Zscherniq v. Miller, 389 U.S. 429, 432 (1968) ("[T]he Constitution entrusts [the field of foreign affairs] to the President and Congress.").

In devising a standard for review of grand jury subpoenae, the Supreme Court stated that its "task [was] to fashion an appropriate standard of reasonableness, one that gives due weight

to the difficult position of subpoena recipients but does not
impair the strong governmental interests" in grand juries.  R.
Enters., 498 U.S. at 300.  In the grand jury context, the burden
of proving unreasonableness is on the recipient of the subpoena,
and the motion to quash ought be denied "unless the district
court determines there is no reasonable possibility that the
category of materials the Government seeks will produce
information relevant to the general subject" of the
investigation.  Id. at 301.  In specific cases reviewing grand
jury subpoenae, courts have looked to the particular
circumstances in deciding what showing they would require from a
party challenging the government.  In re Grand Jury Proceedings,
814 F.2d at 71.  The kinds of showings courts require and the
remedies they consider vary greatly.  See id.; see also In re
Grand Jury Matters,  751 F.2d 13, 18 (1st Cir. 1984) ("In the
absence of privilege, courts normally will ask only whether the
materials requested are relevant to the investigation, whether
the subpoenas specify the materials to be produced with
reasonable particularity, and whether the subpoena commands
production of materials covering only a reasonable period of
time.").

     This Court therefore rules that the appropriate standard of
review is analogous to that used in reviewing grand jury
subpoenae.  There are thus strong factors in favor of the
government in any subpoena requested pursuant to an MLAT.  In

most MLAT cases, the information contained in the government's application for a commissioner or order pursuant to an MLAT will be sufficient to meet its burden and cause the court to approve the requested order or subpoena, subject to the court's review of constitutional issues and potential privilege.  Here Boston College asserts a privilege.

   **C.   Academic Privilege and the Need for Confidentiality**

   Boston College argues that the First Circuit recognizes protections for confidential academic research material and that these protections apply to the targets of the commissioner's subpoenae.  Mot. Quash 9-10 (citing <u>Cusumano</u> v. <u>Microsoft Corp.</u>, 162 F.3d 708 (1st Cir. 1998)).  The First Circuit has decided several cases regarding the issue of academic or journalistic confidentiality in the face of subpoenae.

      **1.   The Precedents**

   In three cases, the First Circuit explained the limits on the use of subpoenae to obtain confidential sources or information: <u>Cusumano</u> v. <u>Microsoft Corp.</u>, 162 F.3d 708, <u>United States</u> v. <u>LaRouche Campaign</u>, 841 F.2d 1176 (1st Cir. 1988), and <u>Bruno & Stillman, Inc.</u> v. <u>Globe Newspaper Co.</u>, 633 F.2d 583 (1st Cir. 1980).  These three cases require a "'heightened sensitivity' to First Amendment concerns and invite a 'balancing' of considerations."  <u>In re Special Proceedings</u>, 373 F.3d 37, 45 (1st Cir. 2004) (describing recent First Circuit precedents as "in principle somewhat more protective" than <u>Branzburg</u> First Amendment

34

protections (citing <u>Branzburg</u> v. <u>Hayes</u>, 408 U.S. 665 (1972))).   In

sum, the First Circuit's balancing approach prevents compulsory

disclosure of a reporter's confidential sources unless it is

"directly relevant to a nonfrivolous claim or inquiry undertaken

in good faith; and . . . where the same information is readily

available from a less sensitive source."   <u>Id.</u>

a.   <u><strong>Cusumano</strong></u> v. <u><strong>Microsoft Corp.</strong></u>

In <u>Cusumano</u> v. <u>Microsoft Corp.</u>, the First Circuit denied a

motion to compel two academic researchers to disclose interviews,

research materials and correspondence pursuant to a civil

subpoena.   162 F.3d at 717 (denying motion to compel under Federal

Rule of Civil Procedure 45).   The researchers in question had

interviewed employees of Netscape (a Microsoft competitor in the

internet browser market) for a then-unpublished book about the

"browser wars" that preceded civil antitrust charges against

Microsoft.   <u>Id</u>. at 711.   Microsoft sought the interviews and

related records through a civil subpoena on the ground that they

were necessary to its defense in the antitrust suit.   <u>Id.</u> at 712-

13.

Before denying the motion to compel, the First Circuit stated

that "[a]cademicians engaged in pre-publication research should be

accorded protection commensurate to that which the law provides

for journalists."   <u>Id.</u> at 714.   According protection commensurate

to that which the law provides for journalists is necessary

because the research of both journalists and academics raise

35

similar concerns about chilling speech.  Cusumano, 162 F.3d at
714.  For example, withholding protection from journalists would
chill speech, and "undermine their ability to gather and
disseminate information," while an academic "stripped of sources,
would be able to provide fewer, less cogent analyses."  Id. at
714.  A researcher's work would be deemed protected if the
researcher intended "'at the inception of the newsgathering
process' to use the fruits of his research 'to disseminate
information to the public.'"  Id. at 714 (quoting von Bulow by
Auersperg v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987)).  The
First Circuit held that the two researchers at issue in the case
were entitled to at least a "modicum of protection."  Id. at 715.

Protections for academics apply if the information in
question was confidential.  Id.  Both confidential sources and
confidential information deserve this protection, and
determinations of "how confidential" something must be are made in
view of the totality of the circumstances.  Id. at 715; see also
In re Bextra & Celebrex Mktg. Sales Practices and Prod. Liab.
Litig., 249 F.R.D. 8, 15 (D. Mass. 2008) (Sorokin, M.J.) (holding
a "very significant" interest in confidentiality tipped the scales
in favor of denying a motion to compel).  The First Circuit's
charge to district courts requires balancing "the potential harm
to the free flow of information that might result against the
asserted need for the requested information."  Cusumano, 162 F.3d
at 716 (holding that when "unthinking" approval of requests could

36

impinge on First Amendment rights, courts must use a balancing test (quoting <u>Bruno & Stillman</u>, 633 F.2d at 595-96)).

In <u>Cusumano</u>, the court preserved the confidentiality of the research materials in question because it found the researchers' needs outweighed that of Microsoft.  <u>Id.</u> at 716-17.  In particular, the First Circuit gave weight to evidence that Microsoft had access to the information through other means, including the time, ability and knowledge to directly subpoena individuals responsible for the information in question.  <u>Id.</u>  The court also accorded weight to the respondents' role as non-parties to the antitrust litigation for which Microsoft sought discovery. <u>Id.</u> at 717 ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").

Notably, the First Circuit continued to avoid the question of whether the protection afforded to journalists or academics is a privilege.  <u>Id.</u> at 716 (declining to decide whether there is a privilege, while noting that Judge Coffin in <u>Bruno & Stillman</u> similarly avoided the question).

### b.   <u>In re Special Proceedings</u>

The court seemingly answered this question for criminal cases in <u>In re Special Proceedings</u>, where it expressed skepticism that even a general reporter's privilege would exist in criminal cases absent "a showing of a bad faith purpose to harass."  373 F.3d 37, 45 (1st Cir. 2004).  In <u>In re Special Proceedings</u>, a

special prosecutor was appointed to investigate the leak and
publication of videos by an investigative television reporter.
Id. at 44.  As the videos were subject to a protective order
intended to protect a high profile grand jury investigation of
corruption (and therefore involved government prosecutors), the
district court appointed a special prosecutor to investigate the
disclosure and prosecute for criminal contempt any appropriate
persons.  Id. at 41.

After multiple interviews and depositions, the special
prosecutor concluded he had exhausted all other means of
obtaining the necessary information, and requested a subpoena
requiring the reporter's presence for a deposition.  Id.  The
reporter, James Taricani, claimed he had given his source a
pledge of confidentiality and refused to answer any questions
about his source for the tape.  Id. at 40.  The district court
subsequently held Taricani in civil contempt, id. at 41, and the
First Circuit affirmed, noting briefly that the information was
highly relevant to a criminal investigation, and reasonable
efforts had been made to obtain the information elsewhere.  Id.
at 45.

In rejecting Taricani's claim for a reporter's privilege,
the court relied in part on Branzburg v. Hayes, the landmark

opinion requiring newsmen to testify before grand juries.[13]  Id.
at 44-45 (citing Branzburg, 408 U.S. 665).  In re Special
Proceedings is analogous to the case before this Court because
the First Circuit also held that Branzburg governs cases
involving special prosecutors as well as grand juries.  Id. at
44-45 (citing McKevitt v. Pallasch, 339 F.3d 530, 531, 533 (7th
Cir. 2003); United States v. Smith, 135 F.3d 963, 971 (5th Cir.
1998); In Re Shain, 978 F.2d 850, 852 (4th Cir. 1992)).  In
particular, three factors from Branzburg cut against a privilege
when subpoenae are issued by a special prosecutor.  Id. at 44.
These factors are "the importance of criminal investigations, the
usual obligation of citizens to provide evidence, and the lack of
proof that news-gathering required such a privilege."  Id.  In
section II.B. above, this Court explained the similarities
between this UK-MLAT request and the grand jury.  See R. Enters.,
498 U.S. at 298; Blech, 208 F.R.D. 65, 67.

---

[13] As one scholar noted:

> While courts have consistently declined to confer
> privileged status upon the gathering of news, they have
> rejected many subpoenas – some because they were
> excessively burdensome, others because the nexus was not
> firmly established between the information and the
> party's needs, and still others because the information
> could be obtained through alternative and less intrusive
> channels. Thus, over the years, journalists have fared
> far better than anyone reading only the Branzburg
> decision could have expected.

Robert M. O'Neil, A Researcher's Privilege: Does Any Hope
Remain?, 59 Law & Contemp. Probs. 35, 44 (1996).

Nonetheless, the court in <u>In re Special Proceedings</u> applied both the <u>Branzburg</u> and <u>Cusumano</u> balancing tests to the special prosecutor's motion to compel.  373 F.3d at 45 (acknowledging First Circuit precedents as "in principle somewhat more protective" than <u>Branzburg</u> First Amendment protections). Accordingly, <u>Branzburg</u> and its First Circuit progeny also govern this case which involves a commissioner.

c.   <b><u>In Camera</u> Review</b>

In its first motion to quash, Boston College proposed an <u>in camera</u> inspection of the Dolours Price interviews.  Mot. Quash 16.  <u>In camera</u> review is one method by which courts respond to First Amendment concerns.  <u>LaRouche</u>, 841 F.2d at 1183.  In <u>Larouche</u>, the First Circuit encouraged district courts to conduct <u>in camera</u> reviews in criminal cases where one party seeks to compel evidence from journalists.  <u>Id.</u>; <u>accord</u> <u>Cusumano</u>, 162 F.3d at 717 (approving the district court's decision to reserve the right to view materials <u>in camera</u>).  By requiring an <u>in camera</u> review, this Court may balance the competing interests, and limit the chilling effect on researchers.  <u>Larouche</u>, 841 F.2d at 1183.

2.   <b>Boston College's Claim for Protection</b>

This Court agrees that subpoenae targeting confidential academic information deserve heightened scrutiny.  "The Supreme Court has recognized that '[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendental value to all of us.'"  <u>Asociación de Educación Privada de P.R., Inc.</u> v.

40

García-Padilla, 490 F.3d 1, 8 (1st Cir. 2007) (quoting Keyishian
v. Board of Regents of Univ. of State of N.Y., 385 U.S. 589, 603
(1967)).

### a.   Threshold Questions

The First Circuit requires this Court to ensure that any
compulsory disclosure is "directly relevant to a nonfrivolous
claim or inquiry undertaken in good faith." In re Special
Proceedings, 373 F.3d at 45.  Nor can materials be compelled if
they are "readily available from a less sensitive source,"
although the party seeking compulsion does not need to exhaust
non-confidential sources. Id.  This Court, having reviewed the
government's submissions on the public record and under seal, as
well as Boston College's affidavits and motions, is confident the
subpoenae are in good faith, and relevant to a nonfrivolous
criminal inquiry.  Nor are the materials readily available from a
less sensitive source. See Mot. Quash 5-7 (explaining that the
Belfast Project research only exists due to the strictest
assurances and beliefs in confidentiality).  For example,
publicly released statements by Belfast Project interviewee
Brendan Hughes include a statement that he admitted his
affiliation with the Irish Republican Army for the first time
only because of his personal trust in Project interviewer Anthony
McIntyre.  Jim Dwyer, Secret Archive of Ulster Troubles Faces
Subpoena, N.Y. Times, May 13, 2011, at ¶ 18, ECF No. 7-4.

This Court must analyze whether the information at issue is

confidential and therefore merits protection by examining the totality of the circumstances.  <u>Cusumano</u>, 162 F.3d at 715.  Prior to the start of the Belfast Project, Boston College and Robert K. O'Neill acknowledged the legal limits of promises of confidentiality.  These statements do not minimize the numerous steps taken by Boston College to preserve the confidentiality of the materials once received.  Overall, the facts of this case indicate that Boston College considered the interviews and content of the Belfast Project to be confidential.

Satisfied that these threshold conditions are met, this Court then turns to balancing the government's need for the requested information against the potential harm to the free flow of information.  The resolution of such disputes "depends heavily on the particular circumstances of the case."  <u>Lovejoy</u> v. <u>Town of Foxborough</u>, No. Civ.A.00-11470-GAO, 2001 WL 1756750, at *1 (D. Mass. Aug. 2, 2001) (O'Toole, J.).

### b.   The Need for the Information

The subpoenae in question were issued by the commissioner appointed by this Court pursuant to 18 U.S.C. § 3512 and the UK-MLAT.  The UK-MLAT is a binding federal law.  U.S. Const. art. VI, cl. 2.  <u>See</u> <u>Medellin</u>, 552 U.S. at 505.  The terms of the UK-MLAT obligate the United States executive branch to provide assistance to the United Kingdom for criminal proceedings.  UK-MLAT art. 1, ¶ 1 ("The parties <u>shall</u> provide mutual assistance, in accordance with the provisions of this Treaty.") (emphasis

added).  The designated Central Authority of the Requested Party

(in this case, the United States Attorney General) may only

refuse assistance for certain specific reasons, such as when the

request "would impair its sovereignty, security, or other

essential interest or would be contrary to important public

policy."[14]  Id. art. 3, ¶ 1(a).  The Attorney General found no

reason to deny the United Kingdom's request in this case.

Gov't's First Opp'n 8.  Unlike the motion to compel, the

executive decision that the request is not subject to a specific

limitation is not reviewable by this Court.  See UK-MLAT art. 1,

¶ 3.  The Treaty explicitly prohibits persons from whom records

are being sought from opposing a request based on the substantive

and procedural requirements of articles 3 or 4.  Id.  See UK-MLAT

---

[14] The text of the UK-MLAT includes several limitations on
requests:

ARTICLE 3 Limitations on Assistance
1.   The Central Authority of the Requested Party may
     refuse assistance if:
   (a) the Requested Party is of the opinion that the
       request, if granted, would impair its sovereignty,
       security, or other essential interests or would be
       contrary to important public policy;
   (b) the request relates to an offender who, if
       proceeded against in the Requested Party for the
       offence for which assistance is requested, would be
       entitled to be discharged on the grounds of a
       previous acquittal or conviction; or
   (c) the request relates to an offence that is regarded
       by the Requested Party as:
       (i) an offence of a political character; or
       (ii) an offence under military law of the Requested
       Party which is not also an offence under the
       ordinary criminal law of the Requested Party.

Technical Analysis, S. Exec. Rep. No. 104-23, at 14 ("Thus, a person from whom records are sought may not oppose the execution of the request by claiming that it does not comply with the Treaty's formal requirements, such as those specified in article 4, or the substantive requirements set out in article 3.").  The Treaty obligations are strong enough that a party nation cannot refuse assistance under the UK-MLAT even when the volume of requests from one party is unreasonable.[15]  Id. at 28.

These legal commitments that the United States made in approving the Treaty coincide with the general legal rule preventing journalistic or academic confidentiality from impeding criminal investigations.  See Branzburg, 408 U.S. at 692 (rejecting "the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it"); United States v. Smith, 135 F.3d 963, 971 (5th Cir. 1998) ("Branzburg will protect the press if the government attempts to harass it.  Short of such harassment, the media must bear the same burden of producing evidence of criminal wrongdoing as any other citizen.").  "'[T]he public . . . has a right to every man's

---

[15] The United States delegation agreed that consultations between Central Authorities would be appropriate in such circumstances, but did not agree that this was adequate grounds to refuse formal requests that do not fall under article 3.  UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23, at 28.

evidence,' except for those persons protected by a
constitutional, common-law, or statutory privilege." United
States v. Nixon, 418 U.S. 683, 709 (1974) (quoting Branzburg, 408
U.S. at 688).  Here, there is no recognized privilege.  In re
Special Proceeding, 373 F.3d at 44-45.

As the subpoenae state, the information is sought in
reference to alleged violations of the laws of the United
Kingdom, namely murder, conspiracy to murder, incitement to
murder, aggravated burglary, false imprisonment, kidnapping, and
causing grievous bodily harm with intent to do grievous bodily
harm.  Mot. Quash 2.  Although there is no principle of dual
criminality in MLAT requests, the crimes being investigated are
also recognized in the United States.  See UK-MLAT Technical
Analysis, S. Exec. Rep. No. 104-23, at 15.  These are serious
allegations and they weigh strongly in favor of disclosing the
confidential information.

### c.    Harm to the Free Flow of Information

In general, the compelled disclosure of confidential
research does have a chilling effect.  LaRouche, 841 F.2d at 1181
("[D]isclosure of such confidential material would clearly
jeopardize the ability of journalists and the media to gather
information and, therefore, have a chilling effect on speech.").
Boston College may therefore be correct in arguing that the grant
of these subpoenae will have a negative effect on their research
into the Northern Ireland Conflict, or perhaps even other oral

history efforts.  United States v. Doe, 460 F.2d 328, 333 (1st
Cir. 1972) ("His privilege, if it exists, exists because of an
important public interest in the continued flow of information to
scholars about public problems which would stop if scholars could
be forced to disclose the sources of such information."); see
Branzburg, 408 U.S. at 693 ("The argument that the flow of news
will be diminished by compelling reporters to aid the grand jury
in a criminal investigation is not irrational.").  In an
affidavit submitted on behalf of Boston College, the past
president of the Oral History Association warned of a fear of
reprisals that could impoverish future oral history projects.
Mot. Quash, Ex. 3, Aff. Clifford M. Kuhn 2, ECF No. 5-3.

     In opposition, the government argues that compelling
production in this unique case is unlikely to "threaten the vast
bulk of confidential relationships" between academics and their
sources.  See Branzburg, 408 U.S. at 691.  It bears noting that
there would be no harm to the free flow of information related to
the Belfast Project itself because the Belfast Project stopped
conducting interviews in May 2006.  See Aff. Moloney 9.
Additionally, while a compelled disclosure here might be
premature under the terms of the Belfast Project confidentiality
agreements, the Burns Library's original intent was to
disseminate this information.  Id. at 8.  That process has
already begun, as Moloney published a book and television

46

documentary using two interviews from the Belfast Project in
2010.  Id. at 1, 9.

### D.  Motion to Intervene

Ed Moloney and Anthony McIntyre move to intervene pursuant
to Federal Rule of Civil Procedure 24(a) or (b).  Mot. Leave
Intervene 1-3, ECF No. 18.  These intervenor applicants claim an
interest in view of their duty of confidentiality to their
sources and their personal safety and that of their sources.  Id.
Courts must permit intervention as of right in two scenarios:
either when an applicant is given an unconditional right to
intervene by a federal statute, or when an applicant claims an
interest relating to the action that may impair or impede the
applicant's ability to protect its interest, "unless existing
parties adequately represent that interest."  Fed. R. Civ. P.
24(a); Ungar v. Arafat, 634 F.3d 46, 50-51 (1st Cir. 2011).
Here, Moloney and McIntyre do not have a federal statutory right,
and the UK-MLAT prohibits them from challenging the Attorney
General's decisions to pursue the MLAT request.  UK-MLAT art. 1,
¶ 3.  Without devoting discussion to the rule that "[a]n interest
that is too contingent or speculative . . . cannot furnish a
basis for intervention as of right," Arafat, 634 F.3d at 50-51
(citations omitted), this Court concludes that Boston College
adequately represents any potential interests claimed by the
Intervenors.  Boston College has already argued ably in favor of
protecting Moloney, McIntyre and the interviewees.

III. **CONCLUSION**

In this case, this Court must weigh significant interests on each side.  The United States government's obligations under the UK-MLAT as well as the public's interest in legitimate criminal proceedings are unquestioned.  The Court also credits Boston College and the Burns Library's attempts to ensure the long term confidentiality of the Belfast Project, as well as the potential chilling effects of a summary denial of the motion to quash on academic research.  With such significant interests at stake, the Court will undertake an in camera review of the interviews and materials responsive to the commissioner's subpoenae.

This Court DENIES the motions of the Trustees of Boston College to quash the commissioner's subpoenae, ECF Nos. 5, 12, and GRANTS Boston College's request for in camera review of materials responsive to the subpoenae to the Court.  This Court ORDERS Boston College to produce copies of all materials responsive to the commissioner's subpoenae to this Court for in camera review by noon on December 21, 2011, thus allowing time for Boston College to request a stay from the Court of Appeals. Absent a stay, this Court promptly will review the materials in camera and enter such further orders as justice may require.

The Court DENIES both the motion to intervene as of right and the motion for permissive intervention under Federal Rule of Civil Procedure 24(b).  ECF No. 18.

48

SO ORDERED.

/s/ William G. Young
William G. Young
District Judge